Unsealed on 7/23/10

~~SEALED~~

10 JUL 22 PM 4:50

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| | ) Magistrate Case No. **10MJ2489** |
| v. | ) |
| | ) COMPLAINT FOR VIOLATION OF |
| ARMANDO VILLAREAL HEREDIA (1), | ) |
| aka Gordo, | ) Title 18, U.S.C., Sec. 1962(d) - |
| aka Gordo Villareal, | ) Conspiracy to Conduct Enterprise |
| RUBEN DARIO CASTRO PEREZ (2), | ) Affairs Through A Pattern of |
| aka Compadre, | ) Racketeering Activity |
| aka Choques, | ) |
| IVAN CANDELARIO | ) |
| MAGANA HEREDIA (3), | ) |
| aka Soldado, | ) |
| JOSE ALFREDO NAJERA GIL (4), | ) |
| CARLOS COSME (5), | ) |
| MARIO ESCAMILLA (6), | ) |
| aka Unico, | ) |
| IGNACIO ESCAMILLA ESTRADA (7), | ) |
| aka Uno, | ) |
| aka Senor, | ) |
| FAUSTO ESCAMILLA ESTRADA(8), | ) |
| aka Taliban, | ) |
| EDGAR GUSTAVO ESCAMILLA (9), | ) |
| aka Dies, | ) |
| JESUS QUINONES MARQUEZ (10), | ) |
| aka Rinon, | ) |
| JOSE ANTONIO ORTEGA NUNO (11), | ) |
| EDGAR LOPEZ DE-ANDA DAHER (12), | ) |
| aka Pollito, | ) |
| JOSE ALEJANDRO FLORES MEZA (13), | ) |
| aka Shakira, | ) |
| ALICIA MARTINEZ (14), | ) |
| aka Comadre, | ) |
| JUAN CARLOS MAGANA HEREDIA (15), | ) |
| OSCAR DANIEL MONTOYA MORA (16), | ) |
| JORGE ALBERTO PONCE (17), | ) |
| aka Betote, | ) |
| OMAR MARTINEZ (18), | ) |
| aka Nino, | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

```
 1 │ JONATHAN VALLE (19),                )
   │   aka Reaper,                       )
 2 │ ARMANDO CASTILLO (20),              )
   │   aka Choco,                        )
 3 │ MIKAEL DANIEL BLASER (18),          )
   │   aka Troubles,                     )
 4 │ ENRIQUE SALINAS, JR. (22),          )
   │   aka Playboy,                      )
 5 │ RAUL MORENO (23),                   )
   │   aka Flaco,                        )
 6 │ MIGUEL SORIA (24),                  )
   │   aka Mikey,                        )
 7 │ PERLA CAROLINA JIMENEZ (25),        )
   │   aka P,                            )
 8 │ LUZ MARIA BENAVIDEZ                 )
   │         MARTINEZ (26),              )
 9 │   aka Araceli,                      )
   │ BRIDGETTE REYNOSO (27),             )
10 │   aka B,                            )
   │ JORGE HUMBERTO LORA (28),           )
11 │   aka Georgie,                      )
   │ CHRISTOPHER ADRIAN RUIZ (29),       )
12 │   aka Sneaky,                       )
   │ RICHARD GILBERT FAVELA (30),        )
13 │   aka Tiny,                         )
   │ HUMBERTO TORRES MENDOZA (31),       )
14 │   aka Tito,                         )
   │ JUAN CARLOS RIQUE AGUIRRE (32),     )
15 │   aka JC,                           )
   │ TELLE KRESCHMER (33),               )
16 │ HECTOR MONTES (34),                 )
   │   aka Toxic,                        )
17 │   aka Little Spikey,                )
   │ JOSE CONTRERAS (35),                )
18 │   aka Pepe,                         )
   │   aka Dandi,                        )
19 │ HASSAIN ALZUBAIDY (36),             )
   │   aka Arab,                         )
20 │ IVAN MORA (37),                     )
   │ ULISES VALENZUELA (38),             )
21 │ BENJAMIN AVENDANO (39),             )
   │   aka Peso,                         )
22 │ JENNIFER ESCAMILLA (40),            )
   │ ARACELI VARELA (41),                )
23 │   aka Uvia,                         )
   │ ROCIO LOPEZ (42),                   )
24 │ KEVIN LUIS (43),                    )
   │   aka Listo,                        )
25 │                                     )
   │              Defendants.            )
26 │ ─────────────────────────────────── )
```

27     The undersigned complainant being duly sworn states:

28 //

2

**THE ENTERPRISE**

1. At various times material to this complaint:

    a.   Defendants ARMANDO VILLAREAL HEREDIA, aka Gordo, aka Gordo Villareal, RUBEN DARIO CASTRO PEREZ, aka Compadre, aka Choques, IVAN CANDELARIO MAGANA HEREDIA, aka Soldado, JOSE ALFREDO NAJERA GIL, CARLOS COSME, MARIO ESCAMILLA, aka Unico, IGNACIO ESCAMILLA ESTRADA, aka Uno, aka Senor, FAUSTO ESCAMILLA ESTRADA, aka Taliban, EDGAR GUSTAVO ESCAMILLA, aka Dies, JESUS QUINONES MARQUEZ, aka Rinon, JOSE ANTONIO ORTEGA NUNO, EDGAR LOPEZ DE-ANDA DAHER, aka Pollito, JOSE ALEJANDRO FLORES MEZA, aka Shakira, ALICIA MARTINEZ, aka Comadre, JUAN CARLOS MAGANA HEREDIA, OSCAR DANIEL MONTOYA MORA, JORGE ALBERTO PONCE, aka Betote, MIKAEL DANIEL BLASER, aka Troubles, JONATHAN VALLE, aka Reaper, ARMANDO CASTILLO, aka Choco, OMAR MARTINEZ, aka Nino, ENRIQUE SALINAS, JR., aka Playboy, RAUL MORENO, aka Flaco, MIGUEL SORIA, aka Mikey, PERLA CAROLINA JIMINEZ, aka P, LUZ MARIA BENAVIDEZ MARTINEZ, aka Araceli, BRIDGETTE REYNOSO, aka B, JORGE HUMBERTO LORA, aka Georgie, CHRISTOPHER ADRIAN RUIZ, aka Sneaky, RICHARD GILBERT FAVELA, aka Tiny, HUMBERTO TORRES MENDOZA, aka Tito, JUAN CARLOS RIQUE AGUIRRE, aka JC, TELLE KRESCHMER, HECTOR MONTES, aka Toxic, aka Little Spikey, JOSE CONTRERAS, aka Pepe, aka Dandi, HASSAIN ALZUBAIDY, aka Arab, IVAN MORA, ULISES VALENZUELA, BENJAMIN AVENDANO, aka Peso, JENNIFER ESCAMILLA, ARACELI VARELA, aka Uvia, ROCIO LOPEZ, KEVIN LUIS, aka Listo (collectively "Defendants"), and others known and unknown to the grand jury, were members and associates of an organization known as the "Fernando Sanchez Organization" ("FSO"), whose members engaged in, among other things, murder, conspiracy to commit murder, attempted murder, kidnaping, conspiracy to kidnap, attempted kidnaping, robbery, conspiracy to commit robbery, attempted robbery, importation

3

of controlled substances into the United States from Mexico, conspiracy to import controlled substances into the United States from Mexico, distribution of controlled substances, conspiracy to distribute controlled substances, money laundering and conspiracy to launder money.  At all relevant times, this organization operated in the Southern District of California and elsewhere.  The organization and the individuals who associate with it for criminal purposes constitute an "Enterprise," as defined by Title 18, United States Code, Section 1961(4) (hereinafter the "Enterprise"), that is, a group of individuals associated in fact.  The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for the common purpose of achieving the objectives of the Enterprise.  The Enterprise was engaged in, and its activities affected, interstate and foreign commerce.

### THE RACKETEERING CONSPIRACY

2.   Beginning in or about November 2008, and continuing up to and including July 20, 2010, within the Southern District of California and elsewhere, defendants ARMANDO VILLAREAL HEREDIA, aka Gordo, aka Gordo Villareal, RUBEN DARIO CASTRO PEREZ, aka Compadre, aka Choques, IVAN CANDELARIO MAGANA HEREDIA, aka Soldado, JOSE ALFREDO NAJERA GIL, CARLOS COSME, MARIO ESCAMILLA, aka Unico, IGNACIO ESCAMILLA ESTRADA, aka Uno, aka Senor, FAUSTO ESCAMILLA ESTRADA, aka Taliban, EDGAR GUSTAVO ESCAMILLA, aka Dies, JESUS QUINONES MARQUEZ, aka Rinon, JOSE ANTONIO ORTEGA NUNO, EDGAR LOPEZ DE-ANDA DAHER, aka Pollito, JOSE ALEJANDRO FLORES MEZA, aka Shakira, ALICIA MARTINEZ, aka Comadre, JUAN CARLOS MAGANA HEREDIA, OSCAR DANIEL MONTOYA MORA, JORGE ALBERTO PONCE, aka Betote, MIKAEL DANIEL BLASER, aka Troubles, JONATHAN VALLE, aka Reaper, ARMANDO CASTILLO, aka Choco, OMAR

4

1  MARTINEZ, aka Nino, ENRIQUE SALINAS, JR., aka Playboy, RAUL MORENO,

2  aka Flaco, MIGUEL SORIA, aka Mikey, PERLA CAROLINA JIMINEZ, aka P, LUZ

3  MARIA BENAVIDEZ MARTINEZ, aka Araceli, BRIDGETTE REYNOSO, aka B, JORGE

4  HUMBERTO LORA, aka Georgie, CHRISTOPHER ADRIAN RUIZ, aka Sneaky,

5  RICHARD GILBERT FAVELA, aka Tiny, HUMBERTO TORRES MENDOZA, aka Tito,

6  JUAN CARLOS RIQUE AGUIRRE, aka JC, TELLE KRESCHMER, HECTOR MONTES, aka

7  Toxic, aka Little Spikey, JOSE CONTRERAS, aka Pepe, aka Dandi, HASSAIN

8  ALZUBAIDY, aka Arab, IVAN MORA, ULISES VALENZUELA, BENJAMIN AVENDANO,

9  aka Peso, JENNIFER ESCAMILLA, ARACELI VARELA, aka Uvia, ROCIO LOPEZ,

10 KEVIN LUIS, aka Listo, and others known and unknown to the grand jury,

11 being persons employed by and associated with the Enterprise (as

12 defined above), which Enterprise was engaged in, and the activities

13 of which affected interstate and foreign commerce, did knowingly and

14 intentionally conspire with each other, and with other persons, to

15 violate Title 18, United States Code, Section 1962(c), that is, to

16 conduct and participate, directly and indirectly, in the conduct of

17 the Enterprise's affairs through a pattern of racketeering activity

18 involving multiple acts indictable under State law and punishable by

19 imprisonment for more than one year and the following provisions of

20 federal law:

21        a.    California Penal Code, Sections 31 and 187(a) (murder
22              and aiding and abetting murder);

23        b.    California Penal Code, Sections 182 and 187(a)
24              (conspiracy to commit murder);

25        c.    California Penal Code, Sections 664 and 187(a)
26              (attempted murder);

27        d.    California Penal Code, Sections 31 and 207(a)
28              (kidnaping and aiding and abetting kidnaping);

e. California Penal Code, Sections 182 and 207(a) (conspiracy to kidnap);

f. California Penal Code, Sections 664 and 207(a) (attempted kidnaping);

g. California Penal Code, Section 211 (robbery);

h. California Penal Code, Sections 182 and 211 (conspiracy to commit robbery);

i. California Penal Code, Sections 664 and 211 (attempted robbery);

j. Title 21, United States Code, Sections 952 and 960 (importation of a controlled substances);

k. Title 21, United States Code, Sections 952, 960 and 963 (conspiracy to import controlled substances);

l. Title 21, United States Code, Section 841(a)(1) (distribution of controlled substances);

m. Title 21, United States Code, Sections 846 and 841(a)(1) (conspiracy to distribute controlled substances);

n. Title 18, United States Code, Section 1957 (money laundering); and

o. Title 18, United States Code, Sections 1956(h) and 1957 (conspiracy to launder money).

3. It was a further part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the Enterprise.

In violation of Title 18, United States Code, Section 1962(d).

\\

And the complainant states that this complaint is based on the attached affidavit, which is incorporated herein by reference.

CHRISTOPHER S. MELZER
Special Agent, Federal
Bureau of Investigation

Sworn to before me and subscribed in my presence, July 20, 2010.

HON. RUBEN B. BROOKS
United States Magistrate Judge
Southern District of California

1

## **AFFIDAVIT IN SUPPORT OF APPLICATION**

2      I, CHRISTOPHER S. MELZER, being duly sworn, declare and state:

3                              **INTRODUCTION**

4      1.      I am an investigative or law enforcement officer of the United States within the

5 meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the

6 United States who is empowered by law to conduct investigations of, and to make arrests for,

7 offenses enumerated in Title 18, United States Code, Section 2516.

8      2.      I am a Special Agent of the Federal Bureau of Investigation ("FBI") and been so

9 employed since July 2005. I am currently assigned to the FBI Cross Border Violence Task

10 Force ("CBVTF") in the San Diego Field Division. I have been assigned to the CBVTF for

11 approximately one year. My duties include the investigation and apprehension of individuals

12 involved in drug-related violent crime. Those crimes include homicide, kidnaping, extortion,

13 assault, robbery, drug trafficking, money laundering, and conspiracy to commit those crimes.

14 Prior to my current assignment I spent approximately three years on the Major Mexican

15 Traffickers Strike Force where I investigated cartel-related drug trafficking matters.

16      3.      I have received approximately 20 weeks of training at the FBI Academy in

17 Quantico, Virginia, and numerous hours of post academy training. During that training, I

18 learned how criminal enterprises are structured and how they operate. I also learned how

19 controlled substances are manufactured, consumed, packaged, marketed and distributed.

20      4.      As a Special Agent, I have performed various tasks which include, but are not

21 limited to:

22            a.      Functioning as a surveillance agent and thereby observing and recording

23 movements of persons trafficking in illegal drugs and weapons, and those suspected of

24 committing violent crimes and trafficking in illegal drugs and weapons;

25            b.      Tracing monies and assets gained by drug traffickers from the illegal sale

26 of drugs and weapons (laundering of monetary instruments);

27            c.      Interviewing witnesses, cooperating individuals, and informants relative

28 to the violent acts, illegal trafficking of drugs, and the distribution of monies and assets derived

from illegal trafficking of drugs (laundering of monetary instruments); and

d.      Supervising, as a case agent/co-case agent, specific investigations involving kidnaping, trafficking of drugs, and the laundering of monetary instruments.

### BASIS FOR CONCLUSIONS AND SOURCES OF INFORMATION

5.      My training and experience as a Special Agent of the FBI, and my conversations with other Special Agents of the FBI, Drug Enforcement Administration ("DEA"), California Department of Justice ("CALDOJ"), Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), Parole Special Investigative Unit Special Agents, Immigration and Customs Enforcement ("ICE"), detectives and officers of the San Diego, Chula Vista, and National City Police Departments ("SDPD," "CVPD," "NCPD" respectively), detectives and officers of the San Diego County Sheriff's Office ("SDSO"), and numerous other local investigators familiar with violent crime, narcotics trafficking, gang activity, and money laundering matters, form the basis of the opinions and conclusions set forth below, which I drew from the facts set forth herein.

6.      I make this affidavit, in part, based on personal knowledge derived from my participation in this investigation and, in part, based upon information from the following sources:

a.      Oral and written reports about this investigation which I have reviewed;

b.      Physical surveillance conducted by federal agents or local law enforcement agents, which observations have been reported to me either directly or indirectly;

c.      A review of pen register and telephone airtime and call records;

d.      Summaries of conversations and electronic communications intercepted pursuant to court-authorized electronic surveillance orders;

e.      A review of consensually recorded conversations; and

f.      Statements of cooperating individuals.

7.      Except as otherwise noted, the information set forth in this affidavit has been provided to me by FBI agents, multi-agency federal, state, and local drug/gang task force officers.  Unless otherwise noted, whenever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer (who may have had

either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I have read and reviewed.  Likewise, information resulting from surveillance, except where otherwise indicated, does not necessarily set forth my own observations but rather has been provided directly or indirectly by other law enforcement officers who conducted such surveillance.  In this affidavit I have also included, where appropriate, my interpretation of intercepted telephone calls in parenthesis and/or brackets.  Those interpretations are based upon my training and experience, conversations I have had with other law enforcement officers familiar with this investigation, as well as my personal participation in this investigation.

8.      Because this affidavit is being submitted for the limited purpose of seeking the arrest and search warrants specified below, I have not set forth each and every fact learned during the course of this investigation.  Rather, I have set forth only those facts that I believe are necessary to establish probable cause for the requested warrants.

## FORMAT OF THIS AFFIDAVIT

9.      I submit this affidavit for a dual purpose: (1) the issuance of arrest warrants based upon a criminal complaint alleging a conspiracy to conduct enterprise affairs through a pattern of racketeering activity, a violation to Title 18, United States Code, Section 1962(d) (hereinafter "RICO conspiracy"); and (2) the issuance of search warrants for the locations specified below.

10.      In furtherance of that dual purpose, I have divided this affidavit into six sections.  First, in the section captioned "Requested Arrest Warrants," I set forth the names and other identifying information regarding the individuals for whom I am seeking arrest warrants (collectively referred to as the "Target Subjects").   Second, in the section captioned "Requested Search Warrants," I list the addresses of the properties for which I am requesting search warrants. Third, in the section captioned "Probable Cause," I set forth those facts and circumstances which I believe establish the probable cause necessary for the Court to issue the requested criminal complaint, arrest warrants and search warrants. Fourth, in the section captioned "Target Subjects - Summary Of Probable Cause," I provide the Court with a brief summary of each Target Subject's involvement in the RICO conspiracy. Fifth, in the section

3

captioned "Search Location Summary," I set forth a summary of the facts and circumstances which I believe establish the probable cause necessary for the Court to issue the requested search warrants.  Finally, in the section captioned "Items To Be Seized," I set forth the basis for seizing the items requested in the search warrant applications.

### REQUESTED ARREST WARRANTS

11.     I respectfully submit that the facts set forth in this affidavit demonstrate that there is probable cause to believe that the Target Subjects knowingly and intentionally participated in a RICO conspiracy, a violation of Title 18, United States Code, Section 1962(d).  The Target Subjects are identified as follows:

a.      Armando VILLAREAL HEREDIA has been identified as a Hispanic male, DOB 1/17/1978, and currently resides in Guadalajara, Mexico.  A criminal history check for VILLAREAL HEREDIA reveals that he has the following convictions and/or arrests:  a 1996 arrest for alien smuggling and a 2000 arrest for possession of a controlled substance for sale.

b.      Ruben Dario CASTRO PEREZ has been identified as a Hispanic male, DOB 4/16/1975, 5'7" in height, 140 pounds, and is currently in federal custody in the Southern District of California for immigration-related charges.  A criminal history check for CASTRO PEREZ reveals that he has the following convictions and/or arrests:  a 1997 felony conviction for possession of a controlled substance for sale and a 2010 arrest for illegal re-entry after deportation.

c.      Ivan Candelario MAGANA HEREDIA has been identified as a Hispanic male, DOB 2/14/1977, 6'0" in height, 160 pounds, and is currently in Guadalajara, Mexico.  A criminal history check for MAGANA HEREDIA reveals that he has the following convictions and/or arrests:  a 2000 felony conviction for possession of a controlled substance and a 1998 arrest for conspiracy to distribute a controlled substance.

d.      Jose Alfredo NAJERA GIL has been identified as a Hispanic male, DOB 5/23/1977, and currently resides in Tijuana, Mexico.  A criminal history check for NAJERA GIL reveals that he does not have any prior convictions and/or arrests.

1          e.      Carlos COSME has been identified as a Hispanic male, DOB 12/11/1975,

2    6'1" in height, 200 pounds, and currently resides at 2198 Cabo Bahia, Chula Vista, California,

3    91914.   A criminal history check for COSME reveals that he does not have any prior

4    convictions and/or arrests.

5          f.      Mario ESCAMILLA has been identified as a Hispanic male, DOB

6    11/12/1980, 5'"11 in height, 175 pounds, and is currently in California state custody in

7    Donovan state prison following a parole violation.   A criminal history check for Mario

8    ESCAMILLA reveals that he has the following convictions and/or arrests: a 1999 felony

9    conviction for possession of a controlled substance; a 1999 misdemeanor conviction for

10   battery; a 2002 felony conviction for robbery; and arrests in 2001, 2002, and 2008 for alien

11   smuggling.

12         g.      Ignacio ESCAMILLA ESTRADA has been identified as a Hispanic male,

13   DOB 8/15/1961, 5'7" in height, 180 pounds, and currently resides in Tijuana, Mexico.  A

14   criminal history check for ESCAMILLA ESTRADA reveals that he has the following convictions

15   and/or arrests: a 1985 felony conviction for alien smuggling; a 1991 felony conviction for alien

16   smuggling; a 1999 misdemeanor conviction for battery; a 1993 arrest for alien smuggling; a

17   1995 arrest for a lewd act with a child; and a 1995 arrest for alien smuggling.

18         h.      Fausto ESCAMILLA has been identified as a Hispanic male, DOB

19   6/5/1985, 5'9" in height, 165 pounds, and is currently in Mexican custody in El Hongo

20   penitentiary, near Tecate, Mexico.  A criminal history check for Fausto ESCAMILLA reveals

21   that he has the following convictions and/or arrests:  a 2003 felony conviction for robbery and

22   a 2005 felony conviction for threatening a crime with the intent to terrorize.

23         i.      Edgar GUSTAVO ESCAMILLA has been identified as a Hispanic male,

24   DOB 11/5/1981, 5'9" in height, 240 pounds, and is currently in Mexican custody in El Hongo

25   penitentiary near Tecate, Mexico.   A criminal history check for GUSTAVO ESCAMILLA

26   reveals that he has the following convictions and/or arrests: a 2000 arrest for alien smuggling;

27   a 2003 arrest for battery resulting in serious injury; and a 2003 arrest for alien smuggling.

28

1         j.      Jesus Quinones MARQUEZ has been identified as a Hispanic male, DOB
2 6/2/1961, and currently resides in Tijuana, Mexico. A criminal history check for MARQUEZ
3 reveals that he does not have any prior convictions and/or arrests.

4         k.      Jesus Antonio ORTEGA NUNO has been identified as a Hispanic male,
5 DOB 3/27/1966, and currently resides in Tijuana, Mexico. A criminal history check for
6 ORTEGA NUNO reveals that he does not have any prior convictions and/or arrests.

7         l.      Edgar Lopez De-ANDA DAHER has been identified as a Hispanic male,
8 DOB 9/28/1981, 5'11", 160 pounds, and currently resides in Tijuana, Mexico. A criminal
9 history check for De-ANDA DAHER reveals that he has the following convictions and/or
10 arrests: a 2010 arrest for possession of a controlled substance.

11         m.      Jose Alejandro FLORES MEZA has been identified as a Hispanic male
12 who currently resides in Tijuana, Mexico. A criminal history check for FLORES MEZA reveals
13 that he does not have any prior convictions and/or arrests.

14         n.      Alicia MARTINEZ has been identified as a Hispanic female, DOB
15 10/26/1976, 5'5" in height, 180 pounds, and currently resides at 4808 Windsurf Way, #369,
16 San Diego, California, 92154. A criminal history check for MARTINEZ reveals that she does
17 not have any prior convictions and/or arrests.

18         o.      Juan Carlos MAGANA HEREDIA has been identified as a Hispanic male,
19 DOB 6/3/1981, 6'1", 235 pounds, and is currently in federal custody in the Southern District
20 of California for drug trafficking charges. A criminal history check for MAGANA HEREDIA
21 reveals that he has the following convictions and/or arrests: a 2005 felony conviction for
22 possession of a controlled substance; a 2007 felony conviction for possession of a controlled
23 substance; and a 2006 arrest for petty theft.

24         p.      Oscar Daniel MONTOYA MORA has been identified as a Hispanic male,
25 DOB 9/21/1981, and currently resides in Tijuana, Mexico. A criminal history check for
26 MONTOYA MORA reveals that he does not have any prior convictions and/or arrests.

27

28

1       q.     Jorge Alberto PONCE has been identified as a Hispanic male who

2   currently resides in Tijuana, Mexico. A criminal history check for PONCE reveals that he does

3   not have any prior convictions and/or arrests.

4       r     Omar MARTINEZ has been identified as a Hispanic male, DOB

5   11/24/1990, 5'1" in height, 115 pounds, CDL # X7578100, and currently resides at 4028 Delta

6   Street, #1, San Diego, California, 92113. A criminal history check for MARTINEZ reveals that

7   he does not have any prior convictions and/or arrests.

8       s.     Jonathan VALLE has been identified as a Hispanic male, DOB

9   5/24/1985, 5'10" in height, 173 pounds, and is currently in federal custody in the Southern

10  District of California for firearms charges. A criminal history check for VALLE reveals that he

11  has the following convictions and/or arrests: a 2003 conviction for assault with a deadly

12  weapon, not a firearm; a 2004 arrest for domestic violence and resisting arrest; a 2005 arrest

13  for domestic violence; and a 2010 arrest for being a felon in possession of a firearm.

14      t.     Armando CASTILLO has been identified as a Hispanic male, DOB

15  6/25/1990, 5'6" in height, 170 pounds, and is currently in federal custody in the Southern

16  District of California for firearms charges. A criminal history check for CASTILLO reveals that

17  he has the following convictions and/or arrests:   a 2009 misdemeanor conviction for

18  possession of a controlled substance and a 2010 arrest for illegal possession of a firearm.

19      u.     Mikael Daniel BLASER has been identified as a Hispanic male, DOB

20  1/30/1990, 6'2", 190 pounds, and currently resides at 13414 Community Road, # 125, Poway,

21  California, 92064. A criminal history check for BLASER reveals that he does not have any

22  prior convictions and/or arrests.

23      v.     Enrique SALINAS, Jr. has been identified as a Hispanic male, DOB

24  2/3/1984, 5'10" in height, 170 pounds, and currently resides at 1319 Fifth  Avenue, Chula

25  Vista, California, 91911. A criminal history check for SALINAS reveals that he has the

26  following convictions and/or arrests: a 2003 felony conviction for possession of a controlled

27  substance; a 2000 arrest for vandalism; a 2003 arrest for alien smuggling; and a 2008 arrest

28  for indecent exposure while illegally entering an occupied dwelling.

1    w.    Raul MORENO has been identified as a Hispanic male, DOB 8/10/1986,

2  6'1", 145 pounds, and currently resides at 1905 East Palomar Street, #4, Chula Vista,

3  California, 91913. A criminal history check for MORENO reveals that he has the following

4  convictions and/or arrests: a 2001 arrest for public intoxication; a 2007 arrest for domestic

5  violence; and a 2008 arrest for conspiracy to transport illegal aliens.

6    x.    Miguel SORIA has been identified as a Hispanic male, DOB 6/27/1991,

7  5'7" in height, 160 pounds, and currently resides at Correctional Alternatives, Incorporated,

8  551 South 35th Street, San Diego, California, 92113. A criminal history check for SORIA

9  reveals that he has the following convictions and/or arrests: a 2010 conviction for possession

10  of a controlled substance.

11    y.    Perla Carolina JIMENEZ has been identified as a Hispanic female, DOB

12  9/14/1981, 5'3" in height, 140 pounds, and currently resides at 564 Arizona Street, #121,

13  Chula Vista, California, 91911. A criminal history check for JIMENEZ reveals that she has the

14  following convictions and/or arrests: a 2009 misdemeanor conviction for domestic violence;

15  a 2000 arrest for domestic violence; a 2000 arrest for alien smuggling; a 2008 arrest for

16  domestic violence; a 2009 arrest for resisting arrest; and a 2009 arrest for driving under the

17  influence.

18    z.    Luz Maria BENAVIDEZ MARTINEZ has been identified as a Hispanic

19  female, DOB 9/28/1978, 5'5" in height, 168 pounds, and currently resides at 78 Oaklawn

20  Avenue, #G, Chula Vista, California, 91910. A criminal history check for BENAVIDEZ

21  MARTINEZ reveals that she has the following convictions and/or arrests: a 2002 arrest for

22  fraud and misuse of a visa.

23    aa.    Bridgette REYNOSO has been identified as a Hispanic female, DOB

24  9/19/1986, 5'2" in height, 140 pounds, CDL # D1083162, and currently resides at 3868 Z

25  Street, San Diego, California, 92113. A criminal history check for REYNOSO reveals that she

26  does not have any prior convictions and/or arrests.

27  \\

28

8

bb.     Jorge HUMBERTO LORA has been identified as a Hispanic male, DOB 8/1/1978, 5'6" in height, 190 pounds, and currently resides at 564 Arizona Street, #121, Chula Vista, California, 91911. A criminal history check for HUMBERTO LORA reveals that he has the following convictions and/or arrests: a 1997 felony conviction for burglary; a 1994 arrest for vehicle theft; a 1997 arrest for false identification to a peace officer; and a 2000 arrest for solicitation of a prostitute.

cc.     Christopher Adrian RUIZ has been identified as a Hispanic male, DOB 6/12/1974, 5'11" in height, 190 pounds, and is currently in federal custody in the Southern District of California for firearms charges. A criminal history check for RUIZ reveals that he has the following convictions and/or arrests:     a     1993     felony     conviction     for possessing/manufacturing/selling a dangerous weapon; a 1993 felony conviction for possession of a controlled substance for sale while armed with a firearm; a 1993 misdemeanor conviction for possessing/manufacturing/selling a dangerous weapon; and a 2010 arrest for being a felon in possession of a firearm.

dd.     Richard Gilbert FAVELA has been identified as a Hispanic male, DOB 10/20/1983, 6'5" in height, 460 pounds, and currently resides at 550 7th Street, Imperial Beach, California, 91932. A criminal history check for FAVELA reveals that he has the following convictions and/or arrests: a 2007 felony conviction for robbery and a 2004 arrest for robbery.

ee.     Humberto TORRES MENDOZA has been identified as a Hispanic male, DOB 1/23/1985, 5'1" in height, 170 pounds, and currently resides at 1005 Silver Star Circle, Colton, California, 92324. A criminal history check for TORRES MENDOZA reveals that he has the following convictions and/or arrests: a 2009 arrest for possession of a controlled substance for sale.

ff.     Juan Carlos RIQUE AGUIRRE has been identified as a Hispanic male, DOB 2/10/1984, 5'9" in height, 190 pounds, and is currently in Mexico. A criminal history check for RIQUE AGUIRRE reveals that he has the following convictions and/or arrests: a 2007 felony conviction for possession of a controlled substance; a 2009 misdemeanor conviction for illegal possession of a firearm; a 2006 arrest for possession of a concealed

1  weapon in a vehicle and possession of a controlled substance while armed; and a 2007 arrest

2  for making or passing a fictitious check.

3       gg.    Telle KRESCHMER has been identified as a Hispanic female, DOB

4  1/23/1989, 5'4" in height, 160 pounds, and currently resides at 15th Street, #8, San Diego,

5  California, 91932. A criminal history check for KRESCHMER reveals that she does not have

6  any prior convictions and/or arrests.

7       hh.    Hector MONTES has been identified as a Hispanic male, DOB 6/9/1987,

8  6'1" in height, 189 pounds, and is in California state custody for firearms-related charges.  A

9  criminal history check for MONTES reveals that he has the following convictions and/or

10  arrests:  a 2006 felony conviction for alien smuggling; a 2004 arrest for vehicle theft and

11  receiving stolen property; a 2006 arrest for alien smuggling; and a 2009 arrest for being a felon

12  in possession of a firearm and possession of a firearm at a public school.

13       ii.    Jose CONTRERAS has been identified as a Hispanic male, DOB

14  10/20/1981, 5'8" in height, 235 pounds, and currently resides at 3083 Naylor Road, San Diego,

15  California, 92173. A criminal history check for CONTRERAS reveals that he has the following

16  convictions and/or arrests:  a 2004 felony conviction for vehicle theft and a 2009 arrest for

17  possession of a controlled substance for sale and being a felon in possession of a firearm.

18       jj.    Hassain ALZUBAIDY has been identified as a Caucasian male, DOB

19  7/1/1985, 5'5" in height, 135 pounds, and currently resides at 11705 Snapdragon Lane,

20  Moreno Valley, California, 92557.  A criminal history check for ALZUBAIDY reveals that he

21  does not have any prior convictions and/or arrests.

22       kk.    Ivan MORA has been identified as a Hispanic male, DOB 6/22/1989, 5'9"

23  in height, 145 pounds, and currently resides at 1168 Elrose Court, San Diego, California,

24  92154. A criminal history check for MORA reveals that he does not have any prior convictions

25  and/or arrests.

26       ll.    Ulises VALENZUELA has been identified as a Hispanic male, DOB

27  12/27/1978, 5'11" in height, 170 pounds, and currently resides at 1307 Ridgeview Way, Chula

28  Vista, California, 91902.  A criminal history check for VALENZUELA reveals that he has the

1 following convictions and/or arrests: a 2004 misdemeanor conviction for driving under the
2 influence.

3        mm.    Benjamin AVENDANO has been identified as a Hispanic male, DOB
4 9/21/1990, 6'0", 150 pounds, and is currently in federal custody in the Southern District of
5 California for drug trafficking charges. A criminal history check for AVENDANO reveals that
6 he has the following convictions and/or arrests: a 2008 felony conviction for possession of a
7 controlled substance for sale.

8        nn.    Jennifer ESCAMILLA has been identified as a Hispanic female, DOB
9 11/12/1983, 5'1" in height, 190 pounds, and currently resides in Tijuana, Mexico. A criminal
10 history check for Jennifer ESCAMILLA reveals that she does not have any prior convictions
11 and/or arrests.

12        oo.    Araceli VARELA has been identified as a Hispanic female, DOB
13 9/19/1976, 5'6" in height, 160 pounds, and currently resides at 1747 Tremaine Way, San
14 Diego, California, 92154. A criminal history check for VARELA reveals that she has the
15 following convictions and/or arrests: a 1998 felony conviction for possession of a controlled
16 substance for sale; a 2010 conviction for driving under the influence; a 2000 arrest for
17 possession of a controlled substance for sale; a 2005 arrest for alien smuggling; and a 2009
18 arrest for driving under the influence.

19        pp.    Rocio LOPEZ has been identified as a Hispanic female, DOB
20 12/13/1972, 5'1" in height, 130 pounds, and currently resides at 4052 Epsilon Street, San
21 Diego, California, 92113. A criminal history check for LOPEZ reveals that she has the
22 following convictions and/or arrests: a 2000 felony conviction for alien smuggling.

23        qq.    Kevin LUIS has been identified as a Hispanic male, DOB 9/6/1981, 5'10",
24 180 pounds, and currently resides at 3818 Chanute Street, San Diego, California, 92154. A
25 criminal history check for LUIS reveals that he has the following convictions and/or arrests:
26 a 2000 felony conviction for vehicle theft; a 2005 conviction for bribing an executive officer and
27 vehicle theft; and a 2009 arrest for possession of a controlled substance.

28 \\

## REQUESTED SEARCH WARRANTS

12.   I also respectfully submit that the facts contained in the numbered paragraphs below demonstrate that there is probable cause to believe that one or more of the following will be found at the search locations described below:  contraband; person(s) to be arrested; property designed for use, intended for use, or used in committing a crime; and/or the fruits, instrumentalities and evidence of a violation of Title 18, United States Code, Section 1962(d).

a.   The location described as 2198 Cabo Bahia, Chula Vista, California, 91914;

b.   The location described as 4808 Windsurf Way, #369, San Diego, California, 92154;

c.   The location described as 4028 Delta Street, #1, San Diego, California, 92113;

d.   The location described as 13414 Community Road, #125, Poway, California, 92064;

e.   The location described as 1319 Fifth Avenue, Chula Vista, California, 91911;

f.   The location described as 1905 East Palomar Street, #4, Chula Vista, California, 91913;

g.   The location described as 564 Arizona Street, #121, Chula Vista, California, 91911;

h.   The location described as 3868 Z Street, San Diego, California, 92113;

i.   The location described as 550 7th Street, Imperial Beach, California, 91932;

j.   The location described as 3083 Naylor Road, San Diego, California, 92173;

k.   The location described as 1168 Elrose Court, San Diego, California, 92154;

12

1          l.     The location described as 1307 Ridgeview Way, Chula Vista, California,

2    91902;

3          m.     The location described as 1747 Tremaine Way, San Diego, California,

4    92154;

5          n.     The location described as 4052 Epsilon Street, San Diego, California,

6    92113; and

7          o.     The location described as 3818 Chanute Street, San Diego, California,

8    92154.

9                                    **PROBABLE CAUSE**

10   **A.     Introduction**

11   13.     Since November 2009, law enforcement officers assigned to the CBVTF have

12   been investigating a criminal organization controlled by Fernando Sanchez Arellano (the

13   "FSO" or "Enterprise").  The FSO is an off-shoot of the now defunct Arellano-Felix drug

14   trafficking organization, commonly known as the "AFO."[1]

15   14.     The FSO is a transnational drug trafficking organization with integrated narcotics

16   and enforcement operations in the United States and Mexico.[2]  As set forth in detail below,

17   the Enterprise is a powerful criminal organization that controls drug distribution and other

18   illegal activities in the United States and Mexico, and which has increasingly committed acts

19   _____

20   [1]     The Arellano-Felix drug trafficking organization ("AFO") has historically been one
     of the most prolific and powerful drug trafficking organizations in existence.  However, law
21   enforcement officers targeting the AFO have systematically dismantled the leadership of the
     organization.  Most recently, in August 2006, law enforcement officers arrested AFO leader
22   Javier Arellano-Felix and his primary lieutenant, Arturo Villareal Heredia, aka Nalgon.  The
     power void resulting from those arrests was filled by Eduardo Arellano-Felix (a brother of
23   Javier, Benjamin and Ramon Arellano-Felix) and Fernando Sanchez Arellano, aka Ingeniero
     (a nephew of the Arellano-Felix brothers).  After Eduardo Arellano-Felix was arrested by
24   Mexican authorities on October 25, 2008, Fernando Sanchez Arellano assumed full leadership
     over the defunct AFO and established his own organization, which I refer to as the FSO.  For
25   purposes of the federal racketeering statute, the FSO is an "association-in-fact" criminal
     Enterprise under Title 18, United States Code, Section 1961(4).
26
     [2]     This summary of the FSO is based upon my personal review of thousands of
27   intercepted conversations involving the Target Subjects.  Indeed, during the course of this
     investigation, law enforcement officers conducted court-authorized wiretaps on over forty
28   different telephone facilities used by the Target Subjects.  The wiretaps on those telephones
     resulted in the seizure of over 50,000 conversations.

of violence in Tijuana, San Diego County, and the greater Los Angeles area to expand its influence. Significant goals of the FSO are to control, and profit from, narcotics trafficking in the Tijuana area and Southern California.

15.    Within the FSO, there is an informal but strictly adhered-to hierarchy and chain-of-command.   Operating at the ultimate direction of Fernando Sanchez Arellano, the Enterprise is comprised of five distinct groups: Lieutenants, Underbosses, Corrupt Mexican Law Enforcement Officials, Crew Leaders, and Crew Members:

(a)    Lieutenants sanction all types of criminal activity conducted by Enterprise members, including murder, kidnaping, drug trafficking and money-laundering related offenses;

(b)    Underbosses have management and oversight responsibility for the crew leaders' implementation of the day-to-day criminal activities of the Enterprise;

(c)    Corrupt Mexican Law Enforcement Officials are former or current law enforcement officers working for the Enterprise. These individuals use their positions within the Mexican law enforcement community to obtain and disseminate confidential law enforcement information to the FSO, bribe judicial and law enforcement authorities to secure the release of arrested FSO members, shift responsibility (both legally and in stories generated by the media) for violent activities from the FSO to rival organizations; and obtain law enforcement employee information for the FSO's use in targeting the law enforcement officers taking actions adverse to the interests of the FSO;

(d)    Crew leaders implement and supervise the day-to-day criminal activities of the Enterprise, as directed by the various underbosses; and

(e)    Crew members conduct the day-to-day criminal activities of the Enterprise as directed by the crew leaders and underbosses.

16.    The Enterprise's ultimate objective and purpose is generation of money, largely through the importation and distribution of narcotics in the United States.  In support of this objective, the FSO has developed contacts with multiple sources of methamphetamine, cocaine, and marijuana. The FSO has further developed the ability to receive narcotics in the

14

1    Mexican interior and transport those narcotics to the U.S./Mexico border near Tijuana. From
2    Tijuana, the FSO has cultivated a network of drivers and body-cavity couriers responsible for
3    crossing the narcotics into the United States and then delivering them to FSO customers.[3/]
4    Furthermore, the FSO actively collects "plaza" or taxes from individuals involved in criminal
5    activities within the geographical areas controlled by the Enterprise, including Tijuana and
6    areas of San Diego.

7            17.    The FSO has also co-opted elements of the Mexican law enforcement
8    community to assist the Enterprise. The most highly ranked Mexican official assisting the FSO
9    is Jesus Quinones Marquez, the Director of International Liaison for the Baja California
10   Attorney General's Office. In that capacity, Marquez is one of the primary Mexican liaison
11   officials responsible for sharing information with United States law enforcement entities.
12   Marquez is aware of the FSO's illegal activities and uses his position to obtain confidential law
13   enforcement information for the use of the Enterprise. Further, Marquez is actively involved
14   in making arrangements to have various rivals of the FSO arrested and detained by Mexican
15   law enforcement officials.

16           18.    The FSO conducts extensive enforcement operations in the United States and
17   Mexico in support of its drug business. Typically, lieutenants sanction acts of violence in
18   furtherance of the Enterprise by giving members the "luz verde" (green light) to proceed with

19

20           [3/]     To date, law enforcement agents have made the following seizures, among
     others, in connection with this investigation: a December 23, 2009 seizure of 120 pounds of
21   marijuana; a January 8, 2010 seizure of ½ pounds of methamphetamine and a firearm; a
     January 23, 2010 seizure of 150 pounds of marijuana; a January 26, 2010, seizure ½ pounds
22   of methamphetamine; a February 3, 2010 seizure of ½ pounds of methamphetamine; a
     February 11, 2010 seizure of 1 pound of methamphetamine; a February 12, 2010 seizure 3/4
23   pound of methamphetamine; a March 8, 2010 seizure of 25 pounds of methamphetamine; a
     March 18, 2010 seizure of 23 ounces of methamphetamine, a shotgun, and 30 pounds of
24   marijuana; a March 24, 2010 seizure of 1 pound of methamphetamine; an April 28, 2010
     seizure of ½ pound methamphetamine; a May 6, 2010 seizure of 1 pound of
25   methamphetamine; a May 13, 2010 seizure of ½ pound of methamphetamine; a May 20, 2010
     seizure of ½ pound of methamphetamine; a May 30, 2010 seizure of 1 ton of marijuana; and
26   a June 4, 2010 seizure of 15 pounds of cocaine. Additionally, on June 23, 2010, the San
     Bernadino Sheriff's High Intensity Criminal Interdiction Unit seized approximately 38,000
27   pounds of marijuana, 2,750 pounds of cocaine, and 67 pounds of methamphetamine from
     a tractor trailer which had been stopped in San Bernadino County. Intercepted calls have
28   confirmed that at least a portion of the seized narcotics belonged to the FSO. Finally, agents
     participating in this investigation have purchased and/or seized over a dozen firearms.

                                                15

assaults, kidnapings, and murders.  The FSO recruits San Diego area gang members and former Mexican police officers to conduct its enforcement activities.  The FSO's enforcement operations, which include kidnapings related to drug debts, torture and killing of rival traffickers, and  murders of individuals who are deemed to have disrespected the Enterprise, are designed to preserve, protect and expand the power of the Enterprise.  Moreover, the FSO has engaged in the systematic purchase of weapons as well as  law enforcement uniforms, boots, ski masks, and plastic restraint devices in the United States (which were then smuggled into Mexico) in order to outfit members of the Enterprise engaged in enforcement activities.

19.     The FSO has sought to publicize its enforcement capability in order to expand its power and influence.  In one intercepted call, a high-ranking FSO member sought to produce a "movie" depicting an actual beheading of a rival drug trafficker to be posted on the Internet.  In another incident, FSO members placed the defaced headstone of two murder victims in the victims' family's courtyard with a threatening message.

20.     The FSO has also developed a sophisticated communication system using cellular phones in an attempt at evading law enforcement electronic surveillance efforts.  On occasion,  FSO lieutenants do not even carry or use cellular phones themselves.  Instead, "alineadores" carry cellular phones for these individuals, answer incoming calls, and relaying messages to/from calling parties.  Underbosses and crew leaders routinely carry and use multiple and changing cellular phones.[4]  Crew members were frequently instructed to change cellular phones.  In addition to communicating via cellular phone, FSO crew leaders and members met in person at an apartment in San Diego referred to as "La Oficina" and known to be one of the FSO's U.S. headquarters.

21.     Furthermore, the FSO utilized a network of couriers to transport the money paid by their U.S. customers back into Mexico.  In most instances, this money was transported via bulk shipment of United States currency hidden in passenger vehicles.

---

[4]     In recognition of the FSO members' use of various and changing telephone facilities in an effort to thwart law enforcement investigative efforts, the Government sought and received "roving" wiretap authority pursuant to Title 18, United States Code, Section 2518(11).

1

**B.    Criminal Activities Of The Target Subjects[5]**

2

**396 Pound Marijuana Seizure - August 31, 2009**

3        22.    On August 31, 2009, Benjamin Avendano drove a 2004 Dodge Durango bearing

4  California license number 6HLU405 ("Durango") containing approximately 396 pounds of

5  marijuana southbound on Interstate 805 in San Diego, California.  As a CHP officer attempted

6  to pull the Durango over for a traffic violation, defendant Mario Escamilla attempted to drive

7  a 2007 Cadillac Escalade, bearing California license number 6DTF679 ("Escalade"), into the

8  patrol vehicle of the CHP officer conducting the stop of the Durango.  At the time of the

9  incident, defendants Hector Montes and Omar Martinez were passengers in the Escalade,

10  which was equipped with a hard-wired police type siren.

11        23.    Due to the actions of Mario Escamilla, defendant Benjamin Avendano was

12  initially able to avoid the CHP stop.  However, a short time later, law enforcement officers

13  located both the abandoned Durango and Escalade.  Approximately 396 pounds of marijuana

14  were seized from inside the Durango.  Since the date of the seizure, defendants Mario

15  Escamilla and Omar Martinez have made recorded statements to CI-1 describing the above-

16  noted events.[6]  Also, during a surreptitiously recorded conversation with an informant on July

17  15, 2009, defendant Benjamin Avendano stated that he was working for defendant Fausto

18

19

20      [5]      Unless otherwise noted, the criminal activities set forth below occurred in the
Southern District of California or were directed from an individual located in the Southern
21  District of California.

22      [6]      A criminal records check for CI-1 has revealed that CI-1 has prior felony
convictions for narcotics, fraud, theft and domestic violence offenses.  CI-1 has also violated
23  the conditions of his parole on numerous occasions.  CI-1 is cooperating in this investigation
in exchange for monetary payments.  To date, CI-1 has been paid for expenses CI-1 has
24  incurred because of his cooperation and for CI-1's assistance in this investigation.  CI-1 was
initially promised that law enforcement officers would relocate him and his family at the
25  conclusion of this investigation.  However, because CI-1 engaged in unauthorized criminal
activity while cooperating during this investigation, he is now in custody.  Despite CI-1's
26  commission of crimes while assisting in this case, I believe the information he provided
regarding the Target Subjects is accurate for several reasons.  First, during the majority of his
27  interactions with the Target Subjects, CI-1 was carrying a concealed recording device.
Second, law enforcement officers have, with the consent of CI-1, been recording all calls
28  to/from CI-1's telephone since December 10, 2009.  Third, the information provided by CI-1
has been independently corroborated through surveillance observations and the interception
of the Target Subjects' conversations pursuant to court-authorized wiretaps.

17

Escamilla and other individuals engaged in smuggling narcotics and committing violent activities.

**Conspiracy To Murder An Unidentified Individual In Tijuana - December 11, 2010**

24.     On December 10, 2009, defendant Mario Escamilla, defendant Omar Martinez, defendant Armando Castillo and CI-1 purchased three handguns from defendant Jose Contreras, which were to be used in a "job," that is, a murder, the "next day." The purchase, which occurred in San Diego, California, was recorded via a concealed recording device on the person of CI-1.

25.     Based upon information provided to me by CI-1, and as corroborated through recorded conversations involving defendant Mario Escamilla and others, I believe that on December 11, 2009, at the direction of defendant Mario Escamilla, defendant Raul Moreno, defendant Armando Castillo and defendant Enrique Salinas Jr. traveled from San Diego, California, to Tijuana, Mexico, to kill an unidentified individual.

**Conspiracy/Attempted Robbery - December 14, 2009**

26.     On December 14, 2009, members of the FSO attempted to rob approximately $7,000 from two females making a cash deposit at a bank in the Plaza Las Americas shopping mall in San Diego, California. The events surrounding that robbery are set forth below.

a.      On December 14, 2009, at approximately 8:20 p.m., defendant Raul Moreno placed a recorded call to CI-1. During the call, Moreno asked CI-1 to report as soon as possible to "la oficina" [literally "the office" in Spanish, but known to be the FSO's headquarters in San Diego at that time, located at 244 Palomar, Apartment #28, Chula Vista, California]. Moreno explained that they were looking for "magazines for the shorts" [ammunition magazines for the handguns].

b.      On his way to the headquarters, CI-1 was provided with a concealed recording device. Surveillance agents then followed CI-1 to the 200 block of Quintard Street, Chula Vista, California, a location near the headquarters. Agents observed defendants Miguel Soria, Raul Moreno and Armando Castillo get into CI-1's vehicle. A review of CI-1's recording device reveals that while driving to the Plaza Las Americas shopping mall, Moreno stated that

18

they were going to rob two women who worked at the mall as those women walked to a nearby bank to deposit their daily cash proceeds. Moreno stated that the women routinely made that walk between 10:00 p.m. and 10:30 p.m. According to CI-1, Moreno was armed with a handgun, but Castillo was not.

27.    Upon arriving at Plaza Las Americas, CI-1 was left alone in his car for a brief period. CI-1 used that opportunity to place a call to SDPD Detective Delgadillo and inform him about the armed robbery plan. Numerous marked police units were immediately sent to the mall in an effort to thwart the planned robbery. The plan worked and the above-noted FSO crew members left the area after defendant Omar Martinez instructed them to postpone the robbery to another day.[7/]

**Conspiracy To Murder C.H., V.A**

28.    According to CI-1, as he and the above-noted crew were leaving Plaza Las Americas after the failed robbery plan on December 14, 2009, defendant Raul Moreno received a telephone call from FNU LNU, aka "Trusty." During the call, Trusty informed Moreno that he knew where V.A., aka Chimbombis, was located. Moreno then placed a call to defendant Mario Escamilla, who gave Moreno permission to kill V.A., aka Chimbombis.

29.    CI-1 and Moreno traveled to a residence in National City. Upon arriving at the residence, Moreno took out a revolver and exited CI-1's vehicle. As he was looking through a window of the residence, Moreno was confronted by an unidentified Hispanic male ("UM"). Moreno pointed the handgun at the UM and asked CI-1 if he should shoot the UM. CI-1 told Moreno that he should not shoot the UM and that they needed to leave the area as soon as possible. As they were driving away, Moreno expressed concern that Mario Escamilla would

---

[7/]    A traffic stop of a vehicle being driven by defendant Mario Escamilla was conducted in the vicinity of the Plaza Las Americas shopping mall about thirty minutes before the planned robbery.

1   be mad at him for failing to locate and kill V.A.  Moreno stated he had seen V.A. in the house
2   and that he should have "blasted her."[8]

3       30.   Thereafter, on December 19, 2009, defendants Hassain Alzubaidy, Omar
4   Martinez, Armando Castillo, Raul Moreno and CI-1 spent approximately one and a-half hours
5   driving to various locations in San Diego searching for C.H. and V.A.  The crew was searching
6   for C.H. and/or V.A. for the purpose of killing them.  While driving around looking for the
7   victims, Martinez was in telephonic contact with defendant Mario Escamilla, who was giving
8   the crew directions to various locations where they might find the victims.  The crew was
9   unable to locate either C.H. or V.A. and ended their search at approximately 1:00 a.m. on
10  December 20.  CI-1 recorded his interactions with the crew via a concealed recording device.

11  **Negotiations To Import Three Tons Of Marijuana - December 17, 2009**

12      31.   During an intercepted conversation on December 17, 2009, defendant Mario
13  Escamilla informed defendant Juan Carlos Rique Aguirre that Escamilla had found a "huge
14  visa," that is, a method or means to smuggle three tons of marijuana into the United States
15  from Mexico.

16      32.   On December 17, 2009, surveillance officers observed defendant Mario
17  Escamilla and defendant Bridgette Reynoso meet with two individuals at a restaurant in Chula
18  Vista, California.  Based upon intercepted calls, I believe that the purpose of the meeting was
19  to negotiate for the importation and delivery of a three ton quantity of marijuana.

20  **Possession Of Narcotics - December 18, 2009**

21      33.   On December 18, 2009, CI-1 provided information that defendants Armando
22  Castillo and Miguel Soria were driving around San Diego making drug deliveries.  Based on
23  that information from CI-1, law enforcement officers conducted a traffic stop of Castillo and
24  Soria's vehicle.  A subsequent search of the vehicle resulted in the seizure of 2.4 grams of
25  actual methamphetamine.

26

27      [8]   The concealed recording device provided to CI-1 earlier in the evening recorded
    the above-noted events.  During an unrecorded conversation with defendant Moreno prior to
    December 14, 2009, Moreno explained to CI-1 why the FSO was targeting C.H. and V.A. for
28  assassination.  Moreno stated that in October 2009, C.H. and V.A. had stolen approximately
    70 pounds of marijuana from Moreno and Mario Escamilla.

**Possession Of Narcotics And Firearms - December 21, 2009**

34.    On December 21, 2009, at approximately 9:00 a.m., defendant Mario Escamilla placed a recorded call to CI-1. During the call, Escamilla asked CI-1 if he would store narcotics and firearms for the FSO at his residence. CI-1 stated that he could not do that. Escamilla then instructed CI-1 to go pick up defendant Raul Moreno at "the hacienda," an apartment complex located at 1042 15th Street, San Diego, California. CI-1 provided the following information about the events on December 21, 2009.

35.    As instructed, CI-1 drove to "the hacienda," where he picked-up Moreno. The two of them drove to "la oficina" [244 Palomar, Apartment #28, Chula Vista, California], where they picked up 176 pounds of marijuana, 1 pound of methamphetamine, 5 to 6 grams of cocaine, 1 AK-47 assault rifle, one shotgun and a .38 caliber handgun.[9/] Moreno and CI-1 placed those items into CI-1's vehicle. Moreno placed a call to Mario Escamilla, who instructed Moreno and CI-1 to take the items to defendant Mikael Blaser at "the hacienda," Apartment 8. On the way to "the hacienda," Moreno and CI-1 stopped at the residence of defendant Enrique Salinas Jr. Salinas, who, accompanied by his seven year old son, got into a second vehicle and followed Moreno and CI-1 to "the hacienda." Surveillance agents were able to observe the two vehicles traveling in tandem on the way to "the hacienda."

36.    Upon arriving at "the hacienda," CI-1 parked his vehicle. Moreno, Blaser and CI-1 then unloaded the drugs and guns from CI-1's vehicle and placed those items in the bedroom closet of Apartment 8. Ten minutes later, Mario Escamilla arrived at Apartment 8. Escamilla informed Blaser that any member of his (Escamilla's) crew had authorization to remove the items in the bedroom closet and that Blaser was responsible for all the items stored in the house. Escamilla and Moreno then discussed the possibility of having C.H. and C.H.'s father pay off the debt from the drugs C.H. had stolen from them. Moreno stated his belief that the FSO should forget about collecting the debt and just kill them both. Escamilla

---

[9/]    CI-1 knew the exact amount of narcotics because after those items were moved to the "stash house," Escamilla had CI-1, Moreno and defendant Omar Martinez weigh and repackage the narcotics.

1   replied that the better course of action would be to collect the debt first, and then kill them.[10]

2   Escamilla stated that he would use "Juan Carlos" [defendant Juan Carlos Rique-Aguirre] to

3   set up C.H. and his father by luring them to a mechanic shop.

### Attempted Murder Of Unidentified Gang Member - December 21, 2009

5       37.    On or about December 21, 2009, after receiving permission from defendant

6   Mario Escamilla, defendant Omar Martinez and defendant Armando Castillo, armed with a

7   loaded AK-47 assault rifle, traveled to a location in the Shelltown area of San Diego for the

8   purpose of killing an unidentified gang member.   The travel of those individuals to the

9   Shelltown area of San Diego was observed by surveillance agents. Moreover, the purpose

10  of their trip was confirmed through intercepted wiretap calls.

### Seizure Of 120 Pounds Of Marijuana - December 23, 2009

12      38.    On December 23, 2009, at approximately 10:30 a.m., defendant Raul Moreno

13  placed a recorded telephone call to CI-1. During the call, Moreno stated that Mario Escamilla

14  had ordered Moreno and CI-1 to go to the Otay Mesa Port of Entry to make sure that a vehicle

15  containing narcotics had successfully crossed into the United States from Mexico.  Moreno

16  stated that if the load vehicle had successfully crossed, he and CI-1 would have to unload the

17  contents of the vehicle. According to Moreno, the load vehicle would be parked in a private

18  lot near the Otay Mesa Port of Entry.

19      39.    Surveillance officers observed CI-1, Moreno and Moreno's brother Ivan at a

20  restaurant near the Otay Mesa Port of Entry, where those three individuals were waiting for

21  a tow truck to arrive at their location to transport the load vehicle. The tow truck eventually

22  arrived, put a Toyota 4-Runner on its flat bed, and drove westbound on the 905 highway. CI-

23  1, Moreno and Ivan were observed following the tow truck in CI-1's vehicle. A traffic stop was

24  conducted on the tow truck and the 4-Runner was impounded.  The execution of a search

25  warrant for the 4-Runner resulted in the seizure of approximately 120 pounds of marijuana

26  from inside the vehicle's tires.

27

28      [10]   During the discussion of C.H. and his father, Escamilla also mentioned killing the driver involved in the drug rip-off, an individual named A.M.  Escamilla did not disclose how he had learned of A.M.'s involvement in the drug rip.

22

**Discussion Regarding Planned Murders - December 27, 2009**

40.     During a conversation which was consensually recorded by CI-1 on December 27, 2009, defendant Mario Escamilla told defendant Jonathan Valle that "Panda" and "the bus driver" needed to be "taken out," that is, those individuals needed to be killed.

**Half Kilogram Cocaine Delivery - December 28, 2009**

41.     According to CI-1, on December 28, 2009, defendant Omar Martinez had CI-1 deliver approximately a half-kilogram of cocaine to defendant Juan Carlos Rique Aguirre. Surveillance agents observed CI-1's vehicle in the vicinity of the transaction and subsequently-intercepted calls regarding the debt owed by defendant Aguirre for the cocaine are consistent with the information provided by CI-1 regarding the half-kilogram cocaine delivery.

**Three Pound Methamphetamine Seizure - December 31, 2009**

42.     On or about December 31, 2009, within the Central District of California, defendant Humberto Torres Mendoza possessed approximately three pounds of methamphetamine, which was seized by law enforcement officers.   During a recorded conversation with CI-3, defendant Mendoza (who had been released on bond in the case resulting from the seizure) admitted that he had been arrested in possession of three pounds of methamphetamine.

**Conspiracy/Attempted Murder Of E.A.Z.**

43.     On January 8, 2010, defendants Mario Escamilla, Mikael Daniel Blaser, Luz Maria Benevides Martinez, Perla Carolina Jimenez, and others, attempted to murder E.A.Z. The murder was ordered by defendant Armando Villareal Heredia. The murder was prevented by law enforcement officers handling this investigation.    The facts and circumstances surrounding the conspiracy/attempted murder are set forth below.

        a.     On January 8, 2010, at approximately 10:30 p.m., Mario Escamilla placed a recorded call to CI-1. During the brief conversation, Escamilla instructed CI-1 to meet him at a restaurant in Chula Vista.

        b.     CI-1 traveled to the restaurant as instructed. Due to Escamilla's order for CI-1 to meet him immediately, agents were unable to meet with CI-1 and provide him with a

23

1  concealed recording device prior to the meeting. According to CI-1, during the meeting with

2  Escamilla at the restaurant, Escamilla stated that Armando Villareal Heredia had ordered them

3  to kill a light-skinned individual named "Sharky" [E.A.Z.]. Escamilla stated that "Sharky" was

4  "on our team and not with Teo" [Sharky was a member of the FSO and was not aligned with

5  Teodoro "Teo" Garcia Simental], but that Sharky had "disrespected the senores in Tijuana"

6  [senior FSO members in Tijuana] and therefore had to be killed.

7          c.      After the meeting at the restaurant, CI-1 took Escamilla back to

8  Escamilla's house. When Escamilla went into the house to take a shower, CI-1 was able to

9  call SDPD Detective Delgadillo and inform him about the plan to kill Sharky. Detective

10  Delgadillo immediately called out numerous law enforcement officers to begin conducting

11  roving patrols in an effort to identify and locate Sharky. Surveillance units were also

12  dispatched to try and follow CI-1.

13          d.      At approximately 12:30 a.m. on January 9, 2010, Mario Escamilla walked

14  out of his house and got into CI-1's vehicle. Escamilla complained that earlier in the day, the

15  police had seized the gun that was supposed to be used in the murder.[11] Escamilla stated

16

17          [11]     Earlier in the day on January 8, 2010, law enforcement officers prevented the
    murder of E.A.Z. on two previous occasions. The murder was originally supposed to be
18  conducted by defendants Omar Martinez, Jonathan Valle, aka Reaper and CI-1. In an attempt
    at seizing the murder weapon which had been discussed over the court authorized wiretaps,
19  agents conducted a probation search at Martinez's residence at approximately 7:00 a.m.
    Although a quantity of methamphetamine was seized during that search, officers were unable
20  to locate the firearm. After the search had ended, Martinez placed a recorded call to CI-1.
    During the call, Martinez stated that the police had missed the gun and that he and CI-1 still
21  needed to "do the job" [commit the murder]. In response to that call, agents had two marked
    SDPD vehicles park in front of Martinez's residence to dissuade him from going forward with
22  the planned murder. Undeterred, Martinez snuck out the back door of his residence and met
    with CI-1. Agents saturated the area with marked SDPD units driving around on patrol. On
23  their way to pick up the gun to be used in the murder, and after noticing the large law
    enforcement presence in the area, Martinez told CI-1 that he was being targeted by the police
24  and that he was going to go to Tijuana and lay low. At the time that Martinez made that
    remark, CI-1 was wearing a concealed recording device.
25
          At approximately 11:30 a.m., agents monitoring the court authorized wiretaps began
26  intercepting calls which confirmed that Mario Escamilla had assigned the murder of E.A.Z. to
    defendants Armando Castillo and Jonathan Valle. A subsequent traffic stop of Castillo and
27  Valle's vehicle resulted in the seizure of a loaded Ruger 9mm pistol and 30 rounds of 9mm
    ammunition from a hidden location. Castillo and Valle were placed under arrest and are
28  currently in federal custody. Two other occupants of the vehicle - defendants Miguel Soria and
    Raul Moreno - were briefly detained and then released. The seizure of the firearm from

1  that they "had to do the job tonight" and that they needed to meet with defendant Perla
2  Carolina Jimenez. CI-1 drove Escamilla to "Club 13" in National City, where they met with
3  Jimenez and defendant Luz Maria Benavidez Martinez, aka Aracely. During the meeting,
4  Escamilla told Jimenez that she needed to "set Sharky up." Jimenez replied that she would
5  lure Sharky to a motel and get him drunk. Jimenez asked Escamilla to keep her involvement
6  in the murder a secret because she "didn't want any problems." Escamilla promised Jimenez
7  that her name would not be mentioned and that "everything would go smooth." In the
8  presence of CI-1 and Escamilla, Jimenez placed a call to Sharky and invited him to "party" with
9  her. Jimenez suggested that Sharky get them a hotel room so that they could be "more
10 comfortable." Sharky agreed to get a hotel room and call Jimenez back with the location.

11           e.      CI-1 and Escamilla then drove to Apartment 8 at "la hacienda" to confirm
12 what weapons were available at that location.[12] At the apartment, CI-1 and Escamilla met with
13 defendant Mikael Daniel Blaser and confirmed that the only weapons available were an AK-47
14 and .38 caliber revolver. Escamilla tasked Blaser with obtaining a semi-automatic handgun
15 for "the job." While at the apartment Jimenez called Escamilla and informed him that Sharky
16 had obtained a room at the "Best Western."

17           f.      CI-1 and Escamilla then drove to the Best Western hotel in National City,
18 California, to look for "Sharky." After waiting in the parking lot of the hotel for approximately
19 40 minutes, CI-1 and Escamilla observed a black Chevrolet truck with black rims arrive at their
20 location. They then observed E.A.Z., aka "Sharky" get out of the truck and walk into the hotel.
21 Escamilla told CI-1 that he wished he had a gun on him because he would get out of CI-1's
22 car and shoot Sharky himself. Shortly after E.A.Z.'s arrival, CI-1 and Escamilla observed
23 Jimenez  and defendant Luz Maria Benavidez Martinez arrive at the hotel and meet with
24 Sharky in the parking lot. Upon observing Jimenez, Martinez and Sharky enter the hotel

25

26 —————————

27 Castillo and Valle was unknown to CI-1 when he told me about his unrecorded conversation
   with Mario Escamilla.

28      [12]    By this time, surveillance units had been able to locate CI-1's vehicle parked at
   the "la hacienda" apartment complex.

1   together, Escamilla stated that Jimenez was "doing her job" and that all he and CI-1 had to do

2   was wait until 4:00 or 4:30 a.m.[13/]

3          g.     CI-1 and Escamilla then drove away from the Best Western toward "Club

4   Rio." While en route to "Club Rio," surveillance agents who were following CI-1's vehicle had

5   a marked SDPD unit pull over CI-1's vehicle. CI-1 was removed from his car, was placed in

6   the back of the marked unit and was given a telephone. CI-1 used the telephone to call SDPD

7   Detective Delgadillo and inform Detective Delgadillo about the above-noted events. Detective

8   Delgadillo arranged for a second marked SDPD unit to deliver a surreptitious recoding device

9   to CI-1 at the site of the traffic stop. To justify the delay in waiting for the second unit to arrive,

10  CI-1 was given a field sobriety test. The second unit eventually arrived and CI-1 was given

11  the recording device.

12         h.     As they left the site of the traffic stop, Escamilla directed CI-1 to drive

13  back to the Best Western. While en route, CI-1 and Escamilla discussed the plan to kill

14  Sharky; however, the recording device was only able to capture CI-1's portion of the

15  conversation. After stopping briefly in the parking lot of the Best Western, Escamilla instructed

16  CI-1 to drive to the "la hacienda," which CI-1 did. Surveillance units were able to maintain

17  visual contact with CI-1's vehicle from the point of the traffic stop until its arrival at the "la

18  hacienda."

19         i.     Upon arriving at the "la hacienda" complex, defendant Blaser entered CI-

20  1's vehicle. While parked outside the apartment complex, CI-1's recording device was able

21  to capture a conversation between Escamilla and Blaser. During the conversation, Escamilla

22  informed Blaser that a woman named Perla [defendant Perla Carolina Jimenez] had "set up"

23  Sharky at a motel. Escamilla stated that Perla was going to get Sharky drunk. Escamilla

24  instructed Blaser to park outside the hotel nearby Sharky's vehicle and to shoot Sharky as he

25  walked from the hotel to his vehicle. Escamilla assured Blaser that if he committed the

26  murder, Blaser would be "in" with not only Escamilla's crew, but with the "clika of senores" [the

27

28         [13/]    Surveillance agents were able to observe CI-1 and Escamilla waiting in the
        parking lot. Agents also saw the arrival of Sharky, Jimenez and Martinez at that location.

1  FSO leadership in Mexico]. Escamilla then stated that Blaser would be paid by the Enterprise

2  for committing the murder, and stated that he [Escamilla] had been paid between $2,000 and

3  $10,000 for committing similar murders in the past. Escamilla informed Blaser that Jimenez

4  would bring Sharky out of the hotel around 4:00 a.m. Blaser stated that he knew the ".38 was

5  functioning properly" because he had fired a test round out of a window in his apartment.

6  Blaser stated that he would wait until Sharky was getting into truck and that he would "shoot

7  him one time in the head and that would be it." Blaser further stated that he needed to shoot

8  Sharky before Sharky started driving in order to make sure that Sharky would not try and drive

9  away, in which case Blaser stated he would have to "chase him and finish him off." At that

10  point in the conversation, the battery on CI-1's recording device failed.

11          j.       At approximately 3:30 a.m., CI-1 drove Escamilla and Blaser from the "la

12  hacienda" apartment complex toward the Best Western. A short distance from the hotel,

13  Escamilla got out of CI-1's vehicle and was picked up by his girlfriend, defendant Bridgette

14  Reynoso, who was driving a black pick-up truck. CI-1 and Blaser drove to the Best Western

15  hotel, parked in the parking lot and remained in CI-1's vehicle. The black pick-up also drove

16  to the area of the Best Western hotel, where it parked on a nearby street with a vantage of the

17  front hotel area.[14]

18          k.       After observing the arrival of CI-1's vehicle and the black pick-up, agents

19  had three marked SDPD vehicles enter and park in the Best Western hotel parking lot. After

20  observing the police cars arrive, Escamilla placed a recorded call to CI-1. During that call,

21  Escamilla instructed CI-1 and Blaser to carry out the planned murder despite the police

22  presence. Escamilla assured CI-1 that if the police tried to chase him and Blaser after the

23  murder had been committed, he would drive the pick-up and "block" the police cars.[15]

24

25

26          [14]     The events described in this paragraph were related by CI-1 and corroborated
        by surveillance observations.
27

28          [15]     I believe that Escamilla was serious about using his vehicle to "block" the police
        and prevent them from chasing CI-1 and Blaser because Escamilla performed a similar
        maneuver on August 31, 2009, in relation to the marijuana seizure detailed above.

1      I.      A SDPD officer from one of the three marked units was then instructed

2   to make contact with CI-1 and Blaser.  The officer walked up to CI-1's vehicle and told CI-1

3   and Blaser that the SDPD had received a complaint regarding a suspicious vehicle parked in

4   the hotel parking lot for a long period of time.  The officer instructed CI-1 and Blaser to leave

5   the area, which they did.  Surveillance agents then observed the black pick-up also leave the

6   area.

7              **Purchase Of A Half-Pound Of Methamphetamine - January 26, 2010**

8      44.     On January 26, 2010, at a location in San Diego, California, CI-1 purchased a

9   half-pound of methamphetamine from defendant Mario Escamilla for $6,500.  The details of

10  that transaction are set forth below.

11     a.      At approximately 3:15 p.m., CI-1 picked up Escamilla at a park near

12  Escamilla's residence.  Prior to the meeting, CI-1's vehicle had been equipped with both audio

13  and video recording devices.  CI-1 also had a surreptitious recording device on his person.[16]

14  Upon entering CI-1's vehicle, Escamilla asked if CI-1 had the money.[17] CI-1 handed Escamilla

15  $6,500, the previously agreed-upon price for the half-pound of methamphetamine.  Escamilla

16  stated that CI-1 could pick-up the methamphetamine at "la hacienda."  Escamilla then placed

17  a call to Blaser to let Blaser know that CI-1 would be coming by the apartment to pick-up the

18  methamphetamine.

19     b.      After a stop at Escamilla's residence, where Escamilla gave the $6,500

20  to defendant Bridgette Reynoso, and at the "la officina" (located at the 4900 block of Logan

21  Avenue, San Diego, California), where CI-1 dropped off Escamilla,[18] CI-1 went to Apartment

22  8 at the "la hacienda" apartment complex.  Inside the apartment, Blaser provided CI-1 with a

23  half-pound of methamphetamine.  CI-1 was then followed by surveillance agents from the "la

24

25     [16]     Surveillance agents also observed the events described below which took place
    in public areas subject to surveillance.
26

27     [17]     The half-pound methamphetamine transaction had been arranged via recorded
    telephone calls between CI-1 and Escamilla.

28     [18]     At the "la oficina," CI-1 observed defendant Jorge Humbero Lora counting
    approximately $52,000 from what Lora stated was a "marijuana transaction."

1  hacienda" apartment complex to a neutral location, where CI-1 gave agents the half-pound of

2  methamphetamine he had just purchased.  Agents also recovered the recording devices from

3  CI-1 and his vehicle at that time.

4  **Purchase Of A Half-Pound Of Methamphetamine - February 3, 2010**

5      45.    On February 3, 2010, agents monitoring Target Telephone #10[19] intercepted a

6  series of calls wherein defendant Mario Escamilla made arrangements to import a half-pound

7  of methamphetamine into the United States from Mexico. Escamilla successfully imported the

8  methamphetamine by having it body-cavity smuggled across the border by two female

9  couriers. After it had been successfully imported into the United States, Escamilla sold the

10  half-pound of methamphetamine to CI-1 for $6,500. The details of the half-pound transaction

11  are set forth below.

12      a.    On January 30, 2010, at approximately 7:44 p.m., CI-1 placed a call to

13  Mario Escamilla on Target Telephone #10.  During the call, CI-1 asked Escamilla to get ready

14  what CI-1 had picked-up the "last time" [referring to the half-pound of methamphetamine CI-1

15  purchased from Escamilla on January 26, 2010].  CI-1 stated that the "lijas" [money] was

16  almost ready.

17      b.    On February 3, 2010, at approximately 10:29 a.m., CI-1 placed a call to

18  Mario Escamilla on Target Telephone #10. During the call, CI-1 stated that he had the "lijas"

19  [money]. Escamilla stated that he would send "the girls" [women to body-cavity smuggle the

20  methamphetamine into the United States from Mexico] with "Uno" [defendant Ignacio

21  Escamilla Estrada] so that they could "go get it."

22      c.    On February 3, 2010, at approximately 3:21 p.m., CI-1 met with Mario

23  Escamilla at a restaurant in Chula Vista, California.  The meeting was recorded by CI-1, who

24  had been provided with a surreptitious recording device prior to the meeting.  During the

25

26  [19]    As noted above, the law enforcement officers handling this investigation sought
and received court authorization to conduct wiretaps on various FSO members' telephones.
In the wiretap pleadings, those telephones were sequentially designated as "Target Telephone

27  #1" to "Target Telephone #45;" the telephones intercepted pursuant to "roving" authorization
were designated sequentially as "Roving Telephone #1" to "Roving Telephone #4."  I have

28  kept those designations in this affidavit.   Thus, when I reference a call to/from a
"Target/Roving Telephone," that call was intercepted pursuant to a court-authorized wiretap.

1   meeting, CI-1 expressed concern over giving Mario Escamilla the purchase money for the
2   methamphetamine because the methamphetamine was still located in Tijuana. Escamilla
3   assured CI-1 that everything would be okay and that "Uno" [defendant Ignacio Escamilla
4   Estrada] already knew what Escamilla needed and stated that "they are getting everything
5   ready" [packaging the half-pound of methamphetamine for body-cavity smuggling across the
6   border]. CI-1 then provided Escamilla with $6,500 in United States currency and observed
7   Escamilla wrap the money in cellophane.

8           d.      On February 3, 2010, at approximately 6:32 p.m., Mario Escamilla placed
9   a call from Target Telephone #10 to defendant Bridgette Reynoso. During the call, Escamilla
10  confirmed that the "small package" contained "5-50" [$5,500, the purchase price of a half-
11  pound of methamphetamine in Tijuana].

12          e.      On February 3, 2010, at approximately 8:56 p.m., CI-1 placed a call to
13  Mario Escamilla on Target Telephone #10. At the time of the call, CI-1 was, as instructed by
14  Escamilla, driving a juvenile female, aka Dopey, and defendant Telle Kreschmer to the San
15  Ysidro Port of Entry so that those two women could body-cavity smuggle the half-pound of
16  methamphetamine into the United States. During the call, Escamilla told CI-1 to tell Dopey
17  that "his wife" [Escamilla's wife, defendant Bridgette Reynoso] would meet the couriers once
18  they arrived in Tijuana to pick-up the methamphetamine.

19          f.      On February 3, 2010, at approximately 9:38 p.m., defendant Raul Moreno,
20  aka Flaco, placed a recorded call to CI-1. During the call, Moreno asked if "the girls" [Dopey
21  and Kreschmer] were "back safely" [had successfully smuggled the methamphetamine across
22  the border]. CI-1 replied that he had dropped "them" off a half-hour ago, but they had not yet
23  crossed back into the United States.

24          g.      On February 3, 2010, at approximately 10:06 p.m., defendant Mario
25  Escamilla placed a call from Target Telephone #10 to defendant Bridgette Reynoso. During
26  the call, Reynoso stated that she had dropped off "Dopey" and another female courier at the
27  border, but that she did not know if the couriers had crossed back into the United States.

28

                                           30

Reynoso assured Escamilla that the couriers would call as soon as they crossed into the United States and that the couriers were aware of where they should go to get picked up.[20]

       h.    On February 3, 2010, at approximately 10:10 p.m., CI-1 placed a recorded call to Dopey. During the call, Dopey informed CI-1 that she and Telle Kreschmer had "just crossed" and that they would meet CI-1 at a restaurant near the San Ysidro Port of Entry. Shortly thereafter, CI-1 picked-up the two couriers at the restaurant. CI-1's vehicle was equipped with audio and video recording devices, which captured the two couriers getting into the vehicle at the restaurant. CI-1 then drove the two couriers to the FSO's "la officina" [literally "the office"], a complex located in the 5000 block of Logan Avenue, San Diego. At that location, the couriers gave the half-pound of methamphetamine they had just smuggled into the United States to CI-1.[21]

       i.    On February 3, 2010, at approximately 11:01 p.m., Mario Escamilla placed a call from Target Telephone #10 to CI-1. During the call, CI-1 stated that he was planning to sell the half-pound of methamphetamine he obtained from Escamilla earlier in the evening to CI-1's customers for "70" [$7,000]. Escamilla encouraged CI-1 to charge the customers more because "they needed to make a profit" on the transaction. Escamilla stated that he had paid "200 for the girls" [had paid $100 to each of the two women who body-cavity smuggled the methamphetamine into the United States].

### 2 Pound Methamphetamine Purchase - February 11, 2010

    46.    On February 11, 2010, CI-3 purchased two pounds of methamphetamine from defendant Carlos Cosme in Tijuana, Mexico, for $18,000. Both Cosme and CI-3 were in the United States during the transaction. Thus, the transaction was accomplished via proxy - with Cosme directing his workers to deliver the methamphetamine, and CI-3 directing his workers to receive delivery of the methamphetamine. Cosme "fronted" the methamphetamine to CI-3,

---

[20]    A check with the Treasury Enforcement Computer System (TECS) reveals that defendant Bridgette Reynoso crossed into the United States from Mexico at 10:08 p.m. on February 3, 2010.

[21]    Following the meeting at "la officina," law enforcement officers followed CI-1 to a predetermined neutral location where CI-1 relinquished the half-pound of methamphetamine.

1   that is, CI-3 was not required to pay for the methamphetamine prior to its delivery to CI-3's

2   workers in Tijuana.

3       47.   After arranging to purchase the two pounds of methamphetamine from Cosme,

4   CI-3 placed a recorded call to defendant Armando Villareal Heredia on February 10, 2010,[22]

5   and asked for Heredia's assistance in crossing the two pounds of methamphetamine into the

6   United States from Mexico.  During the call, Heredia arranged to have members of the FSO

7   import the methamphetamine into the United States from Mexico utilizing female body-cavity

8   smugglers.

9       48.   The first of the two pounds was successfully crossed into the United States on

10  February 11, 2010, and was delivered to an undercover agent ("UC") posing as one of CI-3's

11  workers.  The next day, February 12, 2010, the FSO was able to successfully smuggle a 3/4

12  pound of the remaining one pound into the United States.[23]   The 3/4 pound of

13  methamphetamine was  delivered that same day to an undercover agent posing as one of CI-

14  3's workers.

15      49.   Set forth below are some of the recorded conversations and surveillance

16  observations regarding the above-noted two methamphetamine deliveries.

17          a.   On February 9, 2010, at approximately 11:24 a.m., CI-3 placed a recorded

18  call to Carlos Cosme on Target Telephone #11.  During the call, CI-3 stated that he had a

19  customer who might be interested in purchasing the two pounds of methamphetamine which

20  Cosme had offered to sell CI-3 during an unrecorded conversation on February 8, 2010.  CI-3

21  stated that he would confirm his buyer's ability to pay for the methamphetamine and stated

22  that he would call Cosme back regarding the sale.

23

24

_____

25      [22]   CI-3 placed this call to Target Telephone #8. However, agents monitoring Target
    Telephone #8 did not intercept the call because at the time of the call, Target Telephone #8
26  was physically located in Guadalajara, Jalisco, Mexico.

27      [23]   The juvenile female, aka Dopey, was stopped at the San Ysidro Port of Entry
    trying to body-cavity smuggle a 1/4 pound of methamphetamine into the United States. After
28  it was determined Dopey was a juvenile, she was not criminally charged and was given a drug-
    court diversionary disposition.

32

1    b.    On February 10, 2010, at approximately 11:43 a.m., CI-3 placed a

2   recorded call to Armando Villareal Heredia on Target Telephone #8. During the call, CI-3

3   stated he had made arrangements to purchase "dos cuadernitos" [two pounds] of "ventanitas"

4   [literally "windows," but a common reference to methamphetamine] from "the individual who

5   used to hang out with Marcos, who is now in El Hongo" [defendant Carlos Cosme, who

6   apparently used to "hang out" with Marcos, an unidentified individual serving time in "El

7   Hongo" prison in Tecate, Mexico]. CI-3 stated that he was going to purchase the two pounds

8   of methamphetamine for a total price of $18,000. Heredia asked if the methamphetamine was

9   good quality, two which CI-3 replied that it was a "two" ["one" being uncut high-purity

10   methamphetamine a "two" being methamphetamine already "cut" with a dilutant]. Heredia

11   stated that he could sell CI-1 "one" quality methamphetamine at a price of $10,000 per pound.

12   CI-3 then asked if Heredia could assist him by arranging to have the two pounds of

13   methamphetamine brought across the border.  Heredia responded that his "group" [FSO

14   members acting under his direction] in the United States could smuggle the methamphetamine

15   into the United States.  Heredia stated that his crew had a "small visa" [the ability to cross

16   smaller amounts of drugs] who could transport two or three ounces at a time. Heredia stated

17   that he would have his crew deliver the methamphetamine to CI-3 in the United States.

18    c.    On February 10, 2010, at approximately 12:34 p.m., CI-3 placed a

19   recorded call to defendant Carlos Cosme on Target Telephone #11. During the call, CI-3

20   stated that he would pay Cosme for the two pounds of methamphetamine "tomorrow."  CI-3

21   then informed Cosme that "la persona" [defendant Armando Villareal Heredia] was going to

22   arrange to have the methamphetamine imported into the United States.

23    d.    On February 10, 2010, at approximately 12:42 p.m., defendant Ignacio

24   Escamilla Estrada placed a recorded call from Target Telephone #14 to CI-1. During the call,

25   Estrada instructed CI-1 to "prepare 2 or 3 strollers . . . those little carts for the groceries" [to

26   contact two or three women who would participate in body-cavity smuggling the two pounds

27   of methamphetamine into the United States from Mexico]. Estrada stated that there would be

28

1  "eight people" [eight 1/4 pound quantities], which would require "eight trips" [eight separate
2  crossings to import the two pounds of methamphetamine].

3          e.      On February 10, 2010, at approximately 7:38 p.m., CI-3 placed a recorded
4  call to defendant Carlos Cosme on Target Telephone #11.  During the call, Cosme confirmed
5  that the "two popsicles" [two pounds of methamphetamine, as described during a recorded call
6  over Target Telephone #11 earlier that day at approximately 7:03 p.m.] had been delivered
7  to "a chubby who was in an Explorer" [one of CI-3's workers, who was driving a Ford Explorer].
8  Significantly, during an earlier recorded conversation over Target Telephone #11, Cosme
9  stated his delivery men would be Mexican State Judicial Police officers.  The identities of the
10  individual(s) who made the methamphetamine delivery is uncertain at this time.

11          f.      On February 11, 2010, at approximately 3:28 p.m., CI-3 placed a recorded
12  call to defendant Carlos Cosme on Target Telephone #11.  During the call, Cosme asked if
13  CI-3 would need "two units at a time" [2 pounds of methamphetamine per delivery].  CI-3
14  stated that the quality of the two pounds of methamphetamine Cosme had delivered to CI-3's
15  "people" in Tijuana was "fine."  Cosme stated that as soon as CI-3 was able to sell the two
16  pounds of methamphetamine, Cosme would get CI-3 "another two of the same kind or
17  whatever he (CI-3) wanted."  Cosme stated that he could "do it today" [make another two
18  pound methamphetamine delivery] if CI-3 wanted to.  CI-3 stated he would get back in touch
19  with Cosme.

20          g.      On February 11, 2010, at approximately 8:47 p.m., CI-1 placed a call to
21  defendant Mario Escamilla on Roving Telephone #1.  During the call, Escamilla instructed CI-1
22  to deliver "a complete one" [a pound of methamphetamine] to a car that would be "parked
23  there."  CI-1 stated that he needed 6 minutes to "put tape around it like (defendant Ignacio
24  Escamilla Estrada) had instructed CI-1 to do.  At approximately 9:24 p.m. that evening,
25  surveillance agents observed CI-1 make the one pound methamphetamine delivery as
26  instructed by Escamilla.  The delivery was made to an undercover law enforcement agent's
27  ("UC-1") vehicle.  After receiving the one pound of methamphetamine, the undercover agent

28

1  delivered $9,000 to a unidentified male in the parking lot of the Terra Nova shopping center,

2  located near the intersection of H Street and I-805 in Chula Vista, California.

3          h.      On February 12, 2010, at approximately 2:27 p.m., defendant Mario

4  Escamilla placed a call from Roving Telephone #2 to an undercover law enforcement officer

5  ("UC-2") who was posing as a worker employed by CI-3.  During the call, Escamilla stated that

6  "everything was fine, but that the last small piece stayed stuck" [that the bulk of the

7  methamphetamine had been successfully crossed into the United States from Mexico, but that

8  a courier with a 1/4 pound had been stopped at the San Ysidro Port of Entry].  UC-2 asked

9  Escamilla to bring over "what they had" [the 3/4 pound of methamphetamine which had been

10  successfully crossed] and "leave the other small piece pending" [not wait for the 1/4 pound

11  stuck at the border].  At approximately 3:31p.m., that evening, surveillance agents observed

12  CI-1 make the one pound methamphetamine delivery as instructed by Escamilla.  The delivery

13  was made to UC-1's vehicle.  After receiving the 3/4 pound of methamphetamine, UC-1

14  delivered $9,000 to a unidentified male in the parking lot of the Terra Nova shopping center,

15  located near the intersection of H Street and I-805 in Chula Vista, California.

16          **Disclosure Of A FSO "Hit List" - February 16, 2010**

17          50.     On February 16, 2010, during an audio and video tape recorded session in CI-1's

18  vehicle, defendant Mario Escamilla provided CI-1 with a verbal list of individuals currently

19  being targeted for assassination by the FSO.  Escamilla identified those individuals as: FNU

20  LNU, aka Panda; FNU LNU, aka Tocho, further identified by Escamilla as a relative of

21  defendant Bridgette Reynoso; E.A.Z., aka Sharky; and "Juan Carlos" [identified as J.C.R.A.].

22          **Purchase Of An SKS Assault Rife - February 17, 2010**

23          51.     On February 17, 2010, CI-1 purchased an SKS brand assault rifle from

24  defendant Raul Moreno, aka Flaco, for $1,000.[24/]  Prior to the sale, CI-1 and his person/vehicle

25  were searched by law enforcement officers, with negative results for cash and/or contraband.

26  CI-1 was then provided with a concealed recording device and $1,100 to purchase the firearm.

27  _____

28      [24/]     The cost of the gun was $900 and Moreno demanded an additional $100 for
facilitating the sale.

1  Surveillance agents followed CI-1 to Moreno's residence at the time, located at 244 Palomar

2  Drive, Chula Vista, California, where CI-1 was observed entering Moreno's home.  After

3  approximately ten to fifteen minutes, surveillance agents observed CI-1 and Moreno walk out

4  of the residence.  Moreno was then observed placing a large object (later confirmed to be a

5  case containing the SKS assault rifle) in the back seat of CI-1's vehicle.  Surveillance agents

6  followed CI-1 to a predetermined neutral location where he and his vehicle were again

7  searched.  That search resulted in the recovery of the SKS assault rifle CI-1 had just

8  purchased.  CI-1 also provided law enforcement officers with the $100 not used during the

9  weapon purchase.  No other cash/contraband was found during the search.

10             **Conspiracy/Attempted Murder Of A.E.Z. - February 23, 2010**

11        52.    On February 23, 2010, CI-1 drove to defendant Mario Escamilla's house to pick-

12  up Escamilla and take him to a planned meeting with other FSO members.  CI-1 was in

13  possession of a concealed recording device and CI-1's vehicle was equipped with a video

14  recording device. While en route to the meeting location, Perla Carolina Jimenez placed a call

15  to Mario Escamilla on Roving Telephone #1. The call occurred at approximately 3:53 p.m.

16  During the call, Jimenez stated that "hay un pesesito en la pesera" [A.E.Z., aka Sharky, was

17  in the El Carrizal seafood restaurant].  Upon receiving that information, Escamilla instructed

18  CI-1 to drive to the El Carrizal restaurant so that he could verify A.E.Z.'s location.  Upon

19  arriving at the restaurant, Escamilla confirmed that A.E.Z.'s truck was parked outside.

20        53.    After seeing A.E.Z.'s truck parked outside of the restaurant, Escamilla instructed

21  CI-1 to drive to Apartment #8 at the "la hacienda" apartment complex, located at 1042 15th

22  Street, San Diego, California. While driving to the "la hacienda" complex, Escamilla told CI-1

23  that they would be picking up Mikael Daniel Blaser, who Escamilla stated would be tasked with

24  killing A.E.Z. Escamilla stated that he had $5,000 available to pay Blaser for committing the

25  murder, but Escamilla stated that CI-1 could keep $1,000 or $2,000 out of the $5,000 if he

26  wanted to.

27        54.    Upon arriving at Apartment #8, CI-1 and Escamilla encountered Blaser and

28  Blaser's girlfriend, defendant Telle Kreschmer.  As he had on January 8, 2010, in connection

1  with the prior attempted murder of A.E.Z., Blaser readily agreed to be the one to shoot and kill

2  A.E.Z. Blaser then retrieved a .38 caliber handgun from the bedroom closet and got into CI-

3  1's vehicle with CI-1. Escamilla chose to ride to the restaurant in a separate vehicle - one

4  driven by defendant Jimenez, who had also driven to the "la hacienda" apartment complex.

5      55.     While en route to the El Carrizal restaurant to commit the murder, CI-1 placed

6  numerous calls to law enforcement officers to inform them, in a coded fashion, about the

7  impending murder. Agents responded to the situation by tasking numerous marked SDPD

8  units to drive to the El Carrizal restaurant to saturate that location with law enforcement

9  officers. Although CI-1 and Blaser arrived at the restaurant before the marked SDPD units,

10  CI-1 was able to stall Blaser from getting out of his vehicle long enough to allow the marked

11  units to arrive and thwart the attempted murder.

12      56.     At approximately 5:20 p.m. defendant Mario Escamilla placed a call from Roving

13  Telephone #1 to FNU LNU, aka Franky on Target Telephone #13. During the call, Escamilla

14  stated that "they" [FSO "crew" members] had "made a third attempt . . . and they can't get him"

15  [the FSO had made three attempts to kill E.A.Z., but had been unsuccessful in doing so].

16  Escamilla complained that E.A.Z. must have an agreement with "them hats" [an agreement

17  with the police because every time the FSO attempted to kill E.A.Z., the police appeared at

18  the murder location]. Later during the same call, Escamilla informed Franky that his crew

19  would "wait around and hunt this guy down" [wait in the vicinity of the El Carrizal restaurant

20  and follow E.A.Z. away from that site to kill him at a different location].

21      57.     Because of Escamilla's statement that he was going to have his "crew" members

22  wait and follow E.A.Z. from the restaurant in order to carry out the murder, law enforcement

23  officers also positioned themselves in the vicinity of the restaurant to follow E.A.Z. from that

24  location. After following E.A.Z. a short distance as he drove away from the restaurant, a

25  marked SDPD unit conducted a traffic stop of his vehicle because it was missing a front

26  license plate. A consent search of E.A.Z.'s vehicle resulted in the seizure of a baseball bat,

27

28

37

1   which E.A.Z. admitted he possessed for personal protection. E.A.Z. was then placed under

2   arrest for a violation of California Penal Code 12020 - possession of a dangerous weapon.[25/]

3               **Purchase Of Law Enforcement Equipment - February 22 and 25, 2010**

4               58.     On February 22, 2010, at approximately 5:38 p.m., defendant Fausto Escamilla

5   placed a call from Target Telephone #12 to Escamilla on Roving Telephone #2. During the

6   call, Escamilla stated that he needed to obtain "the plastic things" [heavy-duty zip ties] that

7   "they" [law enforcement officers] use "instead of the handcuffs." Escamilla stated that he had

8   "bought some already" and that "there were some already ready for that" [unidentified

9   individuals to be restrained using the heavy-duty zip ties].

10              59.     On February 25, 2010, at the direction of defendant Armando Villareal Heredia,

11  defendant Mario Escamilla purchased law enforcement uniforms, boots, gloves, ski masks and

12  plastic restraint devices, also known as "zip ties." This event was confirmed through a series

13  of intercepted calls between Heredia and Escamilla. Additionally, a law enforcement officer

14  acting in an undercover capacity observed Escamilla shopping for the above-noted items.

15              **Pending Three Pound Methamphetamine Transaction - March 3, 2010**

16              60.     As a result of the law enforcement seizures set forth above, defendant Mario

17  Escamilla attempted to enlist the help of defendant Fausto Escamilla to obtain additional

18  quantities of methamphetamine from the FSO in Mexico. More specifically, during an

19  intercepted conversation with Fausto Escamilla, Mario Escamilla asked Fausto to speak with

20  "the Senor," that is, defendant Armando Villareal Heredia, regarding a pending order for three

21  pounds of methamphetamine.

22

---

23      [25/]    E.A.Z. was booked into custody and was transported to San Diego County Jail.
     The next day, February 24, 2010, E.A.Z. posted bail and was released from custody. On
24   February 25, 2010, agents monitoring Roving Telephone #1 intercepted a call between
     defendant Mario Escamilla and defendant Perla Carolina Jimenez. During the call, Jimenez
25   informed Escamilla that E.A.Z. was at a tattoo parlor next to the El Carrizal restaurant.
     Escamilla did not act on the information provided by Jimenez.
26
             During a recorded conversation on March 1, 2010, defendant Mario Escamilla stated
27   that because defendant Raul Moreno was too scared to participate in the attempted murder
     of A.E.Z. on February 23, 2010, Escamilla was considering sending Moreno on an "errand"
28   to Tijuana, Mexico, where Escamilla would have his father, defendant Ignacio Escamilla
     Estrada, kill Moreno.

1

**Bullet Proof Vest And Money Transaction**

2      61.    On or about March 8, 2010, during a meeting consensually recorded by CI-1,

3  defendant Jose Contreras provided defendant Mario Escamilla with two bullet proof vests and

4  several thousand dollars.   During that same meeting, defendant Jose Contreras asked

5  defendant Mario Escamilla to deliver several thousand dollars to defendant Edgar Escamilla

6  in Tijuana, Mexico. Regarding Contreras, Escamilla stated that he was "on the same crew as

7  Dies," that is, that Jose Contreras worked for defendant Edgar Escamilla.

8           **Five Pound Marijuana Transaction - March 9, 2010**

9      62.    On March 9, 2010, defendant Kevin Luis picked up approximately five pounds

10  of marijuana from a "stash house" maintained by defendant Mikael Daniel Blaser.  CI-1 was

11  present at the "stash house" during the pick-up and was carrying a concealed recording

12  device. Intercepted telephone conversations also confirm the marijuana pick-up because the

13  price for that marijuana was discussed during those calls.

14           **Delivery Of A Methamphetamine Sample - March 12, 2010**

15      63.    On or about March 12, 2010, defendant Mario Escamilla and defendant Araceli

16  Varela provided a sample of methamphetamine to two individuals at a location near Third

17  Avenue and Naples Street in Chula Vista, California.   Escamilla and Varela traveled to that

18  location in CI-1's vehicle, which was equipped with an audio and video recording device. The

19  video footage from that camera shows Escamilla providing the methamphetamine sample to

20  Varela, who can then be seen examining the packages of methamphetamine.

21           **Methamphetamine Negotiation - March 12, 2010**

22      64.    On or about March 12, 2010, defendants Mario Escamilla and Ignacio Escamilla

23  Estrada agreed to supply defendant Kevin Luis with an ounce of methamphetamine every

24  week at a price of $775 per ounce, as long as Luis was willing to pick the methamphetamine

25  up in Tijuana, Mexico. This event was captured pursuant to the court-authorized wiretaps in

26  this case.

27  \\

28  \\

## Possession Of Narcotics And Weapons - March 18, 2010

65.     On March 18, 2010, agents conducted a search of a "stash house" maintained by members of the FSO. The search location was 1042 15th Street, Apartment #8, San Diego, California, the residence of defendant Mikael Daniel Blaser and his girlfriend, defendant Telle Kreschmer. The search resulted in the seizure of 23 ounces of methamphetamine, a shotgun and approximately 30 pounds of marijuana.   To maintain the viability of the ongoing investigation, no arrests were made in connection with the search.  Because the search was conducted pursuant to the consent of Telle Kreschmer, law enforcement officers did not leave any paperwork, such as a copy of a search warrant, behind at the search location.  Set forth immediately below are a number of intercepted calls which relate to the search.

a.      On March 18, 2010, at approximately 9:41 p.m., defendant Mario Escamilla placed a call from Roving Telephone #3 to CI-1.  During the call, Escamilla told CI-1 that "they went to Danny's" [the police had been to Blaser's residence at 1042 15th Street, Apartment #8, San Diego, California].  CI-1 asked Escamilla, "What's going on?"  Escamilla replied by instructing CI-1 to call "Geo" [defendant Jorge Humberto Lora, aka Georgie ].

b.      On March 18, 2010, at approximately 11:10 p.m., defendant Mario Escamilla placed a call from Roving Telephone #3 to FNU LNU, aka Evelyn.  During the call, Escamilla questioned Evelyn about what had happened at "Danny's house" [the "stash house" maintained by defendant Mikael Daniel Blaser].  Evelyn stated that there had been about "twelve of them" [12 police officers] who had "parked at the corner where no one could see them and they all went to that apartment."  Escamilla asked if the police had arrested anyone, to which Evelyn replied, "No, I'm not sure."  Escamilla then complained that they had "taken all his money" [law enforcement had seized Escamilla's narcotics, which would cost him money].

c.      On March 23, 2010, at approximately 7:06 p.m., defendant Perla Carolina Jimenez placed a call to defendant Mario Escamilla on Roving Telephone #4.  During the call, Jimenez confirmed that "there was no paper" that had been left with "the girl" [the law enforcement officers had not left any paperwork at the "stash house"].  Escamilla instructed

40

1  Jimenez to obtain some type of "paper" from defendant Mikael Daniel Blaser because if
2  Escamilla could not produce any paperwork, "all the problems were going to fall on him"
3  [Escamilla would be held financially accountable for the seized items unless he could produce
4  documentation that they had been seized by law enforcement authorities].   Jimenez stated
5  that the only one who could "get that paper" was "the wife" [defendant Telle Kreschmer] but
6  that "she did not want to" [Kreschmer did not want to obtain any law enforcement paperwork
7  related to the search, most likely because Kreschmer knew that the paperwork would reflect
8  that she had consented to the search].

9          d.      On March 24, 2010, at approximately 8:16 p.m., defendant Edgar Gustavo
10 Escamilla placed a call to defendant Mario Escamilla on Roving Telephone #4.  During the
11 call, Escamilla stated that he had "some pillows" [narcotics] stored in "two locations" but that
12 the narcotics had "fallen" [had been seized by law enforcement authorities].  Escamilla stated
13 that he would nevertheless be able to "get out of it" because he "had money around"
14 [Escamilla would be able to absorb the financial loss from the seized narcotics because he
15 had other funds available].

16          **Weapons, Drugs and Law Enforcement Uniforms**

17          66.     On March 24, 2010, at approximately 11:04 a.m., CI-3 placed a call to defendant
18 Armando Villareal Heredia on Target Telephone #15. During the call, Heredia complained that
19 "last time it took him about a week and one of the pieces fell" [an unidentified worker had taken
20 a week to cross narcotics into the United States and one part of the shipment had been seized
21 at the border]. Heredia stated that "the guy" [unidentified individual] had "three pieces over
22 there right now" [three pounds of methamphetamine in the United States].  Heredia then stated
23 that he was having difficulties obtaining "the uniforms" [law enforcement uniforms to be used
24 by CI-3 and his "kidnaping" crew]. Heredia stated that if CI-3 could find a seamstress, Heredia
25 would give him a sample uniform because he had one "with badges on." Heredia stressed that
26 buying the uniforms would be no problem, it was "having the badges made" [sewing law
27 enforcement insignia on the uniforms] that would be difficult. The conversation then turned to
28 Heredia's previous offer to sell CI-3 an AR-15 assault rifle and a "5-7," also known as a "cop

1 killer." Regarding that sale, Heredia stated that all CI-3 needed to do was give "his guy the
2 money" and "the guy" would then deliver the guns to CI-3. Heredia stated that he would call
3 CI-3 back with "his guy's" location.

4      67.    On March 24, 2010, at approximately 1:16 p.m., an unknown male ("UM") placed
5 a recorded call to CI-3. During the call, the UM stated he was waiting for CI-3 to deliver "the
6 paper" [money] and that he was located in between the "Home Depot and Bank of America."
7 CI-3 stated that he would be at UM's location "shortly."

8      68.    CI-3 was accompanied to the meeting with the UM by an undercover agent
9 ("UC"). The UC observed CI-3 get into the UM's vehicle and hand UM a white envelope
10 containing $4,000. UM then counted the money. While counting the money, the UM received
11 a phone call from Heredia, which CI-3 overheard and recorded via the concealed recording
12 device he was carrying. UM informed Heredia that he was in the process of meeting with CI-3.
13 After counting the money, UM told CI-3 that the guns were be delivered to CI-3 at a later time.

14      69.    On March 26, 2010, CI-3 called the UM to get a status report on the gun delivery.
15 The UM stated that he was only the money collector and that he would call CI-3 back.
16 Immediately afterwards, UM placed a call from Target Telephone #15 to CI-3 and chastised
17 CI-3 for calling Heredia's contact directly. This call clearly demonstrates the hierarchical
18 structure of the FSO.[26/]

19      **Money Shipment - March 24, 2010**

20      70.    On March 24, 2010, agents intercepted a call between defendant Oscar Montoya
21 Mora and Jose Alfredo Najera Gil regarding Montoya's transportation of money to defendant
22 Armando Villareal Heredia. More specifically, on March 24, 2010, at approximately 10:25
23 p.m., Oscar Montoya Mora placed a call from Target Telephone #20 to Jose Alfredo Najera
24 Gil on Target Telephone #16. During the call, Montoya stated that he "might have to deliver
25 some money to Penafiel" [deliver some money to defendant Armando Villareal Heredia].
26 Montoya stated that he was "waiting" [for the money to be delivered] and that he was "on the

27
     ———————————
28      [26/]    The firearms were ultimately delivered to a law enforcement officer acting in an undercover capacity by two Hispanic males on April 17, 2010. The delivery took place in the Central District of California.

1   inside" [inside the United States].  Montoya stated that he just wanted to let Najera know what

2   was going on "in case they ask."  Najera stated that it was "fine" [there would be no problems

3   if Montoya made the money delivery to Heredia].

4   **One Pound Methamphetamine Sale - March 24, 2010**

5   71.   On March 24, 2010, CI-1 purchased a pound of methamphetamine from

6   defendant Mario Escamilla for $14,000.  The transaction occurred outside 1319 5th Avenue,

7   Chula Vista, California, the residence of defendant Enrique Salinas Jr., aka Playboy.

8   Escamilla placed the one pound of methamphetamine into CI-1's vehicle and CI-1 gave the

9   $14,000 payment directly to Escamilla.  CI-1 was carrying a concealed recording device during

10  the transaction and CI-1's vehicle was also equipped with a video recording device in the

11  dashboard; however, because of the manner in which he dropped the methamphetamine into

12  CI-1's vehicle, Escamilla was not captured on the video device.  Escamilla's conversations with

13  the CI-1 were recorded by CI-1's concealed recording device.  Some of the calls pertaining to

14  that transaction are set forth below.

15  a.   On March 24, 2010, at approximately 5:49 p.m., Mario Escamilla placed

16  a call from Roving Telephone #3 to defendant Ignacio Escamilla Estrada.  During the call,

17  Escamilla stated that he had a person who can "move one at a time, on foot" [smuggle a whole

18  pound of methamphetamine into the United States via the pedestrian lanes at the port of

19  entry].  Escamilla stated that they could send her with "primo's one because the guy just

20  called" [CI-1 had just called and ordered a pound a methamphetamine from Escamilla].

21  Escamilla stated that "the guy" [CI-1] already had the "lijas" [money to purchase the

22  methamphetamine].  Estrada expressed concern that "the people were getting busted, plus

23  it is a whole one" [couriers had recently been arrested at the border and a whole pound of

24  methamphetamine was a lot to risk getting seized].  Estrada replied, "it's tough."

25  b.   On March 24, 2010, at approximately 6:37 p.m., CI-1 placed a call to

26  Mario Escamilla on Roving Telephone #4.  During the call, CI-1 stated that he had the "lijas"

27  [money] with him.  CI-1 stated that he was almost at "the fast one" [the freeway] and that he

28  would "be there shortly."

1        c.     On March 24, 2010, at approximately 6:52 p.m., defendant Fausto

2 Escamilla Estrada placed a call from Target Telephone #12 to Mario Escamilla on Roving

3 Telephone #3. During the call, Mario Escamilla stated that "his guy" [CI-1] "had the money on

4 hand" but that Estrada did not want to use Escamilla's "girl" [Mario Escamilla's courier].

5 Estrada said he would call "this guy" [unidentified third party] and see if he had "some inside"

6 [methamphetamine in the United States]. If so, Estrada stated he would tell the third party that

7 there was a "client that would buy it."

8        d.     On March 24, 2010, at approximately 7:47 p.m., FNU LNU, aka Franky

9 placed a call from Target Telephone #13 to Mario Escamilla on Roving Telephone #3. During

10 the call, Mario Escamilla stated that "it had crossed over to that side" [the methamphetamine

11 had been successfully brought into the United States from Mexico]. Franky replied, "that's

12 good." Escamilla then instructed Franky to find out "where and to whom to take that unit"

13 [where the vehicle containing the narcotics was going]. Escamilla stated that he needed "two

14 windows" [two pounds of methamphetamine].

15        e.     On March 24, 2010, at approximately 8:59 p.m., FNU LNU, aka Franky

16 placed a call from Target Telephone #13 to an unidentified male ("UM"). During the call,

17 Franky stated that he was being asked for "two popsicles or two windows" [two pounds of

18 methamphetamine]. Franky stated that the guy "had one" and needed "one more" [already

19 had one pound of methamphetamine, but that he needed an additional pound].

20        f.     On March 24, 2010, at approximately 10:44 p.m., FNU LNU, aka Franky

21 placed a call from Target Telephone #13 to Mario Escamilla on Roving Telephone #3. During

22 the call, Mario Escamilla stated that "they" [unidentified courier] had already given him "the

23 suff" [the methamphetamine]. Escamilla then stated that the plan was to "do that today" [sell

24 the methamphetamine to CI-1 that evening].

25 **Double Homicide In Tijuana - March 25, 2010**

26     72.     On Thursday, March 25, 2010, Efrain Alvarez Gonzalez and Abel Joatan

27 Gonzalez were murdered in Tijuana, Mexico. Intercepted calls confirm that the murders were

28 orchestrated by FNU LNU, aka Panchito, and that the murders were sanctioned by defendant

44

1  Ruben Dario Castro Perez (who was residing in San Diego at the time) and Jose Alfredo

2  Najera Gil.

3      73.    The day after the murders, Mexican State Judicial Homicide Supervisor Eugenio

4  Gilbert called and spoke with SDPD Mexico Liaison Detective Fausto Romero. During the call,

5  Supervisor Gilbert confirmed that on March 25, 2010, a double homicide had occurred outside

6  an automotive shop in Colonia Jardin Delegacion San Antonio de Los Buenos, a community

7  in Tijuana, Mexico. According to Supervisor Gilbert, the victims had been shot in and while

8  fleeing from a Chevy Silverado bearing California license 8W21885.[27/]

9      74.    Set forth below are summaries of intercepted calls confirming the Target

10 Subjects' involvement in the double homicide.

11         a.    On March 25, 2010, at approximately 6:07 p.m.,defendant Jose Alfredo

12 Najera Gil placed a call from Target Telephone #16 to FNU LNU, aka Panchito. During the

13 call, Panchito stated that "they were going with the same operation as yesterday." Najera

14 instructed Panchito to "follow them" [establish surveillance on the two intended victims].

15 Panchito stated that "both of them are together." Najera told Panchito to "note what they are

16 wearing."

17         b.    On March 25, 2010, at approximately 6:28 p.m. Najera placed a call from

18 Target Telephone #16 to Panchito. During the call, Panchito stated that "Efrain" [Efrain

19 Alvarez Gonzalez] was wearing "a white short shirt with a design in the front and blue jeans"

20 and that "Gordo" [Abel Joatan Gonzalez] was wearing a "yellow shirt." Najera instructed

21 Panchito to "confirm correctly" because Najera was "getting ready to send guys over there"

22 [getting ready to send the hit squad to kill the targets] and that he didn't want them "to miss

23 or return the package" [miss their opportunity to kill the targets or shoot the incorrect

24 individuals]. Panchito stated that he understood Najera's concern and that was why he

25 needed "some more time to confirm." Panchito then stated that he was "in the fucking car and

26

27

28      [27/]    A records check with the California DMV revealed that the Chevy Silverado was
registered to victim Efrain Alvarez Gonzalez at an address in San Ysidro, California.

his eyes were not moving from the fucking house and that they would not be able to get by him without being seen."

      c.    On March 25, 2010, at approximately 6:48 p.m., Panchito placed a call to defendant Jose Alfredo Najera Gil on Target Telephone #16. During the call, Panchito stated that Efrain was "moving some stuff in the pick-up" and that he was "wearing a white shirt and a blue hat" and could therefore "easily be seen." Najera asked Panchito to inform him when "both" [Efrain and Abel] "got into the truck." Panchito stated that he would let Najera know when that happened.

      d.    On March 25, 2010, at approximately 7:19 p.m., defendant Jose Alfredo Najera Gil placed a call from Target Telephone #16 to Panchito. During the call, Panchito stated that "they" [Efrain and Abel] had left the house in a "Silverado" and that they were "heading up to El Florido" [driving toward a neighborhood in Tijuana]. Panchito stated that the Silverado had "California plates."

      e.    On March 25, 2010, at approximately 8:41 p.m., defendant Ruben Dario Castro Perez, placed a call from Target Telephone #19 to defendant Jose Alfredo Najera Gil on Target Telephone #16. During the call, Najera stated that "both had been spotted" [both victims had been located] and that they had tried to flee. Najera then stated that "the vehicle was crashed" [the Silverado being driven by the victims had crashed] and that "they" [unidentified hit men] had "sat" [killed] both of them. Najera stated that he had "given the order" [given the order to kill the victims] when "they" [Efrain and Abel] were "on their way to El Florido." Castro instructed Najera to make arrangements to have his men "pick up Reyna and take her" [kidnap Efrain's mother, R.G.]. Najera replied that he would have her "hit right outside instead of being taken" [kill R.G. outside her residence rather than kidnaping her]. Najera then explained that "one stayed in the vehicle, the other tried to flee and they got him" [either Efrain or Abel had been killed inside the Silverado and the other had been killed while trying to run from the vehicle].

      f.    On or about March 25, 2010, at approximately 8:54 p.m., defendant Jose Alfredo Najera Gil placed a call from Target Telephone #16 to defendant Ruben Dario Castro

1   Perez.   During the call, Castro instructed Najera to contact defendant Jesus Quinones
2   Marquez and have Marquez "spread the rumor and make a mess of things, just as if 'they'
3   (Efrain Alvarez Gonzalez and Abel Joatan Gonzalez) were bad guys."  Castro further stated
4   that "they could wait and postpone regarding the princess for another day" [the
5   kidnaping/murder of R.G., Efrain's mother, could be postponed]

6            g.        On March 25, 2010, at approximately 9:09 p.m., defendant Jose Alfredo
7   Najera Gil placed a call from Target Telephone #16 to defendant Oscar Daniel Montoya Mora
8   on Target Telephone #20. During the call, Najera stated that "the neighbors were sitting down
9   on ice boxes" [Efrain and Abel had been successfully killed].  Montoya replied, "That's good."
10  Najera stated that he had "given the order" [to have Efrain and Abel killed] and that he
11  apologized because "things were going to be done differently."  Montoya asked if "they had
12  tried to be heroes" [if the victims had fought back].  Najera replied, "No."

13            h.        On March 25, 2010, at approximately 9:54 p.m., Panchito placed a call
14  to defendant Jose Alfredo Najera Gil on Target Telephone #16.  During the call, Panchito
15  stated that "it was confirmed, they both got taken down."  Panchito stated the "his friend"
16  [unidentified individual] had called and they "they got the guy and Efrain."

17            i.        On March 25, 2010, at approximately 10:18 p.m., defendant Oscar Daniel
18  Montoya Mora placed a call from Target Telephone #20 to defendant Jose Alfredo Najera Gil
19  on Target Telephone #16.  During the call, Najera stated that "both brothers went down."
20  Montoya stated that his "compadre" [defendant Ruben Dario Castro Perez] was going to send
21  him "5,000 dollars" [to be used to pay the individuals involved in the double murder].

22            j.        On March 27, 2010, at approximately 1:54 pm., defendant Jesus
23  Quionones Marquez placed a call from telephone number (619) 726-5026 to defendant Jose
24  Alfredo Najera Gil on Target Telephone #16.   During the call, Najera stated that his
25  "Compadre" [defendant Ruben Dario Castro Perez] wanted to create some "gossip on Friday's
26  newspaper" reflecting that the double homicide had been committed by the "Fishitas" [rival
27  drug trafficking organization controlled by "El Teo"].  Najera further stated that he would call
28  his Compadre and ask if there would "be any motivation" [a monetary payment for providing

47

1  the false information regarding the homicide].  Marquez replied that he would "check if he
2  could do it" [make sure he could spread the false story to the media].

3  **"Kidnaping" Of M.L.**

4      75.    On March 17, 2010, at the direction of defendant Ruben Dario Castro Perez, CI-
5  3 and an undercover agent ("UC") traveled from San Diego to San Bernadino to meet with
6  defendant Humberto Torres Mendoza, regarding the collection of a debt owed by an individual
7  named M.L. During the meeting, Mendoza instructed CI-3 and the UC to kidnap M.L. in order
8  to collect the $100,000 debt M.L. owed to the FSO.  Mendoza provided CI-3 and the UC with
9  a photograph, address and phone number for M.L. Mendoza also stated that he wanted CI-3
10  and the UC to collect debts from other unidentified individuals as well, including a person living
11  in San Diego.

12      76.    On March 30, 2010, at approximately 6:00 a.m., agents established surveillance
13  outside the residence of M.L.  Agents observed M.L. leave his home at approximately 8:30
14  a.m.  M.L. was followed to a nearby gas station where agents approached him, identified
15  themselves as law enforcement officers and asked him to accompany them to a nearby police
16  station.  M.L. agreed.  At the police station, agents informed M.L. that he was the target of a
17  kidnaping/murder plot and that his kidnaping/murder was being planned because he owed a
18  $100,000 drug debt to an identified organization (the FSO).  M.L. agreed to cooperate and has
19  been sequestered with a round-the-clock protective detail since that date.

20      77.    On March 31, 2010, at approximately 11:42 a.m., CI-3 and a team of undercover
21  agents staged the kidnaping of M.L. at a public location in Van Nuys, California.  Defendant
22  Humberto Torres Mendoza did not personally witness the "kidnaping," but was located in a
23  nearby vehicle with CI-3 and the UC. M.L., who had been bound and gagged, was placed in
24  the vehicle with Mendoza, CI-3 and the UC. A call was placed to an associate of Mendoza,
25  named Mario LNU, who, along with the other occupants of the vehicle, aggressively

26
27
28

1  questioned M.L. about his ability to pay the existing drug debt.[28] The aggressive questioning

2  included a threat by Mario that if M.L. failed to pay the debt, his mother and sister would be

3  kidnaped and killed. After the questioning finished, CI-3 and the UC told Mendoza and Mario

4  that they would take M.L. to "the ranch" [an unidentified location]. Set forth below are several

5  calls leading up to and immediately following the staged kidnaping.

6          a.      On March 30, 2010, at approximately 5:58 p.m., defendant Humberto

7  Torres Mendoza placed a call from Target Telephone #21 to CI-3.[29] During the call, CI-3

8  stated that he was "on his way over right now" [coming to the United States from Mexico] and

9  that he would call Mendoza early tomorrow morning so they could "take care of this matter"

10 [handle the planned kidnaping of M.L.]. Mendoza replied, "Okay." CI-3 instructed Mendoza

11 to send a text message to "Mario" requesting that defendant Mario Escamilla give CI-3 a call.

12 Mendoza replied, "Alright."

13          b.      On March 31, 2010, at approximately 8:31 a.m., CI-3 placed a call to

14 defendant Humberto Torres Mendoza on Target Telephone #21.  During the call, CI-3

15 informed Mendoza that he was already at the restaurant waiting for Mendoza.  Mendoza

16 replied that he would be there shortly.  As noted above, Mendoza arrived at the planned

17 meeting site and accompanied CI-3 and the UC during the staged kidnaping and subsequent

18 questioning of M.L.

19          c.      On March 31, 2010, at approximately 4:20 p.m., defendant Jose Alfredo

20 Najera Gil placed a call from Target Telephone #16 to CI-3.  During the call, CI-3 informed

21

22          [28]     On March 30, 2010, at approximately 6:12 p.m., the day before the "kidnapping,"
   defendant Jose Alfredo Najera Gil placed a call from Target Telephone #16 to defendant
23 Jorge Alberto Ponce. During the call, Ponce informed Najera that Mario was the person who
   "had the issue regarding the other 10-20" [Mario was handling the drug debt collection at the
24 location in Los Angeles - i.e. the collection from M.L.]. Najera asked Ponce to call Mario and
   have Mario, in turn, "call the buddy who is inside" [call CI-3, who was "inside" the United
25 States].  Najera explained that Mario needed to talk to CI-3 because "they might work
   tomorrow" [the planned kidnapping of M.L. might take place tomorrow].

26          On March 30, 2010, at approximately 6:34 p.m., Mario LNU placed a recorded
   call to CI-3. During the call, Mario stated that he just spoke to "the man" [Najera]. Mario
27 instructed CI-3 to call him (Mario) once they "had him there" [once M.L. had been kidnaped].

28          [29]     All calls to/from CI-1 and CI-3 are being consensually recorded by the law
   enforcement officers handling this investigation.

                                            49

1   Najera that "they had done everything to the guy, but he had no money" [CI-3 and his
2   associates had questioned and tortured M.L. but had been unable to obtain any money from
3   him]. Najera stated that CI-3 "already knew what to do" [kill M.L.] so that he wouldn't "cry" and
4   "start a gossip" [inform law enforcement officers about the kidnaping].

5          d.      On March 31, 2010, at 11:52 a.m., defendant Jorge Alberto Ponce placed
6   a call from Target Telephone #29 to defendant Jose Alfredo Najera Gil on Target Telephone
7   #16. During the call, Najera informed Ponce that M.L. had been kidnaped and that Ponce
8   needed to "take care of that matter quick," to which Ponce responded, "a vacation would be
9   fine," that is, killing M.L. was an option.

10         e.      On April 1, 2010, at approximately 11:03 a.m., CI-3 placed a call to Jose
11  Alfredo Najera Gil on Target Telephone #16. During the call, CI-3 stated that "they were going
12  to keep him for some days" [CI-3 and his associates were going to keep M.L. alive for a period
13  of time] because "he got a hold of his family and they said they were going to try to come up
14  with the money." NAJERA then asked if Mario LNU had called CI-3 because NAJERA wanted
15  CI-3 to "start working with that other stuff" [begin kidnaping and collecting debts from
16  individuals on a list Mario was supposed to provide to CI-3]. CI-3 asked NAJERA to "hand him
17  the list" [the list of individuals to be kidnaped] once it was ready.

18         e.      On April 1, 2010, at approximately 4:38 p.m., CI-3 placed a call to
19  Humberto Torres Mendoza on Target Telephone #21. During the call, Mendoza asked M.L.'s
20  family members had said to CI-3 about assisting M.L. repay his drug debt to the FSO. CI-3
21  stated that the family members were "all scared and confused" and that they said they "didn't
22  have any money." CI-3 stated that he told M.L.'s family that M.L. owed $100,000 from "work"
23  [a narcotics deal].

24         f.      On or about April 15, 2010, at the direction of defendant Jose Alfredo
25  Najera Gil, defendant Oscar Daniel Montoya Mora delivered a $4,000 payment to CI-3 and a
26  law enforcement officer acting in an undercover capacity.

27  \\
28  \\

**Murder of Marisol Fuerte Aguinon**

78.     On or about March 25, 2010, during an intercepted telephone conversation, defendant Jorge Alberto Ponce informed defendant Jose Alfredo Najera Gil that "the lady" (Marisol Fuerte Aguinon) had been located and "they cashed her check," that is, Aguinon had been killed.

**Transportation Of 839 Lbs. Of Marijuana And Distribution Of Methamphetamine**

79.     On or about April 2, 2010, defendant Jorge Humberto Lora told CI-1 that he had recently transported 839 pounds of marijuana from San Diego to Los Angeles for defendant Mario Escamilla and that Escamilla had paid him $2,000 for transporting the marijuana.  CI-1 surreptitiously recorded his conversation with Lora.

80.     On or about April 6, 2010, defendant Jorge Humberto Lora stated that defendant Mario Escamilla had used too much "cut," that is, a dilutant, on a quarter pound of methamphetamine that Lora had recently sold to a female who lived near the Sycuan Indian Reservation in San Diego.  Lora's statement in that regard was recorded by CI-1, who had been equipped with a surreptitious recording device.

**Kidnaping of C.A.P.**

81.     On April 25, 2010, at the direction of defendant Ruben Dario Castro Perez, Marcos and several other individuals kidnaped an individual named C.A.P. in Tijuana, Mexico.[30] According to intercepted calls, C.A.P. was targeted for kidnaping because he was a member of a rival drug trafficking organization controlled by Teodoro Garcia Simental, aka "El Teo."  In response to post-kidnaping interrogation by FSO members, C.A.P. apparently identified FNU LNU, aka Pero, as the "financial person" for the El Teo organization.  Set forth below are intercepted calls concerning the kidnaping of C.A.P.

a.     On April 24, 2010, at approximately 6:19 p.m., FNU LNU, aka Gordito, placed a call to defendant Jose Alfredo Najera Gil on Target Telephone #16.  During the call, Gordito stated that they would be "taking him to the area of the perritos" [transporting the kidnap victim to the "small dogs" area of Tijuana, a coded reference to a location unfamiliar

[30]     Prior to the successful kidnaping, intercepted calls confirmed that defendant .

1   to me]. Gordito stated that they would be transporting him via the "El Gato que aruna"

2   [unknown reference] route. Najera stated that he would be sending "him" [possibly a reference

3   to Marcos] in about five minutes to "check the surroundings" [conduct surveillance in the area

4   surrounding the planned kidnaping site]. Najera stated that he needed about "ten minutes to

5   confirm that he is still there" [ten minutes to confirm that the victim was still at the kidnap

6   location] and then Gordito could "do his thing" [kidnap the victim]. Gordito agreed and then

7   cautioned Najera that there was an "AFI checkpoint" [Mexican law enforcement checkpoint]

8   in the Benevides area of Tijuana near the "auto parts" store. Najera replied that "they had to

9   stay alert and perhaps take a different route" [change their planned route of travel to avoid the

10  checkpoint].

11              b.      On April 24, 2010, at approximately 6:28 p.m., Gordito placed a call to

12  defendant Jose Alfredo Najera Gil on Target Telephone #16. During the call, Gordito asked

13  if Najera had spoken to "his guy" [Cristian LNU, aka Elmer, a member of the kidnaping

14  surveillance team, along with defendant Jose Alejandro Flores Mesa] because it appeared that

15  the kidnaping victim "wasn't there anymore." Gordito stated that there was "no car and no

16  guy."

17              c.      On April 24, 2010, at approximately 6:39 p.m., Gordito placed a call to

18  Jose Alfredo Najera Gil on Target Telephone #16. During the call, Najera stated that "they

19  went by there and he was not there" [Najera's surveillance team had driven by the kidnaping

20  location and the victim was not there]. Najera instructed Gordito to "send some units over

21  there to check and see if the Honda arrived" [dispatch surveillance units to the kidnap location

22  to monitor whether or not the victim arrived at the site in his Honda]. Najera stated that if the

23  Honda did not arrive, then "they would abort." Gordito stated that he would have different

24  "units" drive by the kidnap location "every fifteen or twenty minutes."

25              d.      On April 24, 2010, at approximately 9:15 p.m., Jose Alfredo Najera Gil

26  placed a call from Target Telephone #16 to Gordito. During the call, Gordito stated that

27  "everything looked dark and no one was around" [the victim was not at the kidnaping site].

28  Najera stated that Gordito should "go somewhere else" and that if "something else came up"

he would let Gordito and "that guy know so they would get coordinated" [Najera would let Gordito and defendant Ruben Dario Castro Perez know if the kidnaping was going to go forward so they could coordinate their activities].

e.      On April 25, 2010, at approximately 8:34 a.m., Marcos (using Gordito's telephone) placed a call to Najera on Target Telephone #16. During the call, Najera stated that he had "sent a guy" [sent defendant Jose Alejandro Flores Mesa, aka Shakira, by the kidnap location to conduct surveillance] and that "the son-of-a-bitch was there" [the victim was at the location].

f.      On April 25, 2010, at approximately 11:22 a.m., defendant Ruben Dario Castro Perez, placed a call from Target Telephone #22 to Jose Alfredo Najera Gil on Target Telephone #16.[31/] During the call, Najera asked if Marcos was going to do "the job" [kidnap C.A.P.]. Castro stated that he thought "Marquito" [Marcos] would be the one to do the job because Marquito was "in the mix." Najera stated that he had Gordito at the location of the planned kidnaping.

g.      On April 25, 2010, at approximately 11:30 a.m., Marcos placed a call to defendant Jose Alfredo Najera Gil on Target Telephone #16. During the call, Marcos stated that he had "puntilla" [a point man] at the "Cucah" [possible location of the kidnaping]. Najera asked if Marcos "had the guy" [if Marcos had already kidnaped the victim]. Marcos replied, "Yes."

h.      On April 25, 2010, at approximately 11:31 a.m., defendant Jose Alfredo Najera Gil placed a call from Target Telephone #16 to defendant Ruben Dario Castro Perez on Target Telephone #22. During the call, Najera stated that "they had him" [the victim had been kidnaped]. Najera asked Castro not to call him back for a while because he "would be busy working on that" [overseeing the kidnaping] and "talking to that guy" [talking to Marcos]. Castro instructed Najera to have Marcos ask the guy "for his name" [confirm the victim's identity].

---

[31/]      During this time period, defendant Ruben Dario Castro Perez was living and operating in San Diego, California.

i.     On April 25, 2010, at approximately 11:34 a.m., defendant Jose Alfredo Najera Gil placed a call from Target Telephone #16 to Marcos.   During the call, Najera instructed Marcos to "ask the son-of-a-bitch for his name."

j.     On April 25, 2010, at approximately 11:37 a.m., Marcos placed a call to defendant Jose Alfredo Najera Gil on Target Telephone #16.   During the call, Marcos stated that the kidnap victim's name was C.A.P.

k.     On April 25, 2010, at approximately 11:51 a.m., Marcos placed a call to defendant Jose Alfredo Najera Gil on Target Telephone #16.   During the call, Marcos stated that Cesar was C.A.P.'s brother.   Najera stated that "he was of interest too" [the FSO was interested in kidnaping Cesar as well].   Najera instructed Marcos to find out where "he" [Cesar] was and "how to get to him."   Marcos stated that "this son-of-a-bitch knows him" [C.A.P. knew FNU LNU, aka Perro].   Najera stated that Perro was one of the "financial people of the Loquitos" [involved in the financial aspect of El Teo's drug trafficking group] and that Perro was "very rich."   Marcos assured Najera that "this son-of-a-bitch" [kidnap victim C.A.P.] would "give them that" [provide the locations of Cesar and Perro].

**Additional Recorded Telephone Calls**

82.     In addition to the above-noted events, law enforcement officers conducting the court-authorized wiretaps intercepted hundreds of calls confirming the Target Subjects' participation in the alleged RICO conspiracy.   Agents also recorded hundreds of calls to/from the telephones used by CI-1 and CI-3, with the express consent of CI-1 and CI-3.   I have interpreted and summarized some of those additional calls in the immediately following paragraphs.

a.     On March 17, 2010, defendant Jesus Quinones Marquez provided defendant Jose Alfredo Najera Gil with information about a triple homicide which occurred in "Las Brisas," a neighborhood in Tijuana, Mexico.

b.     On March 23, 2010, defendant Jesus Quinones Marquez informed defendant Jose Alfredo Najera Gil that he (Marquez) was "waiting for things to get better" [waiting for the FSO to generate more money from their illegal activities] so that Najera could

buy him (Marquez) the apartment, to which Najera responded that there would be "more money," "things would get better," and that Marquez should "not worry."

c.      On April 19, 2010, defendant Jose Alfredo Najera Gil informed CI-3 that Oscar Daniel Montoya Mora would introduce CI-3 to an unidentified male ("UM"), so that CI-3 and the UM could make arrangements to rob $100,000 from a check cashing business in National City, California.

d.      On April 25, 2010, defendant Fausto Escamilla informed defendant Mario Escamilla that defendant Armando Villareal Heredia had ordered the murder of an individual in San Diego and that Fausto Escamilla would be sending someone to meet with Mario Escamilla the next day to give Mario Escamilla "the coordinates of the big mouth," that is, the location of the intended victim.

e.      On April 25, 2010, defendant Ivan Candelario Magana Heredia told defendant Carlos Cosme that Bladimir Castro Ochoa (charged elsewhere), who Magana referred to as "one of my guys," had been arrested.

f.      On April 25, 2010, defendant Ivan Candelario Magana Heredia tasked defendant Carlos Cosme with making the necessary arrangements, including making bribe payments, to have Bladimir Castro Ochoa (charged elsewhere) released from custody in Mexico.

g.      On April 26, 2010, defendant Mario Escamilla informed defendant Fausto Escamilla that Mario Escamilla, defendant Jorge Humberto Lora and "Luis" had attempted to locate and kill an unidentified individual in San Diego, California.

h.      On April 27, 2010, defendant Oscar Daniel Montoya Mora informed CI-3 that he was making arrangements to rob a liquor store, which doubled as a check cashing business, located in National City, California, and that the robbery would be assisted by two employees at the store.

i.      On April 28, 2010, defendant Jose Antonio Ortega Nuno agreed to operate and supervise a "hit squad" in Tijuana, Mexico, operating under the direction of defendant Carlos Cosme.

j.      On April 28, 2010, defendant Edgar Gustavo Escamilla offered to "front" CI-1 a one ounce sample of methamphetamine and stated that if CI-1's customers liked the quality of the methamphetamine, Escamilla would supply CI-1 with additional quantities by having four females body-cavity smuggle the methamphetamine into the United States from Mexico.

k.      On April 28, 2010, defendant Edgar Gustavo Escamilla stated that he would look into obtaining at least one handgun for CI-1 to use against any person who "acted stupid" so CI-1 could make that person "sit down," that is, so CI-1 could kill that person.

l.      On April 29, 2010, defendant Ruben Dario Castro Perez told defendant Jose Alfredo Najera Gil that he wanted Najera to make a "movie," that is, a video-taped execution, that included "intelligence" information, which Castro stated would be "bad ass."

m.      On May 3, 2010, defendant Carlos Cosme stated that he had moved Z.L.G.M., a law enforcement officer in Tijuana, several times and that it would be cheaper if FNU LNU, aka Eco, would kill Z.L.G.M.

n.      On May 12, 2010, defendant Edgar Gustavo Escamilla instructed CI-1 to obtain a vehicle and crash it into the vehicle of a potential witness against defendant Mario Escamilla so that the witness would not be able to drive to Mario Escamilla's court proceedings.

o.      On May 12, 2010, at the direction of defendant Jose Alfredo Najera Gil and defendant Ruben Dario Castro Perez, Cristian LNU, aka Elmer, placed a dead dog and a threatening message, stating that "the family is next," on the gravesite of Efrain Alvarez Gonzalez and Abel Joatan Gonzalez.

p.      On May 13, 2010, defendant Edgar Gustavo Escamilla instructed CI-1 to collect money from an individual in National City and to send that money to Edgar Escamilla so that Edgar Escamilla could make a payment to the "Senores," that is the leadership of the Enterprise.

q.      On May 13, 2010, defendant Edgar Gustavo Escamilla instructed defendant Jorge Humbero Lora and CI-1 to collect a $1,850 debt defendant Christopher Adrian Ruiz owed to Edgar Gustavo Escamilla.

r.     On May 13, 2010, defendant Edgar Lopez De-Anda Daher agreed, on behalf of defendant Ruben Dario Castro Perez, to use his law enforcement contacts to secure the release of two drug couriers who had been arrested in Mexico.

s.     On May 14, 2010, defendant Edgar Lopez De-Anda Daher and Ruben Dario Castro Perez discussed a $100,000 payment owed to Castro by "Yahaira."

t.     On May 15, 2010, defendant Ruben Dario Castro Perez instructed defendant Edgar Lopez De-Anda Daher to call the "prosecutor" because the military had arrested an individual who operated "the ranch" for Castro.

u.     On May 18, 2010, defendant Jose Alfredo Najera Gil instructed CI-3 to go forward with the kidnaping of J.C. because the kidnaping would generate anywhere from $500,000 to $1,000,000.[32/]

v.     On May 18, 2010, defendant Jose Antonio Ortega Nuno agreed to provide defendant Carlos Cosme with a photographic roster of current Baja California State Police Officers in exchange for a $1,000 payment.[33/]

w.     On May 18, 2010, in Tijuana, Mexico, and at the direction defendant Jose Alfredo Najera Gil and defendant Ruben Dario Castro Perez, Cristian LNU, aka Elmer, removed the headstone from the gravesite of Efrain Alvarez Gonzalez and Abel Joatan Gonzalez.

x.     On May 18, 2010, in Tijuana, Mexico, and at the direction defendant Jose Alfredo Najera Gil and defendant Ruben Dario Castro Perez, Cristian LNU, aka Elmer, transported the headstone from the gravesite of Efrain Alvarez Gonzalez and Abel Joatan Gonzalez to the residence of D.A., where he left the headstone and a threatening message in front of the entryway to the home.

---

[32/]     That same day, defendant Ivan Mora directed a law enforcement officer acting in an undercover capacity and CI-3 to the residence of J.C. in National City, California, in order to kidnap J.C.

[33/]     Defendant Cosme obtained the roster and resold a copy of it to CI-3 May 28, 2010, for $500.

y.      On May 18, 2010, defendant Ruben Dario Castro Perez told defendant Jose Alfredo Najera Gil that he was going to make the family members of Efrain Alvarez Gonzalez and Abel Joatan Gonzalez suffer and move out of their home.

z.      On May 18, 2010, defendant Ruben Dario Castro Perez told defendant Jose Alfredo Najera Gil that if the family members of Efrain Alvarez Gonzalez and Abel Joatan Gonzalez did not move out of their house, he was going to kill them.

aa.     On May 20, 2010, at the direction of defendant Ivan Candelario Magana Heredia, one or more individuals shot J.L.Q.C., believing J.L.Q.C. to be F.B., a high-ranking Mexican law enforcement official.

bb.     On May 28, 2010, defendant Christopher Adrian Ruiz told defendant Edgar Gustavo Escamilla that he was going to shoot "Mark" in the kneecaps and put him in the hospital instead of killing him because Ruiz still hoped to collect the money that "Mark" owed.

cc.     On June 1, 2010, defendant Armando Villareal Heredia, defendant Ivan Candelario Magana Heredia and defendant Carlos Cosme made arrangements to steal fifty pounds of methamphetamine, which was being transported from the interior of Mexico to Tijuana via a commercial bus line.

dd.     On June 2, 2010, defendant Oscar Daniel Montoya Mora informed defendant Edgar Lopez De-Anda Daher that defendant Jose Alfredo Najera Gil was in control of "the money coming in" because Ruben Dario Castro Perez had been arrested.

ee.     On June 3, 2010, defendant Juan Carlos Magana Heredia informed defendant Ivan Candelario Magana Heredia that he was going to make Andrew Martinez (charged elsewhere) deliver approximately 15 pounds of cocaine from San Diego to Los Angeles.

ff.     On June 3, 2010, defendant Ivan Candelario Magana Heredia stated that he would "cash the check" of Andrew Martinez (charged elsewhere), that is, kill Martinez, after Martinez delivered approximately 15 pounds of cocaine to Los Angeles.[34/]

---

[34/]     On June 4, 2010, law enforcement officers seized approximately 15 pounds of cocaine from Andrew Martinez (charged elsewhere) as he drove north from San Diego toward Los Angeles.

gg.     On June 6, 2010, defendant Jose Alfredo Najera Gil asked defendant Jesus Quinones Marquez to "help out" with the situation involving "Gabby," who Najera stated was being targeted by Mexican law enforcement officers investigating the murder of Marisol Fuerte Aguinon on March 25, 2010, in Tijuana, Mexico.  Based upon this and other intercepted calls, I know that Najera was enlisting the support of Marquez to intervene with the homicide detectives conducting the investigation into Marisol Fuerte Aguinon's murder, as set forth above.

hh.     On June 15, 2010, defendant Oscar Daniel Montoya Mora transported approximately $105,000 from defendant Alicia Martinez's residence in San Diego to Tijuana, Mexico.

ii.     On June 15, 2010, defendant Alicia Martinez possessed $81,000.

jj.     On June 21, 2010, defendant Juan Carlos Magana caused $285,620 to be transported from San Diego to Ivan Candelario Magana Heredia in Tijuana, Mexico.

**Additional Weapon/Narcotics Sales**

83.     In addition to the above-noted criminal activities, law enforcement officers have conducted the following "controlled purchases" of narcotics and/or firearms.[35]

a.     On March 18, 2010, defendant Jorge Humberto Lora sold CI-1 an SKS assault rifle with an obliterated serial number for $1,000.

b.     On April 20, 2010, defendant Mario Escamilla and defendant Christopher Adrian Ruiz sold CI-1 a Colt AR-15 assault rifle for $1,500.

c.     On May 4, 2010, at the direction of defendant Edgar Gustavo Escamilla and defendant Jose Contreras, an unidentified male sold CI-1 a 9 mm Glock 26 handgun for $1,000.

---

[35]     I use the term "controlled purchase" to describe an investigative technique where a confidential informant is used to purchase an item from a Target Subject.  The informant is searched prior to and after each such purchase to confirm that he is not in possession of any unauthorized funds and/or contraband.  Also, unless otherwise noted, the informant used in each of the controlled purchases described below was equipped with a concealed recording device.  Where I state that a particular transaction was "at the direction of" a Target Subject, it means that intercepted calls confirmed that the named Target Subject directed or orchestrated the transaction.

d.     On May 6, 2010, at the direction of defendant Jose Alfredo Najera Gil, defendant Oscar Daniel Montoya Mora sold a half-pound of methamphetamine to CI-3 and a law enforcement officer acting in an undercover capacity for $5,800.

e.     On May 6, 2010, at the direction of defendant Jose Alfredo Najera Gil, defendant Oscar Daniel Montoya Mora "fronted" a half-pound of methamphetamine to CI-3 and a law enforcement officer acting in an undercover capacity.

f.     On May 13, 2010, defendant Christopher Adrian Ruiz sold CI-1 a .300 caliber Savage rifle and a bolt-action 22-250 caliber rifle for $700.

g.     On May 13, 2010, at the direction of defendant Edgar Gustavo Escamilla, defendant Rocio Lopez "fronted" a half-pound of methamphetamine to CI-1.   This methamphetamine purchase was a "controlled purchase, as that term is described above. That is, during the transaction, CI-1 was in possession of a surreptitious recording device and he was searched for contraband before and after the transaction.   I know that the methamphetamine was "fronted" because CI-1 did not bring any money to Lopez's residence to purchase the methamphetamine and, moreover, agents intercepted calls wherein defendant Edgar Gustavo Escamilla informed CI-1 that Lopez would "front" the methamphetamine to CI-1.

h.     On May 18, 2010, defendant Jorge Humberto Lora sold a "cs" grenade, a Mossberg shotgun and .22 caliber handgun to CI-1 for $750.

i.     On May 20, 2010, at the direction of defendant Edgar Gustavo Escamilla, Rocio Lopez sold a half-pound of methamphetamine to CI-1 for $6,500.[36/]   This methamphetamine sale was recorded via an audio and video recording device in CI-1's vehicle. During the transaction, defendant Lopez stated that she had an additional half-pound of methamphetamine (seen by CI-1), which Lopez stated she was going to deliver to defendant Christopher Adrian Ruiz later that day.

---

[36/]     CI-1 obtained the half-pound of methamphetamine from defendant Rocio Lopez at the direction of defendant Edgar Gustavo Escamilla. More specifically, on May 19, 2010, at approximately 3:50 p.m., CI-1 placed a recorded call to Escamilla.  During that call, Escamilla told CI-1 to go to "Roxy's" [defendant Rocio Lopez's residence] and that Escamilla would "have it sent" there [have the half-pound of methamphetamine delivered to defendant Lopez's residence, for subsequent delivery to CI-1].

## TARGET SUBJECTS - SUMMARY OF PROBABLE CAUSE

84. Based upon the facts and circumstances set forth above, and as supplemented in the lettered paragraphs which follow, I submit that there is probable cause to believe that the Target Subjects knowingly and intentionally participated in the RICO conspiracy alleged in the attached criminal complaint, a violation of Title 18, United States Code, Section 1962(d). Following a brief summary of each Target Subject's involvement in the Enterprise, I list the paragraphs in this affidavit substantiating that involvement, beginning with defendant Carlos Cosme.

a. Armando Villareal Heredia is a lieutenant who reports directly to Fernando Sanchez Arellano. Heredia coordinates the smuggling of narcotics into the United States from Mexico, and he is also responsible for sanctioning acts of violence committed by members of his organization. Heredia recently moved to Zapopan/Guadalajara, Jalisco, Mexico. He is believed to be hiding in the interior of Mexico because of increased law enforcement efforts against the FSO. Despite being located in the interior of Mexico, as opposed to the border city of Tijuana, Heredia has maintained control over the activities of the FSO.

b. Ruben Dario Castro Perez is a lieutenant who reports directly to Fernando Sanchez Arellano. Castro Perez coordinates the smuggling of narcotics into the United States from Mexico, and he is also responsible for sanctioning acts of violence committed by members of the Enterprise. On May 22, 2010, law enforcement officers arrested Ruben Dario Castro Perez as he and other FSO members drove Northbound on Interstate 5 from San Diego to Los Angeles. The decision to take Castro into custody on an immigration violation stemmed from a series of intercepted calls wherein Castro made plans to return to Tijuana, Mexico, from his temporary residence in San Diego.

c. Ivan Candelario Magana Heredia, believed to be a cousin of Armando Villareal Heredia, is a lieutenant who resides in Tijuana. Magana Heredia manages a importation/distribution cell and facilitates enforcement activities on behalf of the FSO. Additionally, Magana Heredia participated in the attempted murder of F.B., a high-ranking official within the Baja Attorney General's Office. As noted above, the individuals Magana Heredia directed to commit the killing shot the wrong individual.

d.     Jose Alfredo Najera-Gil is a particularly violent underboss. Najera has been engaged in drug trafficking and violent activities. He personally had a FSO member deliver two half-pound shipments of methamphetamine to a confidential informant. Najera was also involved in coordinating a March 25, 2010, double homicide in Tijuana, and is currently negotiating with an undercover agent to kidnap an individual living in National City, California. Najera lives and operates in Tijuana, Mexico, but he has made repeated efforts to obtain a visa for entry into the United States. Those efforts have included obtaining false documents showing Najera's ties to Mexico.

e.     Carlos Cosme is a former Mexican law enforcement officer who now lives in the United States. Cosme uses his established ties with Mexican law enforcement officers to facilitate the illegal activities of the FSO. Specifically, Cosme has been intercepted on the wiretaps in this case using current law enforcement officers in Tijuana to deliver narcotics and he has also been intercepted obtaining confidential information regarding upcoming joint U.S.-Mexico law enforcement operations. [¶ 46, 47, 49a, 49b, 49c, 49e, 49f, 82e, 82f, 82i, 82m, 82v, 82cc.]

f.     Mario Escamilla, an individual well-known to law enforcement officers who handle gang-related investigations in San Diego, is an underboss who resides in the United States. Escamilla takes orders directly from Armando Villareal Heredia and directs crews to import narcotics, sell narcotics, transport narcotics and commit acts of violence. On May 12, 2010, SDPD officers arrested Escamilla for a parole violation after intercepted phone conversations indicated he was actively attempting to murder an unidentified individual. [paragraphs throughout this affidavit.]

g.     Ignacio Escamilla Estrada, the father of Mario Escamilla, is an underboss responsible for overseeing the FSO's Tijuana-based drug trafficking activities. Among other things, Estrada coordinates the importation of methamphetamine using female body-cavity couriers who make repeated trips across the border. Estrada answers directly to Armando Villareal Heredia. [¶ 45b, 45c, 45d, 49g, 57, 64, 71a.]

h.     Fausto Escamilla, the brother of Mario Escamilla, is responsible for facilitating the FSO's Tijuana-based drug trafficking activities and directing the importation of

methamphetamine.   Additionally, Fausto works with Mario to coordinate the FSO's enforcement activities by, among other things, arranging meetings for FSO members preparing to murder individuals identified for assassination. [¶ 23, 58, 60, 71c, 82d, 82g, 82h.]

i.      Edgar Gustavo Escamilla, the brother of Mario Escamilla, is presently incarcerated in El Hongo prison in Tecate, Mexico.   Despite his incarceration, Gustavo Escamilla actively oversees day-to-day operations for the FSO. With the recent arrest of Mario Escamilla, Gustavo has increased his role within the FSO. [¶ 65d, 82j, 82k, 82n, 82p, 82q, 82bb, 83c, 83g, 83i.]

j.      Jesus Quinones Marquez is currently employed as the Director of International Liaison for the Baja California Attorney General's Office.   In that capacity, Marquez is one of the primary Mexican liaison officials responsible for sharing information with United States law enforcement entities.   Marquez is not only aware of the FSO's illegal activities, he uses his position to obtain confidential law enforcement information for the use of the Enterprise.   Based on his contacts with U.S. law enforcement, Marquez obtains information maintained by the California Highway Patrol, San Diego Sheriff's Department, Los Angeles Police Department, San Diego Police Department, Customs and Border Protection, and Border Patrol on behalf of the Enterprise.   Further, Marquez is actively involved in making arrangements to have various rivals of the FSO arrested and detained by Mexican law enforcement officials.   Marquez primarily communicates with Jose Alfredo Najera-Gil and is paid by the Enterprise in exchange for his work on its behalf.[37/] [¶ 74f, 74j, 82a, 82b, 82gg.]

k.      Jose Antonio Ortega Nuvo is a Mexican police officer who runs a "hit crew" for the FSO. He works under the direction of Carlos Cosme, who is a former Mexican law enforcement officer.   Ortega was responsible for killing rival drug traffickers. Additionally,

---

[37/]      Marquez's employment with the FSO was further confirmed during an intercepted telephone on March 16, 2010, when defendant Jose Alfredo Najera Gil told defendant Jesus Quinones Marquez that he was going to get a new phone number for Marquez's phone, but that despite that change, Marquez would not lose his "agenda," that is, his contact list.   Indeed, I am not aware of any legitimate reason for a high-ranking public official such as Marquez to have a telephone controlled and funded by a high-ranking member of a criminal organization.

he provided a photographic roster of current Baja California State Police Officers to Cosme so that the FSO could target police officers for assassination or corruption.[38/] [¶ 82v.]

l.     Edgar Lopez De-Anda Daher a currently employed as a Mexican law enforcement officer (possibly a prosecutor).  He works on behalf of the FSO to secure the release of arrested Enterprise members through bribes and other illegal means. [¶ 82r, 82s, 82t, 82dd.]

m.     Jose Alejandro Flores Meza, a former Mexican law enforcement officer, who is a drug courier for the FSO. [¶ 81b, 81e.]

n.     Alicia Martinez, the wife of Ruben Dario Castro Perez, has assumed increased managerial responsibilities for the FSO, after Castro Perez was incarcerated on immigration-related charges.   These duties include directing narcotics distribution and arranging for the transfer of bulk cash payments.[39/] [¶ 82hh, 82ii.]

_____

[38/]     For example, on April 28, 2010, at approximately 12:21 p.m., defendant Carlos Cosme placed a call from Target Telephone #18 to defendant Jose Antonio Ortega Nuvo on Target Telephone #41.  During the call, Cosme offered Ortega a job working for the FSO. Cosme stated that Ortega would "do it through him" [use Cosme as his contact] and that "no one would know who he was" [Ortega would not interact directly with any member of the FSO other than Cosme and Ortega's identity would therefore be unknown].  Cosme said "the idea is to eliminate the competition" [Ortega and his men would work as a "hit squad" killing the FSO's competition].  Cosme stated that they would tell Ortega "about a guy" [a rival trafficker being targeted for assassination] and Ortega's role would be to "show up and run him out . . . . stick a knife in him or some bullshit."  Cosme stated that he had informed other FSO members that Ortega "had experience and knew how to handle himself."  Cosme reiterated that Ortega's role would be to "show up with his team and get rid of the guys, like competition." Ortega acknowledged and stated that he would "fuck him up."

[39/]     Law enforcement officers have intercepted numerous calls confirming that Alicia Martinez has stepped-up her involvement in the FSO following the arrest of her husband, Ruben Dario Castro Perez.  Set forth below are some of those intercepted calls.

a.     On May 28, 2010, at approximately 4:39 p.m., defendant Oscar Daniel Montoya placed a call from Target Telephone #20 to Alicia Martinez on Target Telephone #35. During the call, Martinez demanded to speak with FNU LNU, aka Pepe, who Montoya placed on the phone.  Martinez accused Pepe of being a "real degenerate" because Pepe was "trying to see who would be stepping in" [Pepe was attempting to smuggle narcotics using the contacts of Martinez's husband - Ruben Dario Castro Perez - who had recently been arrested on immigration-related charges].  Martinez stated that she "didn't want things to go on hold, and if it's work and it's for the benefit of Guerito's dad and her husband, then it was perfect" [Pepe could continue trafficking narcotics so long as he did it, in part, for the financial benefit of Martinez and her incarcerated husband].  Martinez stressed that she did not want Pepe to think "they could take over" [that Pepe and his associates could cut her out of the profits just because her husband was in jail].

b.     On June 1, 2010, at approximately 2:44 p.m., defendant Oscar Daniel Montoya placed a call from Target Telephone #20 to defendant Alicia Martinez on Target

o.       Juan Carlos Magana Heredia, the brother of Ivan Candelario Magana Heredia, is a U.S.-based crew leader for the FSO. He is responsible for overseeing the delivery of successfully imported narcotics to FSO customers in Southern California. He was recently involved in the attempted shipment of 15 pounds of cocaine, which was seized by law enforcement officers on June 4, 2010, at the San Clemente immigration checkpoint. [¶ 82ee, 82jj.]

p.       Oscar Daniel Montoya is a crew leader who takes directions from Jose Alfredo Najera-Gil. Montoya has delivered a total of one and a-half pounds of methamphetamine to a confidential informant on behalf of Najera and has recently introduced the same confidential informant to an individual who is attempting to have the confidential informant and an undercover officer kidnap an individual living in Chula Vista, California. Montoya lives in Tijuana, Mexico, but regularly crosses the border into the United States to commit crimes on behalf of the FSO. [¶ 70, 74g, 74i, 77f, 82c, 82h, 82dd, 82hh, 83d, 83e.]

q.       Jorge Alejandro Ponce is a crew leader who is presently employed as a police officer in Tijuana, Mexico. Ponce works under the direction of Najera and was a participant in the March 30, 2010 "staged" kidnaping of M.L. [¶ 77, 77d, 78.]

_____

Telephone #35. During the call, Martinez stated that she had spoken with her incarcerated husband, Ruben Dario Castro Perez, who was looking at "24 months" [a two year sentence for pending immigration-related offenses]. Martinez also stated that Castro was paranoid on the prison telephone and had yelled, "Don't tell me anything!" Martinez stated that "they would have to work and see how it panned out because she wasn't going to stop the fucking game, with the bills she had coming" [Martinez would ensure that the FSO narcotics trafficking activities continued despite her husband's incarceration].

c.       On June 2, 2010, at approximately 4:42 p.m., Alicia Martinez placed a call from Target Telephone #35 to Oscar Daniel Montoya on Target Telephone #20. During the call, Martinez stated that the "madrina" [narcotics shipment] was going to "leave" [would be delivered] or else "they were going to be left worthless" [the transaction needed to occur so Martinez could make money].

d.       On June 14, 2010, at approximately 4:45 p.m., Alicia Martinez placed a call from Target Telephone #35 to Oscar Daniel Montoya on Target Telephone #20. During the call, Montoya stated that he had already "met and gave him 17 units" [Montoya had delivered "17 units" of narcotics to FNU LNU, aka Chepe].

e.       On June 15, 2010, at approximately 10:38 a.m., Oscar Daniel Montoya placed a call from Target Telephone #20 to Alicia Martinez on Target Telephone #35. During the call, Martinez confirmed that she had "81" [$81,000 in narcotics proceeds at her house]. Martinez stated that "they were all organized because they were 5 at a time and there was 1 loose" [sixteen bundles of $5,000 in each bundle and $1,000 "loose" for a total of $81,000]. Montoya stated that he would "do it so that it wasn't accumulating" [transport the cash to Tijuana so it would not accumulate in Martinez's residence in San Diego.

r       Omar Martinez, a San Diego-based leader, is responsible for drug distribution and enforcement activities. He has been personally tasked with the murder of multiple FSO rivals. In addition, he has procured several firearms on behalf of the FSO, which he subsequently transferred to other FSO members tasked with carrying out killings. Martinez also participated in an attempted robbery of $7,000 at Plaza Las Americas in San Ysidro. [¶ 22, 23, 24, 27, 30, 35, 37, 41, 43d.]

s.      Jonathan Valle is a San Diego-based member of the FSO. He performs drug (primarily methamphetamine) distribution and enforcement functions on behalf of the Enterprise. Valle was tasked with murdering FSO-rivals in San Diego. On January 8, 2010, while en route to commit a murder, Valle, along with Armando Castillo, was arrested on firearms charges and booked into federal custody. [¶ 40, 43d.]

t.      Armando Castillo is a San Diego-based member of the FSO who performs drug distribution and enforcement functions on behalf of the Enterprise. At the direction of Mario Escamilla, Castillo was tasked with committing robberies and murdering FSO-rivals in both San Diego and Tijuana. On January 8, 2010, while en route to commit a murder, Castillo, along with Jonathan Valle, was arrested on firearms charges and booked into federal custody. [¶ 24, 25, 26b, 30, 33, 37.]

u.      Mikael Daniel Blaser is a member of the FSO, residing in San Diego. He is a stash-house operator, drug distributor (primarily methamphetamine), and enforcer. Blaser has attempted to commit robberies and murders in both San Diego and Tijuana on behalf of the Enterprise. The attempted murders were directed at rivals as well as members of the FSO who were deemed to have disrespected the "Senores" (high-ranking FSO-lieutenants in Tijuana). Additionally, he carjacked a 2008 Ford Explorer for use in an attempted robbery of $50,000 at a check-cashing business in Tijuana. [¶ 35, 36, 43, 43e, 43i, 43j, 43k, 43l, 44a, 44b, 53, 54, 55, 62, 65, 65a, 65b, 65c.]

v.      Enrique Salinas, Jr. is a San Diego-based member of the FSO. He performs drug distribution and enforcement functions for the Enterprise. Salinas answers primarily to Mario Escamilla and has attempted to murders rivals of the FSO as well as

Enterprise members who are deemed to have disrespected the organization's leadership. [¶ 25, 35, 71.]

w.   Raul Moreno, a San Diego-based member of the FSO, is a stash-house operator, drug distributor, and enforcer. At the direction of Mario Escamilla, Moreno attempted to murder multiple FSO-rivals in San Diego.  Moreno has also engaged in several illegal firearms sales for the Enterprise. [¶ 25, 26a, 26b, 28, 29, 30, 34, 35, 36, 38, 39, 45f, 51.]

x.   Miguel Soria, who resides in San Diego, is a member of the FSO.  He performs drug distribution and enforcement functions for the Enterprise.  He has been tasked with committing robberies and murders in San Diego.  Additionally, Soria has transported 150 pounds of marijuana for the Enterprise. [¶ 26b, 33, 43d.][40/]

y.   Perla Carolina Jimenez, is a member of the FSO, residing in San Diego. She has assisted the FSO's enforcement operations by luring an individual targeted for murder to a motel in Chula Vista where other FSO member planned to kill him.  After law enforcement agents successfully prevented that murder, Jimenez identified the location of the same individual approximately three weeks later so that the FSO could undertake a second attempt to assassinate him.  Jimenez has also participated in the FSO's drug distribution and money-smuggling operations. [¶ 43, 43d, 43e, 43f, 43i, 52, 54, 65c.]

z.   Luz Maria Benavidez Martinez, a member of the FSO, resides in San Diego.  She assisted the FSO's enforcement operations by luring an individual targeted for murder to a motel in Chula Vista where other FSO member planned to kill him. [¶ 43, 43d, 43f.]

aa.   Bridgette Reynoso, the common-law wife of Mario Escamilla, is a member of the FSO.   She performs drug (methamphetamine and marijuana) distribution and enforcement functions on behalf of the Enterprise.  With respect to drug distribution, Mario Escamilla and Reynoso have jointly negotiated narcotics purchases for the FSO, including the negotiation for the purchase of 3 tons of marijuana.  Reynoso also acts as a money courier for the FSO. [¶ 32, 43j, 44b, 45d, 45e, 45g, 50.]

---

[40/]   The noted 150 pounds of marijuana were seized by law enforcement officers on January 23, 2010.

bb.     Jorge Humberto Lora is a member of the FSO, responsible for drug distribution, weapons sales, and enforcement activities. He has distributed methamphetamine and marijuana. Jorge Humberto Lora also attempted carjackings, robberies, and murder for the Enterprise. Furthermore, Lora sold assault rifles and handguns for the FSO. [¶ 65a, 79, 80, 82g, 83a, 83h.]

cc.     Christopher Adrian Ruiz is a FSO member residing in San Diego who performs drug (methamphetamine) distribution and enforcement work for the Enterprise. He has also committed robberies for the FSO. Ruiz was arrested on June 3, 2010, on firearms charges and booked into federal custody. [¶ 82q, 82bb, 83b, 83f, 84dd.]

dd.     Richard Gilbert Favela resides in San Diego and performs enforcement functions for the FSO. After committing an armed robbery in a motel room with Christopher Adrian Ruiz, Favela asked Ruiz for permission to rape the male victim. In particular, according to surveillance footage from the motel and the statement of the victim, on May 11, 2010, defendant Christopher Adrian Ruiz and defendant Richard Gilbert Favela physically restrained and robbed M.G.

ee.     Humberto Torres Mendoza, a San Diego-based FSO member, is responsible for drug distribution and enforcement activities. He provided a picture of M.L., identified his residence, and participated in the kidnaping itself. Mendoza has also distributed methamphetamine for the FSO. [¶ 42, 75, 77, 77a, 77b, 77e.]

ff.     Juan Carlos Rique Aguirre, a San Diego-based FSO member, is responsible for drug distribution and enforcement activities. He has conspired to murder individuals who stole marijuana from the Enterprise as well a member of the FSO who disrespected the organization's leaders in Tijuana. Rique Aguirre also distributed marijuana and cocaine for the FSO. [¶ 31, 36, 41.]

gg.     Telle Kreschmer is a drug courier for the FSO. She typically operates as a body-cavity courier, importing quarter-pound quantities of methamphetamine, and assists the operation of an Enterprise stash house in San Diego. [¶ 45e, 45h, 54, 65.]

hh.     Hector Montes is a San Diego-based drug (marijuana) courier for the FSO. [¶ 22.]

ii.    Jose Contreras, an FSO member residing in San Diego, answers directly to Edgar Escamilla. Contreras participates in the FSO's enforcement activities. To that end, Contreras provided firearms and bullet-proof vests to Mario Escamilla and FSO members. Contreras also delivered United States currency derived from the FSO's criminal activities. [¶ 24, 61, 83c.]

jj.    Hassan Alzubaidy is a FSO-member, residing in San Diego. He is a drug courier for the Enterprise. Additionally, he has attempted to commit murders and robberies for the FSO. [¶ 30.] During an intercepted call between defendant Omar Martinez and Mario Escamilla on December 18, 2009, Martinez stated that he and Alzubaidy would be out delivering the "mustard" [marijuana] and the "windows" [methamphetamine].

kk.    Ivan Mora is San Diego-based FSO member who performs enforcement functions for the FSO. [¶ 82u.] In addition, on May 28, 2010, Ivan Mora and other individuals (including an undercover law enforcement officer) attempted to locate and kidnap J.C. in National City, California. The kidnaping of J.C. was authorized by Jose Alfredo Najera Gil. [¶ 82u.]

ll.    Ulises Valenzuela performs enforcement functions for the Enterprise. He lives in San Diego and agreed to commit a murder for the FSO. For example, during an intercepted conversation on June 1, 2010, defendant Ivan Candelario Magana Heredia recruited defendant Ulises Valenzuela to murder M.S. in San Diego, California. Valenzuela agreed to commit the murder on behalf of the FSO.

mm.    Benjamin Avendano is a San Diego-based drug (marijuana) distributor for the FSO. He was specifically identified in Mario Escamilla's February 4, 2009 letter, which detailed his plans for the Enterprise. In 2009, Escamilla rammed a CHP officer's patrol vehicle in order to assists Avendano's drug distribution efforts. [¶ 22, 23.]

nn.    Jennifer Escamilla is a money courier for the FSO. She resides in Tijuana but crosses the border to commit crimes in the United States.[41/]

---

[41/]    For example, on May 13, 2010, as confirmed during intercepted conversations, defendant Jennifer Escamilla transported $2,900 from San Diego to Tijuana, Mexico. Moreover, on May 18, 2010, at the direction of Edgar Gustavo Escamilla and Ignacio Escamilla Estrada, Jennifer Escamilla transported $6,500 from San Diego to Tijuana, Mexico. CI-1 provided Jennifer Escamilla with the $6,500 as payment for a half-pound of

oo.    Araceli Varela is a drug distributor for the FSO. Varela specifically asked Mario Escamilla for permission to distribute narcotics on behalf of the Enterprise. In addition to delivering samples of methamphetamine to FSO customers in San Diego, Varela was tasked with assessing the quality of methamphetamine in Mexico before the FSO purchased it.[42/] [¶ 63.]

pp.    Rocio Lopez is a multi-pound methamphetamine distributor for the FSO, who resides in San Diego. She acts at the direction of Underboss Edgar Gustavo Escamilla and is responsible for inventory maintained at an Enterprise stash house. [¶ 84i.][43/]

qq.    Kevin Luis is a drug distributor for the FSO. Like Varela, Luis specifically asked Mario Escamilla for permission to distribute narcotics on behalf of the Enterprise. Luis received methamphetamine on a weekly basis and has access to marijuana in an Enterprise-controlled stash house.[44/] [¶¶ 62, 64.]

## SEARCH LOCATION SUMMARY

85.    The locations for which I am requesting search warrants are described in full below.

a.    The premises described as 2198 Cabo Bahia, Chula Vista, California, 91914, is the residence of Carlos COSME. San Diego County Assessors Records reveal that the property located at that location is owned by COSME. Likewise, according to records obtained from San Diego Gas and Electric ("SDG&E"), the utilities at 2198 Cabo Bahia are

---

methamphetamine. During a call with defendant Edgar Gustavo Escamilla on June 12, 2010, defendant Jennifer Escamilla confirmed that she had delivered "that" [narcotics] to "Perez" [Jackie Perez]. Escamilla stated that she had delivered it just like "his dad" [defendant Ignacio Escamilla Estrada] had given it to her - "two in one" [possibly two ounces of methamphetamine wrapped in a single package].

[42/]    During a conversation consensually recorded by CI-1 on March 3, 2010, defendant Mario Escamilla gave defendant Aracely Varela permission to distribute narcotics on behalf of the Enterprise.

[43/]    Additionally, on May 13, 2010, at the direction of Edgar Gustavo Escamilla, Rocio Lopez "fronted" a half-pound of methamphetamine to CI-1. The methamphetamine was a "controlled purchase," as described above. The sale took place at Lopez's residence, where CI-1 observed additional quantities of methamphetamine packaged for sale.

[44/]    During a conversation consensually recorded by CI-1 on March 3, 2010, defendant Mario Escamilla gave defendant Kevin Luis permission to distribute narcotics on behalf of the Enterprise.

subscribed to by COSME.  Moreover, records maintained by the California Department of Motor Vehicles ("DMV") show that COSME lists the 2198 Cabo Bahia property as his address of record.  Further, agents conducting surveillance of COSME have observed him at the 2198 Cabo Bahia address on numerous occasions, most recently on or about July 12, 2010. Additionally, surveillance agents have seen COSME driving a 2009 BMW X5 sport utility vehicle bearing California license plate CARLTS and a 2008 Toyota Tundra bearing California license plate 8P01188, which are both registered to COSME at the 2198 Cabo Bahia address. Further, the BMW X5 and Toyota Tundra, are both regularly parked at the 2198 Cabo Bahia residence.

b.      The premises described as 4808 Windsurf Way, #369, San Diego, California, 92154, is the residence of Alicia MARTINEZ.  Agents conducting surveillance of MARTINEZ have observed her at the 4808 Windsurf Way address on numerous occasions, most recently on July 7 and July 8, 2010.  On July 7, 2010, undercover law enforcement agents conducting surveillance at 4808 Windsurf Way, # 369, made contact at the front door of the residence with a female who verbally identified herself as MARTINEZ.  The next day, on July 8, 2010, agents observed MARTINEZ enter the residence through the garage door. Agents also observed a white Volkswagen sedan bearing California license plate 6KCR552 parked in the garage attached to the 4808 Windsurf Way residence.  Subsequent records checks confirmed that the Volkswagen sedan bearing California license plate 6KCR552 was registered to MARTINEZ at the 4808 Windsurf Way residence.

c.      The premises described as 4028 Delta Street, #1, San Diego, California, 92113, is the residence of Omar MARTINEZ. On or about January 7, 2010, law enforcement agents intercepted court-authorized wiretap conversations indicating that MARTINEZ was preparing to commit a murder.  In an attempt to seize the murder weapon which had been discussed over the wiretaps, agents conducted a probation search at 4028 Delta Street, #1, at approximately 7:00 a.m. Although a quantity of methamphetamine was seized during that search, officers were unable to locate the firearm.  After the search had ended, MARTINEZ placed an intercepted call to CI-1in which he stated that the police had missed the gun and that he and CI-1 still needed to "do the job" [commit the murder].  More recently, on July 12,

1
2
3
4
5
6
7
8

2010, law enforcement agents conducting surveillance observed MARTINEZ arrive at the 4028 Delta Street residence following a California state court appearance. On that date, law enforcement agents were unable to position themselves closely enough to the apartment building to confirm that MARTINEZ entered Apartment #1 because doing so would have risked exposing their surveillance efforts and compromising this investigation. Further, on July 19, 2010, law enforcement agents acting in an undercover capacity contacted MARTINEZ at the 4028 Delta Street, #1 residence. Specifically, law enforcement agents used a ruse to briefly speak to MARTINEZ's father, who confirmed that MARTINEZ resides at that location.

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

d.      The location described as 13414 Community Road, #125, Poway, California, 92064, is the residence of Mikael Daniel BLASER. On July 18, 2010, law enforcement agents conducting surveillance observed BLASER at the 13414 Community Road, #125 residence. Specifically, at approximately 2:35 p.m., BLASER walked down the stairway from the residence, smoked a cigarette, and walked back up the stairway leading to the 13414 Community Road, #125 entry. Law enforcement agents were unable to position themselves closely enough to the apartment building to confirm that BLASER entered Apartment #125 because doing so would have risked exposing their surveillance efforts and compromising this investigation. However, the stairwell BLASER used led to only two apartments: #125 and #135. At approximately, 3:15 p.m., law enforcement officers observed a Hispanic female with a child walk down the same stairwell as BLASER and enter a vehicle parked nearby. Subsequent DMV records checks confirmed that the vehicle she entered was registered to 13414 Community Road, #135, Poway, California, 92064. This confirms my belief that BLASER resides in the 13414 Community Road, #125 residence. Moreover, on July 18, 2010, law enforcement agents observed a 2002 Nissan four-door sedan bearing California license plate 6ARD652 parked near the residence. DMV records checks show that this 2002 Nissan is registered to Carmen A. Blaser, who is believed to be BLASER's mother, at 13414 Community Road, #125, Poway, California, 92064.

27
28

e.      The location described as 1319 Fifth Avenue, Chula Vista, California, 91911, is the residence of Enrique SALINAS, Jr. On March 24, 2010, CI-1 purchased a pound of methamphetamine from defendant Mario ESCAMILLA for $14,000 outside 1319 Fifth

Avenue, Chula Vista, California. According to records obtained from SDG&E, the utilities at 1319 Fifth Avenue are subscribed to by SALINAS. Additionally, records maintained by the DMV show that SALINAS lists 1319 Fifth Avenue as his address of record. Moreover, on July 15, 2010, agents conducting surveillance of SALINAS observed him at the 1319 Fifth Avenue address. On that date, an undercover agent observed an individual she recognized as SALINAS outside the residence. The undercover agent contacted SALINAS and asked him what family resided at the 1319 Fifth Avenue address. He responded that the "Salinas" family lived at that property.

f.      The location described as 1905 East Palomar Street, #4, Chula Vista, California, 91913, is the residence of Raul MORENO. Law enforcement agents conducting surveillance of MORENO have observed MORENO at this location on July 18, 2010, and July 19, 2010. On July 18, 2010, law enforcement agents operating in an undercover capacity contacted MORENO at the 1905 East Palomar Street, #4 residence, and confirmed that MORENO lives at that address. Of note, MORENO answered the door to the residence in his boxer shorts, no shirt, and no shoes, which further serves to confirm my belief that he resides at that location. Likewise, on July 19, 2010, law enforcement agents conducting surveillance of MORENO observed him open the door to the residence at 1905 East Palomar Street, #4.

g.      The location described as 564 Arizona Street, #121, Chula Vista, California, 91911, is the residence of Perla Carolina JIMENEZ. Law enforcement agents conducting surveillance of JIMENEZ have observed her driving a black Ford Mustang bearing California license plate 6APU329 on multiple occasions. On July 14, 2010, undercover law enforcement agents observed the black Ford Mustang parked near the 564 Arizona Street residence. On that same day, undercover law enforcement agents made contact at the front door of the residence with a female who the agents recognized as JIMENEZ from her DMV photograph. Additionally, the female who opened the front door at the 564 Arizona Street, #121 residence verbally identified herself as JIMENEZ. She also stated that she owned the black Ford Mustang parked near her residence.

h.      The location described as 3868 Z Street, San Diego, California, 92113, is the residence of Bridgette REYNOSO. According to records maintained by the DMV,

REYNOSO lists the 3868 Z Street residence as her address of record for two vehicle.   The first vehicle is a black 2004 Mini-Cooper bearing California license plate 6LWR653.   Law enforcement agents conducting surveillance of REYNOSO observe her driving this vehicle on two separate occasions, most recently on July 13, 2010. The second vehicle is a black 2004 Ford F-150 pickup truck bearing California license plate 7M00808. Law enforcement agents observed this black Ford F-150 parked in front of the 3868 Z Street address on June 30, 2010. Law enforcement agents later observed REYNOSO enter the Ford F-150 in front of the 3868 Z Street address and drive the truck to a nearby Arco gas station.

i.      The location described as 550 7th Street, Imperial Beach, California, 91932, is the residence of Richard Gilbert FAVELA. On July 12, 2010, a law enforcement agent spoke with the United States Postal carrier for the route that covers the 550 7th Street residence who stated that FAVELA regularly receives mail at that address. Additionally, on July 12, 2010, law enforcement agents conducting surveillance observed FAVELA speaking with an unidentified Hispanic male near the front door of the 550 7th Street residence.

j.      The location described as 3083 Naylor Road, San Diego, California, 92173, is the residence of Jose CONTRERAS. On July 14, 2010, at approximately 2:00 p.m., a law enforcement agent conducting surveillance observed CONTRERAS standing in the driveway of the 3083 Naylor Road property.   As the agent maintained surveillance, CONTRERAS was observed repeatedly entering and exiting the garage attached to the 3083 Naylor Road residence. On that same date, the agent observed a grey/blue 2006 Ford F-250 with raised suspension bearing California license plate 8F41973 parked in the driveway of the 3083 Naylor Road residence. The agent observed a large "Super Trucks" silver decal on the rear tailgate of the Ford F-250, and a DMV query showed that the Ford F-250 pickup truck was registered to "Super Trucks Off-Road." Further, on August 26, 2009, CONTRERAS was detained by law enforcement agents and listed his place of employment as "Super Trucks Off-Road."   Moreover, according to information maintained by the Treasury Enforcement Communication System, CONTRERAS crossed into the United States from Mexico in the grey/blue 2006 Ford F-250 bearing California license plate 8F41973 on June 5, 2010.

k.      The location described as 1168 Elrose Court, San Diego, California, 92154, is the residence of Ivan MORA. According to records maintained by the DMV, MORA lists the 1168 Elrose Court residence as his address of record for a registered black 2008 Toyota FJ Cruiser bearing California license plate 6CUH208.  Further, on July 14, 2010, at approximately 6:00 p.m., agents conducting surveillance of MORA observed him at the 1168 Elrose Court address. Specifically, agents observed MORA exit the residence and enter the black 2008 Toyota FJ Cruiser.  Later that same evening, at approximately 8:45 p.m., law enforcement agents observed MORA exit the residence and enter the black FJ Cruiser a second time. In addition, a check with SDG&E records reveals that the utilities at 1168 Elrose Court, are subscribed to by Ernesto MORA, who is believed to be Ivan MORA's father.

l.      The location described as 1307 Ridgeview Way, Chula Vista, California, 91902, is the residence of Ulises VALENZUELA.  On July 8, 2010, law enforcement agents conducting surveillance of VALENZUELA observed him at the 1307 Ridgeview Way address. Specifically, agents observed VALENZUELA arrive at the residence in white 2007 Toyota Tundra bearing California license plate 8K89974. VALENZUELA then entered the residence through the garage.  A short time later, VALENZUELA exited the residence, entered the Toyota Tundra, and departed from the 1307 Ridgeview Way residence.  During the following week, law enforcement agents conducing surveillance observed the same white 2007 Toyota Tundra parked in front of the 1307 Ridgeview Way property on multiple occasions.

m.      The location described as 1747 Tremaine Way, San Diego, California, 92154, is the residence of Araceli VARELA.  On July 8, 2010, law enforcement agents instructed CI-1 to contact VARELA at 1747 Tremaine Way.  CI-1 had a pre-existing relationship with VARELA based on jointly-planned illegal firearm sales (which were never successfully completed). On July 8, 2010, law enforcement agents observed CI-1 contact VARELA at 1747 Tremaine Way, enter the residence, and exit approximately ten minutes later. Shortly thereafter, CI-1 informed law enforcement agents that he met with VARELA and VARELA stated that she resided at the 1747 Tremaine Way residence with her three minor children. Moreover, agents conducting surveillance of the meeting between VARELA and CI-1

confirmed that they observed VARELA answer the front door of the 1747 Tremaine Way residence.

n.    The location described as 4052 Epsilon Street, San Diego, California, 92113, is the residence of Rocio LOPEZ. According to records obtained from SDG&E, the utilities at 4052 Epsilon Street are subscribed to by LOPEZ. Additionally, according to records maintained by the DMV, LOPEZ lists the 4052 Epsilon Street residence as her address of record for a registered grey 2002 Mitsubishi sedan bearing California license plate 4UXT075. Further, on July 13, 2010, law enforcement agents observed the Mitsubishi sedan registered to LOPEZ parked in the driveway area of the 4052 Epsilon Street residence. On that same date, law enforcement agents conducting surveillance observed LOPEZ exit the front door of the 4052 Epsilon Street residence, enter the Mitsubishi sedan, and drive westbound on Epsilon Street.

o.    The location described as 3818 Chanute Street, San Diego, California, 92154, is the residence of Kevin LUIS. According to information maintained by the DMV, on February 2, 2010, LUIS listed the 3818 Chanute Street address as his residence in his drivers license application. Additionally, on February 26, 2010, LUIS provided the 3818 Chanute Street address as his residence during a field interview with San Diego Police Department officers. Moreover, on July 9, 2010, at approximately 9:00 a.m., a law enforcement agent conducting surveillance observed a blue 2002 Dodge four-door sedan bearing California license plate 4TAW970 parked in front of 3818 Chanute Street. Approximately five minutes later on that same day, the law enforcement agent observed LUIS driving the blue 2002 Dodge four-door sedan westbound on Chanute Street.

## ITEMS TO BE SEIZED

86.    Based upon my experience and training, consultation with other law enforcement officers experienced in drug, gang, and financial investigations, and all the facts and opinions set forth in this affidavit, I know that:

a.    Individuals involved in drug dealing, drug manufacturing and violent crimes related to drug trafficking will often maintain at their residence, residences of associates, place of business and/or rental storage locations quantities of controlled

substances, as well as paraphernalia for packaging, weighing, cutting, testing, distributing, and identifying controlled substances.

      b.     Individuals involved in drug dealing, drug manufacturing and violent crimes related to drug trafficking often maintain at their residence, residences of associates, place of business and/or rental storage locations records and ledgers evidencing their trafficking activities in order to keep track of the manufacturing, ordering, purchasing, storage, distribution and transportation of drugs. At times, the drugs may be sold, but documentary records and ledgers often remain for long periods of time to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and coconspirators. These records are often maintained not only on paper, but also as computer data in the form of computer hardware and software.[45]

      c.     Individuals involved in drug dealing, drug manufacturing and violent crimes related to drug trafficking must often rely on others to obtain the drugs and to help them market the drugs and evidence of the identities of these criminal associates is often maintained at their residence, residence of associates, place of business and/or rental storage locations.

      d.     Based on prior searches of premises used by individuals involved in drug dealing, drug manufacturing and violent crimes related to drug trafficking, I believe I will find articles of personal property evidencing the identity of persons occupying, possessing, residing the in, owning, frequenting or controlling the premises or property therein. I also believe that I will find documents and/or photographs evidencing the association between the various Target Subjects and other individuals associated with the Enterprise.

      e.     Individuals involved in drug dealing, drug manufacturing and violent crimes related to drug trafficking will often conceal evidence of their drug dealing in vehicles outside their residence in order to prevent detection and seizure by officers conducting search

---

[45]    Computer hardware and/or software (including electronic storage devices) seized pursuant to this warrant will be maintained and a separate search warrant detailing the search protocol will be sought for those items. In the event that search warrant(s) for those items are not issued, they will be returned within five days from the date of seizure.

warrants at the residence.  Therefore, I am requesting permission to search all vehicles located on the premises associated with the respective Target Locations and their residents.

f.      Individuals involved in drug dealing, drug manufacturing and violent crimes related to drug trafficking earn sums of money and often try to legitimize these profits. In order to do this they attempt to secret, transfer and conceal the money by, among other ways: (1) placing assets in names other than their own to avoid detection while maintaining control; (2) laundering the money through what appears to be a legitimate business or businesses; (3) hiding money in their homes, business locations, safes and safety deposit boxes; or (4) using the money to buy assets which are hard to trace.  Records of these transactions are often found at their residence, residences of associates, place of business and/or rental storage locations.

g.      Individuals involved in drug dealing, drug manufacturing and violent crimes related to drug trafficking will often maintain weapons, firearms and ammunition on their person or at their residence and cars in order to protect themselves and guard their drugs and drug profits, and for enforcement purposes during their drug dealings.  These weapons and firearms are used and can be used as an instrumentality of the crime of possession and distribution of drugs .  Therefore, I am requesting permission to seize weapons, firearms and ammunition that may be found at the above-described Target Locations.  Intercepted conversations have revealed that several of the Target Subjects have access and possession of firearms.

87.    It is also my opinion and belief that the above-described documents are permanently possessed by drug dealers/manufacturers much the same way a legitimate business will maintain records and tools of its  trade whether or not the business has a particular item in inventory on a given date.  These documents are kept by drug dealers/manufacturers whether or not the dealer/manufacturer is in possession of any drugs at any give moment. I believe that the seizure of such documents will provide evidence of the events set forth in this affidavit and that such documents can be found in the Target Locations to be searched despite any lapse of the time between the events described and the anticipated search pursuant to this warrant.

88.     The investigation into the criminal activities of the above individuals reveals that their drug distribution and violent activities are ongoing.  Due to the quantities of narcotics being and distributed and the relatively sophisticated manner in which the above individuals conduct their illegal activities, I believe they have been engaged in the illegal sale of narcotics for a long period of time.  Based on my training and experience, I believe that the criminal activity described above is, by nature, self-perpetuating.

89.     Based upon my experience and training, consultation with other law enforcement officers experienced in drug, gang, and financial investigations, and all the facts and opinions set forth in this affidavit, I believe that the items set forth in Attachment B, which evidence a violation of Title 18, United States Code, Section 1962(d), as set forth above, will be found at the above-noted locations.

## SEALING REQUEST

90.     Because of the ongoing nature of this investigation, I am requesting that this affidavit, the arrest warrants, criminal complaints, search warrants, seizure warrants, and all other associated court records be ordered sealed until further order of the court, as disclosure of any of the above would hamper further investigative efforts.

CHRISTOPHER S. MELZER
Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN to before me
this 20th day of July, 2010.

HON. RUBEN B. BROOKS
United States Magistrate Judge
Southern District of California

79