1
2
3
4
5
6
7 **UNITED STATES DISTRICT COURT**
8 **SOUTHERN DISTRICT OF CALIFORNIA**
9

| | |
|---|---|
| 10 UNITED STATES OF AMERICA, | CASE NO. 10CR3044 WQH |
| 11 Plaintiff, | |
| vs. | |
| 12 | ORDER |
| 13 (5) Carlos COSME, | |

10 UNITED STATES OF AMERICA,

CASE NO. 10CR3044 WQH

Plaintiff,

vs.

ORDER

(5)  Carlos COSME,
(6)  Mario ESCAMILLA,
(10) Jesus Quinones MARQUEZ,
(11) Jose Antonio ORTEGA NUNO,
(17) Jorge Alberto RAMIREZ PONCE,
(18) Omar MARTINEZ,
(19) Jonathan VALLE,
(20) Armando CASTILLO,
(21) Mikael Daniel BLASER,
(22) Enrique SALINAS, Jr.,
(23) Raul MORENO,
(24) Miguel SORIA,
(25) Perla Yadira FLORES,
(27) Bridgette REYNOSO,
(28) Jorge Humberto LORA,
(31) Humberto TORRES MENDOZA,
(32) Juan Carlos RIQUE AGUIRRE,
(40) Jennifer ESCAMILLA,
(41) Araceli VARELA,
(43) Kevin LUIS,

Defendants.

HAYES, Judge:

   The matters before the Court are the wiretap motions and joinders filed by Defendants.

**BACKGROUND FACTS**

   On July 29, 2010, the federal grand jury returned a one-count indictment charging forty-three defendants with conspiring to conduct enterprise affairs through a pattern of racketeering

activity, in violation of 18 U.S.C. § 1962(d).  The indictment alleged that the defendants and "others known and unknown to the grand jury, were members and associates of an organization known as the 'Fernando Sanchez Organization' ('FSO'), whose members engaged in, among other things, murder, conspiracy to commit murder, attempted murder, kidnaping, conspiracy to kidnap, attempted kidnaping, robbery, conspiracy to commit robbery, attempted robbery, importation of controlled substances into the United States from Mexico, conspiracy to import controlled substances into the United States from Mexico, distribution of controlled substances, conspiracy to distribute controlled substances, money laundering and conspiracy to launder money."  ECF No. 82 at 3-4.

On April 28, 2011, the grand jury returned a two-count superseding indictment.  The superseding indictment charges the forty-three defendants in Count 1 with conspiring to conduct enterprise affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d) as charged in the original indictment.  The superseding indictment charges the forty-three defendants in Count 2 with conspiring to distribute cocaine, marijuana and methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii), 841(b)(1)(A)(vii), 841(b)(1)(A)(viii) and 846.

During the course of the investigation, the Government sought and received authorization to conduct electronic surveillance on a number of telephones used by the defendants and alleged co-conspirators.  The initial wire order was issued on December 11, 2009 by the Honorable Jeffrey Fraser in the Superior Court of the State of California for the County of San Diego.  A second state wiretap order was issued by the Honorable David Danielsen on January 14, 2010 in the Superior Court of the State of California for the County of San Diego.

The initial federal wiretap application was made by the Assistant United States Attorney on February 2, 2010 to the Honorable William Q. Hayes, United States District Court Judge.  The district court judge issued the initial wiretap order on February 2, 2010, authorizing interception of calls made on phones used by Defendants Armando Villareal-Heredia, Mario Escamilla and Carlos Cosme.

The application for the February 2, 2010 wiretap order was supported by the Affidavit of Special Agent of the Federal Bureau of Investigation ("FBI") Christopher Melzer. The FBI agent informed the district court judge that law enforcement officers were currently investigating members of a criminal enterprise which law enforcement believed responsible for drug trafficking and associated violent activities in San Diego, California. The FBI agent described the leaders of the criminal organization as Armando Villareal-Heredia, a United States citizen living and operating in Tijuana, Mexico; and Mario Escamilla, the U.S. based leader of the targeted organization. The FBI agent informed the district court judge that he believed Villareal-Heredia coordinates the smuggling of narcotics into the United States from Mexico, and that he is also responsible for sanctioning acts of violence committed by members of his organization. The FBI agent informed the district court judge that he believed that at least four different former Mexican law enforcement officers are working for Villareal-Heredia in the United States, including Carlos Cosme. The affidavit of the FBI agent detailed facts and circumstances in support of his belief that the targeted telephones were being used to for the purpose of committing enumerated criminal offenses in the United States, including the collection of drug proceeds, the purchase of firearms, attempted armed robbery, attempted murder, transportation of narcotics and weapons, and the importation of controlled substances.

In the February 2, 2010 order, the district court judge found probable cause to believe that Villareal-Heredia, Escamilla, and others are committing offenses enumerated in 18 U.S.C.§ 2516 including conspiracy to distribute controlled substances and distribution of controlled substances, conspiracy to import controlled substances and importation of controlled substances, continuing criminal enterprise, felony firearms offenses, the unlawful use of communication facilities to facilitate the commission of drug offenses, and offenses involving racketeer-influenced and corrupt organizations. The district court judge authorized the interception of calls from target telephones used by Villareal-Heredia, Cosme, and Escamilla.

Subsequent orders authorizing wiretaps were issued by the district court judge on March 5, 2010; April 23, 2010; May 11, 2010; May 21, 2010; May 27, 2010; June 17, 2010; June 22, 2010; and July 15, 2010.

10cr3044WQH

**ANALYSIS**

**Motion to suppress evidence derived from state court wiretaps (ECF No. 681)**

Defendant Miguel Soria, joined by other defendants, moves the Court to suppress all evidence obtained during the course of and derived from the Emergency Wiretap Order 09-32 issued by the Honorable Jeffrey Fraser on December 11, 2009 and the Wiretap Order 10-1 issued by the Honorable David Danielsen on January 14, 2010.[1] Defendant asserts that the state wiretaps did not meet the requirements of California Penal Code Section 629.50 *et. seq.* or 18 U.S.C. § 2516 on the grounds that they were not applied for or presented by San Diego County District Attorney Bonnie Dumanis. Defendant asserts that Assistant District Attorney Jesus Rodriguez improperly presented the wiretaps "claiming that the District Attorney was 'absent.'" ECF No. 681 at 2. Defendant contends that a plain reading of California Penal Code Section 629.50 only authorizes the Assistant District Attorney to apply for a wiretap, if he is so designated and is acting in the District Attorney's absence. Defendant asserts that the state wiretap law does not and may not allow the District Attorney "to give blanket authority to an assistant prosecutor to make wiretap applications and any delegation must be limited to circumstances in which the district attorney is prevented from performing his/her duties because he/she is actually absent from his/her office or some exigency prevents him/her from acting, e.g., a disability." ECF No. 681-1 at 15.

The Government asserts that the delegation of the district attorney's power to a designated assistant in California Penal Code Section 629.50 is consistent with the authority conferred under 18 U.S.C. § 2516(2) as well as congressional intent. The Government asserts that there were no defects in the wiretap orders signed by the state court judges.

On December 11, 2009, at 11:03 a.m., Assistant District Attorney Jessie Rodriguez, Deputy District Attorney Mark Amador, and representatives from law enforcement met with San Diego Superior Court Judge Jeffrey Fraser in chambers to request an emergency oral wire tap. Deputy District Attorney Mark Amador stated:

---

[1]Defendant Soria does not address his standing to challenge the interceptions pursuant to the state court orders.

> Your honor, we're here to request an emergency oral wire tap, numbers superior court 09-32. For the record, yourself, Judge Jeffrey Fraser, is a designated wire tap judge. I understand Judge Trentacosta is first and you're – and Judge Trentacosta is unavailable to hear this emergency request. Furthermore, District Attorney of San Diego County, Bonnie Dumanis, is also unavailable; and according to our office policy, the designee for wiretaps would be next in line, who is Assistant District Attorney Jesus Rodriguez, and he's authorized to act in her absence.

ECF No. 681-3, Exhibit A at 3. Judge Fraser stated "Okay" and swore the affiant San Diego Sheriff's Deputy Aguilar. Deputy Aguilar set forth his experience and training and described his current assignment as a liaison with the Cross-Border Violence Task Force. The deputy informed the Court that he was there to seek an emergency oral wire tap based upon his belief that an emergency situation existed. The deputy described his current investigation into the Arellano Felix Cartel Organization, a violent criminal enterprise operating in the Republic of Mexico and the United States. The deputy stated that his investigation led to a crew currently operating in San Diego trafficking marijuana, crystal meth, and extorting victims. The deputy stated that he personally observed and identified Mario Fabian Escamilla as operating a crew of Hispanic male enforcers. The deputy informed the state court judge that recent information led to the belief that an imminent kidnaping and murder will be occurring. The deputy requested an order to intercept the telephones used by Escamilla and two members of his organization. The deputy described the relationship between Escamilla and a confidential informant, including a number of personal encounters and a number of phone conversations. The deputy told the state court judge that the confidential informant was present when the crew accepted the job to kill an intended victim. The deputy further described details relayed by the confidential informant which led the deputy to believe that the crew member was in possession of a weapon and that the situation was imminent. Judge Fraser orally authorized the emergency interception of wire and electronic communications on the three target telephones.

On December 13, 2009, a written application was submitted to Judge Fraser signed by Assistant District Attorney Rodriguez.[2] Attorney Rodriguez declared in the application under

---

[2] California Penal Code Section 629.56 provides: "Approval from an interception under this section shall be conditioned upon filing with the judge, by midnight of the second full court day after the oral approval, a written application for an order which, if granted consistent with this chapter, shall also recite the oral approval under this subdivision and be retroactive to the time of the oral approval."

10cr3044WQH

penalty of perjury: "Bonnie Dumanis is the District Attorney of the County of San Diego and she has designated me to act in her absence pursuant to Penal Code section 629.50 and it is in her absence that I make this application." ECF No. 681-3, Ex. C at 1.

On December 13, 2009, Judge Fraser signed an order approving the interception of communications. The order stated in part as follows: "Jesus Rodriguez, the Assistant District Attorney for the County of San Diego, State of California, is the 'person designated to act as district attorney in the district attorney's absence' pursuant to Penal Code Section 629.50(a)." ECF No. 681-3, Ex. D at 1.

On January 14, 2010, Assistant District Attorney Rodriguez presented another application for a wiretap presented to San Diego Superior Court Judge David Danielsen which stated under penalty of perjury: "Bonnie Dumanis is the District Attorney of the County of San Diego and she has designated me to act in her absence pursuant to Penal Code section 629.50 and it is in her absence that I make this application." ECF No. 681-3, Ex. E at 1. On the same date, Judge Danielsen signed an order authorizing additional wire communications stating in the order that "Jesus Rodriguez, the Assistant District Attorney for the County of San Diego, State of California, is the 'person designated to act as district attorney in the district attorney's absence' pursuant to Penal Code Section 629.50(a)." ECF No. 681-3, Ex. F at 1.

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 established the procedures by which law enforcement officials can obtain judicial authority to intercept wire and oral communications. State laws must meet the minimum standards of Title III.

18 U.S.C. §2516 (2) states:

> (2) The principal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision thereof, if such attorney is authorized by a statute of that State to make application to a State court judge of competent jurisdiction for an order authorizing or approving the interception of wire, oral, or electronic communications, may apply to such judge for, and such judge may grant in conformity with section 2518 of this chapter and with the applicable State statute an order authorizing, or approving the interception of wire, oral, or electronic communications by investigative or law enforcement officers having responsibility for the investigation of the offense as to which the application is made, when such interception may provide or has provided evidence of the commission of the offense of murder, kidnapping, gambling, robbery, bribery, extortion, or dealing in narcotic drugs, marihuana or other dangerous drugs, or other crime dangerous to life, limb, or property, and punishable by imprisonment for more than one year, designated in any applicable State statute authorizing such interception, or any conspiracy to commit any of the foregoing offenses.

18 U.S.C. §2516 (2). The State of California has enacted California Penal Code Section 629.50 which provides in relevant part:

> Each application for an order authorizing the interception of a wire or electronic communication shall be made in writing upon the personal oath or affirmation of the Attorney General, Chief Deputy Attorney General, or Chief Assistant Attorney General, Criminal Law Division, or of a district attorney, or the person designated to act as district attorney in the district attorney's absence, to the presiding judge of the superior court or one other judge designated by the presiding judge.

California Penal Code Section 629.50(a).

Defendant submits the calendar of San Diego County District Attorney Bonnie Dumanis indicating that she was present in San Diego from December 9, 2009 through December 13, 2009. Defendant contends that he has satisfied his burden of establishing a prima facie case that the District Attorney was not absent at the time that the wiretap applications were submitted to the state court judge. Defendant asserts that he is entitled to an evidentiary hearing pursuant to *Franks v. Delaware*[3] to examine whether the District Attorney was, in fact, absent as required by the California Penal Code Section 629.50(a).

The Government submits Intra-Departmental Correspondence dated July 24, 2009 from District Attorney Dumanis designating Assistant District Attorney Rodriguez to review and make applications pursuant to California Penal Code Section 629.50(a) in her absence. ECF No. 726-1 at 2. The Government submits the declaration of District Attorney Dumanis stating that she appointed Jesus Rodriguez as the Assistant District Attorney; that Assistant District Attorney Rodriguez holds the second highest position in the District Attorney's Office; and that Assistant District Attorney Rodriguez serves at the pleasure of the District Attorney. District Attorney Dumanis states: "On December 11, 2009, December 13, 2009, and January 14, 2010, I was within the County of San Diego, but absent and unavailable for the purpose of reviewing and applying for the wire interceptions 'Emergency Oral Wiretap 09-32,' 'Wiretap 09-32,' and 'Wiretap 10-1,' as I was fulfilling other official duties and discharging my responsibilities as District Attorney. On December 11, 2009, December 13, 2009, and January 14, 2010, Assistant District Attorney Rodriguez acted pursuant to my designation in

---

[3] 483 U.S. 154 (1978).

reviewing and applying for the three wire interceptions and had full authorization to do so." ECF No. 726-2 at 3.

Section 2516(2) limits the type of state officials who can authorize applications for wire interceptions. Delegation must be expressly allowed by state law and limited to specified individuals "responsive to the political process." *United States v. Giordano*, 416 U.S. 505, 520 (1974); *see also United States v. Fury*, 554 F.2d 522, 526-27 (2nd Cir. 1977). California Penal Code Section 629.50(a) specifically provides that the "district attorney, or the person designated to act as district attorney in the district attorney's absence" has the authority to make an application for an order authorizing the interception of a wire or electronic communication. Section 629.50(a) assures that the person who makes the application for a wire interception has the authority to do so.

The record in this case establishes that Assistant District Attorney Rodriguez was authorized to act in the absence of District Attorney Dumanis. Assistant District Attorney Rodriguez is second in command, and serves at the pleasure of the District Attorney who is responsive to the political process. The record establishes that there was no blanket designation and that the District Attorney determined that designation in her absence was necessary as authorized by state law. The Court finds that Defendant has failed to make a "substantial preliminary showing that a false statement was deliberately or recklessly included" in support of the state wiretap applications. *Franks v. Delaware*, 438 U.S. at 155-156. Defendant is not entitled to a *Franks* hearing.

Defendant further asserts that the state court judge authorizing the initial wiretap did not make a determination that the presiding judge was unavailable. California Penal Code Section 629.50(a) provides that an application for wiretap may be made "to the presiding judge of the superior court or one other judge designated by the presiding judge. An ordered list of additional judges may be authorized by the presiding judge to sign an order authorizing an interception. One of these judges may hear an application and sign an order only if that judge makes a determination the presiding judge, the first designated judge and those judges higher on the list are unavailable." Cal. Penal Code § 629.50(a). The record in this case shows that the state court judge was aware of the statutory requirement and complied with the

requirement.  ECF No. 681-3 at 3.

The motion to suppress evidence derived from state court wiretaps on the grounds that the state court lacked authority (ECF No. 681) is denied.

**Motions to suppress electronic surveillance evidence (ECF No. 676 and ECF No. 687)**

Defendant Mario Escamilla[4] and Defendant Armando Castillo[5], joined by other defendants, contend that the December 11, 2009 emergency wiretap order was improvidently granted without a showing of probable cause. Defendants assert that Deputy Aguilar informed the state court judge that the confidential informant was a paid informant but did not inform the judge how much or when the confidential informant was paid.  Defendants assert that the transcript of the December 11, 2009 proceedings and the December 13, 2009 affidavit fail to set forth facts sufficient for the issuing state court judge to determine the reliability of the confidential informant.

The Government asserts that the deputy sufficiently alerted the issuing state court judge to the derogatory nature of the confidential informant's criminal record and informed the state court judge that the confidential informant was a paid informant.  The Government asserts that the information provided was adequate to support the determination of probable cause at the December 11, 2009 oral hearing and that the December 13, 2009 application and affidavit provided further detailed information regarding the reliability of the confidential informant. The Government further asserts that the issuing state court judge was specifically asked if he had any questions and stated that he did not.

At the emergency wiretap hearing on December 11, 2009, Deputy Aguilar presented facts to the Court in support of probable cause to believe that Mario Escamilla was operating a kidnaping and murder crew.  The deputy informed the state court judge that the crew was currently operating in San Diego trafficking marijuana, crystal meth and extorting victims and that recent information led him to the belief that an imminent kidnaping and murder would be occurring on the same day.  The facts provided by the deputy were primarily obtained from the

---

[4]Defendant Escamilla was a named target of the state emergency wiretap order.

[5]Defendant Castillo was listed as a target subject for Target Telephone #2 and recorded as a result of the state wiretap order.

confidential informant working for law enforcement who had been established as a part of the crew. The deputy informed the state court judge of meetings and phone calls between the confidential informant and members of the crew. The deputy informed the state court judge that these meetings were confirmed by surveillance, that the phone calls were witnessed, and that the phone numbers were confirmed by law enforcement.

The deputy informed the state court judge that the confidential informant had multiple prior felony fraud convictions and that the confidential informant was a "paid informant." ECF No. 681-3 at 16. The deputy stated that the reliability of the confidential informant had been tested on prior occasions and that the informant had been proven reliable based on his information and the deputy's ability to corroborate his information. The deputy stated that he had a relationship with the confidential informant in which the informant had previously performed duties on behalf of law enforcement. The deputy stated that in his opinion the confidential informant had been proven reliable and credible as a confidential informant.

The emergency wiretap order was supplemented by a written application on December 13, 2009. The December 13, 2009 affidavit informed that Court that

> The CI has been an informant since 2008. The CI was only recently paid. The CI has consistently delivered reliable information to various law enforcement investigators relating to drug trafficking and firearms trafficking. To the best of my knowledge the CI is a tested and reliable Confidential Informant, who has provided law enforcement officers with information for over a year. The CI has personally provided information to law enforcement that has resulted in at least two cases that have been submitted for prosecution in San Diego County. Based on the CI's reliable information, those prosecutions were the result of the seizure of firearms and narcotics.

ECF No. 687-7 at 1. The December 13, 2009 application informed Judge Fraser in detail that the confidential informant suffered twelve convictions including crimes for passing fictitious checks, burglary, and possession of a controlled substance.

In order to find probable cause to issue an order authorizing interception of communication, the Court must determine whether there was a substantial basis for concluding "that an individual is committing, has committed, or is about to commit a particular offense" and "that particular communications concerning that offense will be obtained through such interception." 18 U.S.C. § 2518(3)(a) and (b). "Probable cause means only a 'fair probability,' not certainty, and requires consideration of the totality of the circumstances." *United States*

*v. Garcia-Villalba,* 585 F.3d 1223, 1233 (9th Cir. 2009)(citation omitted). The decision is made by the issuing court on the basis of practical, common-sense considerations and overturned only if lacking a "substantial basis." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

In this case, the facts available to the state court judge were sufficient to establish probable cause to believe that the target subjects were engaged in criminal activity and that the target telephones would be utilized in furtherance of the criminal activity. The state court judge was informed that the confidential informant was a "paid informant" and that the informant "has a prior criminal history, prison priors for fraud." ECF No. 681-3 at 16. The state court judge was informed that the deputy had previously worked with the confidential informant, that the reliability of the informant had been tested in those prior performances, and that the reliability of the confidential informant had been proven based upon his prior information. The deputy detailed for the state court judge the efforts made by law enforcement to corroborate or dispute the information provided by the confidential informant, including surveillance of reported meetings, witnessing the phone number of calls made by the informant, and listening to telephone calls made by the informant to the target subjects. The state court judge had the opportunity to ask any follow-up questions and stated that he had no questions. The Court concludes that the state court judge was fairly informed of facts necessary to assess the credibility of the confidential informant. The Court concludes that the December 11, 2009 oral disclosures regarding the reliability of the confidential informant were sufficient to support the determination of probable cause and that the Government disclosed the information necessary in order for the state court judge to assess the reliability of the confidential informant. The Court further concludes that the December 13, 2009 affidavit provided further details to the state court judge to evaluate the reliability of the informant.

"A defendant is entitled to a *Franks* hearing only if he makes a two-fold showing: intentional or reckless inclusion or omission, and materiality." *United States v. Bennett*, 219 F.3d 1117, 1124 (9th Cir. 2000). Defendant must make specific allegations of facts omitted accompanied by a detailed offer of proof. *See United States v. Kiser*, 716 F.2d 1268, 1271 (9th Cir. 1983). Defendants in this case have not identified any specific facts omitted and have not provided an offer of proof of any omitted facts necessary to the finding of probable cause. The

10cr3044WQH

Court concludes that the Defendants are not entitled to a *Franks* hearing.

The motions to suppress electronic surveillance evidence (ECF No. 676 and ECF No. 687) are denied.

**Motion to Suppress Evidence derived from wiretaps as exceeding the jurisdiction of the authorizing court and Title III (ECF No. 679)**

Defendant Jesus Quinonez Marquez, joined by other defendants, moves the Court to suppress all evidence obtained during the course of and derived from the federal wiretap orders issued on March 5, 2010;[6] April 23, 2010; May 11, 2010; May 21, 2010; May 27, 2010; issued on June 17, 2010; June 23, 2010; and July 15, 2010. Defendant asserts that the Government illegally intercepted his communications while he was using a cellular phone in Mexico to communicate with others located in Mexico for the entire duration of the conversation. Defendant contends that the interception of his calls exceeded the scope of the wiretap orders and the jurisdiction conferred by Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510, *et seq.* Defendant contends that Title III does not authorize the interception of communications which occur entirely in a foreign country. Defendant requests an evidentiary hearing in order to show that law enforcement officials misled the district court judge about the nature of the intended interceptions. Defendant asserts that the FBI agent failed to inform the district court judge that his "communication were between phones located in Mexico and that it intended to apply the wiretap order to intercept calls between phones located in Mexico." ECF No. 679-1 at 19.

The Government agrees that Title III does not authorize U.S. law enforcement officers to conduct wiretaps in foreign countries. The Government asserts that the interception of wire communications in this case occurred solely in the Southern District of California in compliance with 18 U.S.C. § 2518(3). The Government contends that no provision in Title III suggests that Congress limited the ability of a judge "to authorize the interception of only those conversations which occur solely in the United States." ECF No. 726 at 76. The Government contends that a *Franks* hearing is not required. The Government asserts that the FBI agent

---

[6]Telephone conversations of the Defendant Jesus Quinonez Marquez were first intercepted in March 6, 2010 pursuant to the March 5, 2010 order.

10cr3044WQH

informed the district court judge of the nature of the wire communications that the Government sought to intercept in each of the federal wiretap affidavits. The Government asserts that there are no grounds to conclude that the FBI agent misled the Court into believing that only calls involving telephone facilities in the United States would be intercepted.

18 U.S.C. § 2518(3) states:

(3) Upon such application the judge may enter an ex parte order, as requested or as modified, authorizing or approving interception of wire, oral, or electronic communications within the territorial jurisdiction of the court in which the judge is sitting (and outside that jurisdiction but within the United States in the case of a mobile interception device authorized by a Federal court within such jurisdiction), if the judge determines on the basis of the facts submitted by the applicant that--

(a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;

(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

(c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;

(d) except as provided in subsection (11), there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

18 U.S.C. § 2518(3). In *United States v. Luong*, 471 F.3d 1107, 1109 (9th Cir. 2006), the Court of Appeals for the Ninth Circuit specifically addressed "[w]hat constitutes 'interception' within the meaning of section 2518(3)." *Id.* The Court of Appeals stated: "We join several of our sister circuits in holding that the district court had jurisdiction because the intercepted communications were first heard by the government within the court's district." *Id.* The Court of Appeals explained:

The most reasonable interpretation of the statutory definition of interception is that an interception occurs where the tapped phone is located and where law enforcement officers first overhear the call. We join at least three of our sister circuits in so holding. As the Second Circuit reasoned:

It seems clear that when the contents of a wire communication are captured or redirected in any way, an interception occurs at that time. Such an interception plainly occurs at or near the situs of the telephone itself, for the contents of the conversation ... are transmitted in one additional direction. Redirection presupposes interception....

- 13 -

10cr3044WQH

> Nonetheless, since the definition of interception includes the "aural" acquisition of the contents of the communication, the interception must also be considered to occur at the place where the redirected contents are first heard.
>
> *United States v. Rodriguez*, 968 F.2d 130, 136 (2d Cir. 1992); accord *United States v. Ramirez*, 112 F.3d 849, 852 (7th Cir. 1997) (concluding that an interception occurs in the jurisdiction where the tapped phone is located, where the second phone in the conversation is located, and where the scanner used to overhear the call is located); *United States v. Denman*, 100 F.3d 399, 403 (5th Cir. 1996) (holding that "the interception includes both the location of a tapped telephone and the original listening post").
>
> The district court accordingly had jurisdiction to authorize the wiretap of Luong's mobile telephone despite the phone's Eastern District area code. Agent Lee's affidavit explained that all of the intercepted conversations would "first be heard" at a listening post "in San Francisco, California, regardless of where the telephone calls are placed to or from." The FBI's listening post in San Francisco, California was within the territorial jurisdiction of California's Northern District. The calls were therefore intercepted within the jurisdiction of the judge of the Northern District of California who authorized the wiretap, as required by section 2518(3).

471 F.3d at 1109.

The record in this case conclusively establishes that the wire room used in this investigation where agents and monitors used technical equipment to conduct the court-authorized wiretaps was physically located in San Diego County, in the Southern District of California. ECF No. 726-5 at 3. The word "intercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). The intercepted conversations in this case were first heard and were only heard by law enforcement officials within the Southern District of California and all conversations were intercepted within the authority conferred by § 2518(3). Defendants and conspirators committing criminal offenses in the San Diego area intercepted within the Southern District of California are not exempted from the valid wiretap order by making their plans across the border.

The Court further finds that the Defendant is not entitled to an evidentiary hearing under *Franks* in order to show that the affidavits in support of the wiretap applications contained false or misleading statements. The initial wiretap application made on February 2, 2010 described the investigation into a criminal organization with leaders located in Tijuana, Mexico and in the United States. In the February 2, 2010 affidavit, the FBI agent described the user

10cr3044WQH

of target telephone #8 as Armando Villareal-Heredia, one of the leaders of the criminal organization, a United States citizen living and operating in Tijuana, Mexico. The intended interception of calls to and from target telephones related to criminal actors and criminal acts in Mexico and in the United States. The district court judge found probable cause to believe that the target telephones were being used to facilitate criminal acts in the Southern District of California. The wiretap order conferred authority to intercept communications within the Southern District of California of individuals living in Mexico and individuals living in the United States.

On March 5, 2010, a second application was made to the district court judge for an order to allow the interception of wire communications to and from a number of target telephones. The affidavit of the FBI agent in support of the March 5, 2010 application,[7] informed the district court judge of further details of the investigation into the importation and distribution of significant quantities of narcotics in the San Diego area, facilitated by specific criminal acts in Mexico. The March 5, 2010 affidavit stated in part:

> **Target Telephone #8**. Armando Villareal-HEREDIA, the leader of the HEO, is the individual currently using this telephone facility. During the last period of interception, no calls were intercepted over the wiretap on **Target Telephone #8**. When a telephone subject to monitoring is physically located in Mexico, United States law enforcement agents are only able to intercept calls to/from that telephone when it accesses a cell tower on the United States network. Thus, to intercept calls to/from **Target Telephone #8** while that phone is in Mexico, it must be physically located in fairly close proximity to the border between the United States and Mexico. Geo-location information for **Target Telephone #8** reveals that it was located in Guadalajara, Jalisco, Mexico, during the last period of interception. Once HEREDIA returns to his base of operations in Tijuana, Mexico, agents will be able to intercept calls to/from **Target Telephone #8**.

ECF No. 679-5 at 14. The affidavit described in detail criminal activity under investigation involving intercepted parties which occurred in Mexico, including individuals incarcerated in Mexico using a cell phone physically located in the prison in Mexico. The district court judge was specifically informed that target telephones were located in Mexico and that calls on target telephones in Mexico can only be intercepted when the calls "accesses a cell tower on the United States network." *Id.* The Court was specifically informed that the target phones "must

---

[7] The February 2, 2010 affidavit was incorporated by reference into the March 5, 2010 affidavit.

10cr3044WQH

be physically located in fairly close proximity to the border between the United States and Mexico" in order for interceptions to occur. *Id.*

In the May 21, 2010 application, law enforcement specifically sought to intercept the communication of a target telephone belonging to the Defendant Quinonez Marquez. The FBI agent stated in the affidavit in support of the May 21, 2010 application that "**Target Telephone #25** is currently being used by Jesus Quinones MARQUEZ, aka Rinon." ECF No. 679-5 at 4. The FBI agent informed the court that "Service for **Target Telephone #25** is provided by the Mexican branch of Sprint-Nextel and subscriber records for that telephone are not maintained by the U.S. branch of Sprint-Nextel company." *Id.* The agent informed the district court that

> MARQUEZ is currently employed as the Director of International Liaison for the Baja California Attorney General's Office. In that capacity, MARQUEZ is a high-ranking Mexican law enforcement officer who is one of the primary Mexican liaison officials responsible for sharing information with United States law enforcement entities."

*Id*. at 14. The agent described in detail a number of calls between Defendant Quinonez Marquez and Jose Alfredo Najera Gil, involved in drug trafficking and violent crimes, regarding police investigation into a double homicide in Tijuana.

The record shows that the district court judge was informed that phones were located in Mexico and that conversations took place between target telephones located in Mexico. The district court judge was informed that interceptions would take place within the Southern District and that law enforcement was only able to intercept calls involving cellular telephones in Mexico when the calls accessed cell sites in the United States in order to place or to receive the intercepted calls. Defendant has presented no facts which support the Defendant's assertion that the district court judge was misled into believing that the interception of conversations between individuals located in Mexico were not intended to be intercepted within Southern District of California.

The motion to suppress evidence derived from wiretaps as exceeding the jurisdiction of the authorizing court and Title III (ECF No. 679) is denied.

**Motion to suppress wiretap evidence due to material misstatements and omissions (ECF No. 683)**

10cr3044WQH

Defendant Jesus Quinonez Marquez moves to suppress all evidence derived from the federal wiretap order issued on May 21, 2010 and subsequent federal wiretaps derived from the May 21, 2010 wiretap. Defendant asserts that the affidavit in support of the May 21, 2010 wiretap of his cell phone "contained either intentionally made false summaries of conversations, or summaries made with reckless disregard for the distorted and inaccurate interpretations of the true conversations." ECF No. 683 at 2. Defendant presents the transcripts of the calls between March 25, 2010 and May 10, 2010 referred to by the FBI agent and asserts that the actual conversations show that the FBI agent misled the district court judge about the nature of the interceptions. Defendant requests an evidentiary hearing pursuant to *Franks v. Delaware.*

The Government asserts that the disputes presented by the Defendant rely upon minor translation differences or immaterial interpretive issues. The Government asserts that Defendant's challenges do not undermine the FBI agent's interpretation of the conversations, and that each of the calls, standing alone, is sufficient to establish probable cause for the interception. The Government asserts that the Defendant will have the opportunity to present his interpretations of the phone calls to a jury and that the interpretations of the FBI agent are supported by the actual transcripts of the conversations.

On May 21, 2010, the Assistant United States Attorney applied to the district court judge for an order allowing the interception of wire communications to and from Target Telephone #25 supported by the affidavit of FBI Agent Melzer. The FBI Agent stated that Target Telephone #25 is "currently being used by Jesus Quinones MARQUEZ, aka Rinon." ECF No. 679-20 at 4. The FBI agent stated that there is probable cause to believe that Target Telephone #25 has been used, is being used, and will be used for the purpose of committing this criminal activity, including conspiracy to distribute controlled substances, conspiracy to import controlled substances, continuing criminal enterprise, felony firearms offenses, unlawful use of communications facilities to facilitate the commission of drug felonies, and offenses involving racketeering-influenced and corrupt organizations.

The FBI agent stated that "MARQUEZ is currently employed as the Director of International Liaison for the Baja California Attorney General's Office. In that capacity,

10cr3044WQH

MARQUEZ is a high-ranking Mexican law enforcement officer who is one of the primary Mexican liaison officials responsible for sharing information with United States law enforcement entities." *Id*. at 14. Agent Melzer states:

> As set forth in my April 23, 2010 affidavit, which I incorporate by reference, Dario CASTRO Perez and Jose Alfredo NAJERA Gil, the leaders of the CNO, had Efrain Alvarez Gonzalez and Abel Joatan Gonzalez murdered in Tijuana, Mexico, on March 25, 2010. Intercepted calls following that murder confirmed that MARQUEZ used **Target Telephone#25** and another telephone facility to provide NEJERA with information regarding the police investigation into the double homicide. Some of the intercepted calls are set forth below.

*Id*. at 14. Agent Melzer details ten telephone calls between MARQUEZ and NAJERA made on March 25, 2010, March 26, 2010, March 27, 2010, April 28, 2010, April 6, 2010, May 7, 2010 and May 10, 2010. *Id*. at 15-18.

The procedure to address claims of misrepresentations in an affidavit in support of a warrant was set forth by the United States Supreme Court in *Franks v. Delaware*, 438 U.S. 154 (1978). The Supreme Court held that "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to a finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Id*. at 155-56. The Supreme Court stated:

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

*Id.* at 171. The Ninth Circuit has identified five requirements in applying *Franks v. Delaware*, that a defendant must meet to obtain an evidentiary hearing as follows: (1) the defendant must allege specifically which portions of the affidavit are allegedly false; (2) the defendant must assert that the false statements or omissions were made deliberately or recklessly; (3) the defendant must present a detailed offer of proof, including affidavits, to support these allegations; (4) the offer of proof must challenge only the veracity of the affiant; and (5) the

challenged statements must be necessary to the finding of probable cause. *See United States v. Kiser*, 716 F.2d 1268, 1271 (9th Cir. 1983); *see also United States v. Dicesare*, 765 F.2d 890, 894-95 (9th Cir. 1985). If the challenged statements are not necessary to find probable cause, the defendant is not entitled to an evidentiary hearing. *United States v. Fowlie*, 24 F.3d 1059, 1067 (9th Cir. 1994).

In this case, the FBI agent described ten intercepted calls offered to show that following the murder of Efrain Alvarez Gonzalez and Abel Joatan Gonzalez in Tijuana, Mexico on March 25, 2010, Quinonez-Marquez "used **Target Telephone #25** and another telephone facility to provide NEJERA with information regarding the police investigation into the double homicide." ECF No. 679-20 at 14. The Court has reviewed the affidavit of the FBI agent and the transcripts of the intercepted calls submitted by the Defendant. The Court concludes that the transcripts do not provide evidence that the FBI agent provided a false statement knowingly and intentionally, or with reckless disregard for the truth. The transcripts indicate minor, and immaterial translation and interpretative issues that may be presented to a jury. For example, Quinonez Marquez asserts that the he did not say he would "check on it" in a March 25, 2010 call as represented by Agent Melzer but instead said "Let me see." ECF No. 683-1 at 8. The FBI agent stated in the affidavit: "During the call MARQUEZ stated that there were two dead victims and that 'it was a 9mm' [a .9 millimeter hand gun had been used in the double murder]." ECF No. 679-20 at 15. Quinonez Marquez asserts that the transcript shows that the word used was "strafed" in the actual conversation and not the word "dead," and that the .9mm referred to shell casings and not to a hand gun. ECF No. 683-1 at 8-9.

The Court concludes that the transcripts of the conversations do not show any material misrepresentations by the FBI agent which could amount to a knowing false statement. The Court concludes that the Defendant has failed to make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Franks,* 438 U.S. at 171.

The motion to suppress wiretap evidence due to material misstatements and omissions (ECF No. 683) is denied.

**Motions to suppress illegally obtained electronic surveillance evidence on the grounds of**

**necessity and minimization (ECF No. 671, ECF No. 672, ECF No. 687, ECF No. 685, and ECF No. 688)**

18 U.S.C. § 2518(3)(c) provides, in relevant part, that a judge may approve a wiretap if he or she "determines on the basis of the facts submitted by the applicant that ... normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous...." 18 U.S.C. § 2518(3)(c). In order to obtain a wiretap, the application must provide "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). The purpose of this requirement is to "assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974). The government must overcome the statutory presumption against this intrusive investigative method by proving necessity. *United States v. Rivera*, 527 F.3d 891, 897 (9th Cir. 2008); *United States v. Blackmon*, 273 F.3d 1204, 1207 (9th Cir. 2001).

The review of the court "includes an assessment of whether the affidavit attests that adequate investigative tactics were exhausted before the wiretap order was sought or that such methods reasonably appeared unlikely to succeed or too dangerous." *United States v. Gonzales*, 412 F.3d 1102, 1111 (9th Cir. 2005). The Court of Appeals has adopted a "common sense approach" in which the reviewing court uses a standard of reasonableness to evaluate the government's good faith effort to use alternative investigative means or its failure to do so because of danger or low probability of success. *Blackmon*, 273 F.3d at 1207. In *United States v. McGuire*, 307 F.3d 1192 (9th Cir. 2002), the Court of Appeals explained that "conspiracies pose a greater threat to society than individual actions toward the same end" when considering the statutory requirement of necessity under Section 2518(1)(c). *Id.* at 1197. The Court of Appeals stated:

> Conspiracies pose other special dangers. Unlike individual criminal action, which comes to an end upon the capture of the criminal, collective criminal action has a life of its own. . . . Reflecting this concern, we have consistently upheld findings of necessity where the traditional investigative techniques lead only to apprehension and prosecution of the main conspirators, but not to apprehension and prosecution of . . . other satellite conspirators. Because the government has a duty to extirpate conspiracy beyond its duty to prevent the

- 20 -

mere commission of specific substantive offenses, we conclude that the government is entitled to more leeway in its investigative methods when it pursues a conspiracy.

*Id.* at 1197-98. (quotations and citation omitted).

**State wiretap applications**

Defendants Mario Escamilla [ECF No. 676], Armando Castillo [ECF No. 687], and Enrique Salinas [ECF No. 685], joined by other defendants, move the Court to suppress all evidence obtained as a result of the state wiretap orders on the grounds that the applications did not satisfy the requirement of necessity. Defendants assert that the wiretap applications to the state court judges failed to make the required full and complete statement of facts. Even if the statement of facts is full and complete, Defendants assert that the applications did not show that traditional means of investigation were not effective. Defendants assert that the December 11, 2009 emergency wiretap simply relied upon a single confidential informant without regard to other investigative techniques routinely used by law enforcement prior to seeking a wiretap. Defendants assert that law enforcement never used utility checks, vehicle checks, mail covers, bumper beepers, pole cameras or other techniques routinely used in other investigations. Defendants further assert that Deputy Aguilar failed to explain why the use of the confidential informant relied upon to support the December 11, 2009 application as well as the use of other confidential informants would not be sufficient to obtain the information that the government sought to obtain through the wiretaps.

The Government asserts that the affidavits in support of the state wiretap applications set forth, in good faith, the reasonable investigative techniques and their results to the court. The Government asserts that law enforcement satisfied its obligation to explain why those techniques were not utilized or were not likely to succeed within a reasonable time. The Government assert that the December 13, 2009 affidavit of Deputy Aguilar and the January 14, 2010 affidavit of Deputy Aguilar comply with the required showing of necessity.

"[T]he necessity requirement is ... to be interpreted in a practical and commonsense fashion and need not therefore be used as a last resort." *United States v. Bailey*, 607 F.2d 237, 241 (9th Cir. 1979); *see also, United States v. Bennett*, 219 F.3d, 1117, 1121 (9th Cir. 2000) (wiretap applications established necessity where law enforcement was "unable ... to obtain

information about the extended organization, such as other members, couriers, buyers, and suppliers."); *United States v. Torres*, 908 F.2d 1471, 1422 (9th Cir. 1990) ("[T]he government need not exhaust every conceivable investigative technique in order to show necessity."). The Court of Appeals has consistently held that the wiretap statute

> does not mandate the indiscriminate pursuit to the bitter end of every non-electronic device as to every telephone and principal in question to a point where the investigation becomes redundant or impractical or the subjects may be alerted and the entire investigation aborted by unreasonable insistence upon forlorn hope.

*United States v. Baker*, 589 F.2d 1008, 1013 (9th Cir. 1979). A judge must determine whether "ordinary investigative techniques have failed to make the case within a reasonable period of time." *United States v. Spagnuolo*, 549 F.2d 705, 711 (9th Cir. 1977).

The information provided by Deputy Aguilar at the emergency hearing on December 11, 2009 and in the subsequent December 13, 2009 affidavit[8] sets forth in detail the information that law enforcement was able to obtain through the confidential informant. The information established probable cause to believe that the targeted telephones were being utilized by a crew of individuals engaged in narcotics trafficking between Mexico and the United States. The information established probable cause to believe that the individuals were engaged in violent acts and that the target telephones would be used in furtherance of an imminent attempted murder.

The December 13, 2009 affidavit further incorporates by reference the accompanying *Hobbs* attachment which describes the efforts made to identify and recruit cooperating witnesses, the limitations of the confidential informant currently providing information, and future attempts to develop confidential informants. Deputy Aguilar stated in the *Hobbs* attachment:

> During the course of this investigation, the subjects have repeatedly tested and questioned the CI-1's loyalty. For example, **"UNICO"** asked the CI to remove his/her clothes to see if the CI was wearing a recording device. In addition the CI was directed to drive to certain locations to meet unknown persons, only to arrive at those locations and be sent elsewhere. I believe the subjects were attempting to surveill (sic) the CI in an effort to determine if the CI was being followed by law enforcement. Given this level of scrutiny, and the fact the CI

---

[8]Pursuant to California Penal Code Section 629.56, the December 13, 2009 affidavit is retroactive to December 11, 2009.

10cr3044WQH

only recently joined the crew, I believe the CI is not considered to be completely trustworthy. In (sic) follows then, that the subjects of this investigation will keep certain information from the CI in order to protect themselves. I believe the subjects of the investigation will not reveal to the CI all the details necessary for law enforcement to meet the goals of this investigation. For example, the CI may learn that the crew is planning to commit a violent act against an individual. It would not be unusual, and the exigent wire intercepts have shown, that the CI would be last to learn of all activities of the crew, if the CI learned anything at all.

Thus, continued surveillance is not expected to significantly enlarge the information now available. To the contrary, prolonged or regular surveillance of the movements of the suspects would most likely be noticed, causing the "TARGET SUBJECT" to become more cautious of their illegal activities, to flee to avoid further investigation and prosecution, or might otherwise compromise the investigation. For example, on Thursday December 10, 2009, investigators established surveillance on the subjects of this investigation. Even before the subjects departed the park where they were playing soccer, they had observed suspicious vehicles in the area.

ECF No. 687-7 at 8-9.

The January 14, 2010 affidavit of Deputy Aguilar detailed the successes of the confidential informant in aiding the investigation and the limitations of physical surveillance on the confidential informant. The deputy explained that the confidential informant takes orders from Escamilla and is not privy in any way to information prior to receiving it from Escamilla. The deputy stated:

I do not believe we can introduce another CI who would be able to maneuver into any better of a position than CI 1.
At this time I am possibly and theoretically in a position to place an undercover agent into the Target Subject's organization using CI-1. However, I believe the placement of an undercover agent will not further the objectives of this investigation. First, CI 1 is already in position to gain information useful to this investigation. CI 1 has the background and pedigree to fit the Escamilla crew. Introducing an undercover agent would only duplicate efforts and create an undue risk to life and limb.

AVH-DASD-EWP-00138. The affidavit of the deputy described the efforts and limitations of physical surveillance, undercover agents, pen registers and telephone toll analysis, grand jury subpoenas, and search warrants.

The Court concludes that the facts presented to the issuing state court judge established that goals of the investigation were significant, and the criminal acts under investigation were dangerous and imminent. Under these facts and circumstances, the efforts made by law enforcement to gather information were sufficient for the issuing judge to conclude that the wiretaps were necessary in order to identify the unknown criminal associates of Escamilla and

to investigate his criminal activities, including conspiracy to commit murder, kidnaping, extortion and narcotics trafficking. The state court judge reasonably concluded based upon the facts presented that "ordinary investigative techniques [would fail] to make the case within a reasonable period of time." *Spagnuolo*, 549 F.2d at 711.

**Federal wiretap applications**

Defendants Carlos Cosme (ECF No. 671), Jennifer Escamilla (ECF No. 672), Enrique Salinas (ECF No. 685), and Kevin Luis (ECF No. 688)[9] move the Court to suppress all evidence obtained as a result of the federal wiretap orders on the grounds that the applications did not satisfy the requirement of necessity and the requirement of minimization. Defendants assert that the affidavits of Agent Meltzer in support of the federal wiretap applications did not contain a full and complete statement of the utility of the traditional investigative techniques and provided the Court with boilerplate assertions regarding necessity. Defendants further assert that law enforcement was in possession of overwhelming evidence of guilty prior to the wiretap applications and that the wiretap applications were not necessary in order for a successful prosecution.

The Government asserts that the affidavits of the FBI agent in support of the applications set forth in detail case-specific reasons why the utilization of traditional investigative techniques would not enable the Government to achieve its goals of investigating and prosecuting the members of the criminal organization under investigation.

Section 2518(1)(c) requires that the application must provide "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). This requirement protects against "[a]n affidavit composed solely of conclusions unsupported by particular facts." *Spagnuolo*, 549 F.2d at 710. The affidavit "read in its entirety, must give a factual basis sufficient to show that ordinary investigative procedures have failed or will fail in the particular case at hand." *Id.* The Court must determine whether the affidavit provides "specific probative facts" supporting any conclusory statements. *United*

---

[9] Defendant Luis states in his memorandum that he was never the target of the wiretap applications or orders in this case.

*States v. Commito,* 918 F.2d 95, 98 (9th Cir. 1990).

In this case, the FBI agent addressed in each of his affidavits the investigative techniques utilized during the course of the investigation. In the affidavit in support of the initial February 2, 2010 federal wiretap application, the FBI agent described his qualifications as an FBI Agent assigned to the FBI Cross Border Violence Task Force investigating and apprehending individuals involved in drug-related violent crime. The FBI agent described the investigation into the activities of target subjects of the Heredia-Escamilla organization many of which were learned through the successful introduction of a confidential informant (CI-1) into the organization. The FBI agent described in detail the information provided by CI-1 and three other confidential informants, and the known criminal activity of target subjects which confirmed their involvement in drug trafficking and violent activities. The criminal activity described in detail included specific acts involving the collection of drug proceeds in Ontario, California; the purchase of three handguns in Imperial Beach, California; an armed robbery attempt at Plaza Las Americas in Chula Vista, California; an attempted murder of two individuals in the San Diego area; the transportation of narcotics and weapons in the San Diego area; the importation of 120 pounds of marijuana at the Otay Mesa Port of Entry; and an attempted murder ordered by Heredia in the Chula Vista area; and the purchase of a half-pound of methamphetamine in the San Diego area. The information described by Agent Meltzer was primarily obtained through information provided by CI-1. The FBI agent further stated that "virtually all of the information provided by CI-1 regarding the [Heredia-Escamilla organization] has been independently corroborated by recorded conversations, law enforcement surveillance observations and/or information provided by other confidential informants." ECF No. 674-1 at 12. .

The information provided by the FBI agent described the investigation and provided probable cause to believe that the target subjects had committed, are committing, and will continue to commit a range of violations of federal law including narcotics trafficking, firearms offenses, and offenses involving racketeering-influenced and corrupt organization such as dealing in controlled substances, murder, attempted murder and robbery; and that the communication by the target subjects would reveal evidence of these offenses. The FBI agent

10cr3044WQH

stated that the interception of wire communication was necessary in order to gather sufficient evidence to prove the extent and scope of the violent crimes committed by the target subjects, the locations and items used in furtherance of the violent crimes committed by the target subjects, the extent and scope of the narcotics business of the target subjects, the identities and locations of accomplices and co-conspirators; and to prove the location of weapons used to commit criminal activity, and the location of proceeds of the criminal activity.

The FBI agent addressed the range of investigative techniques utilized in the investigation. The FBI agent explained that extensive physical surveillance has been conducted during the course of the investigation. The FBI agent noted that law enforcement had been unable to locate a crew attempting to carry out a murder despite surveillance and that the target subjects had detected the presence of surveillance agents on a number of occasions severely hampering the investigative efforts. The FBI agent considered the use of fixed surveillance devices and noted important locations at which there is no viable site where agents could install and use a pole camera. The FBI agent noted the use of confidential informants to confirm the ongoing nature of the criminal activities of the organization and noted that the current informants were not privy to a significant amount of information regarding the full scope of the criminal activities, for example, the supplier of Heredia. The FBI agent detailed the limited ability to introduce new confidential informants and undercover agents into the organization.

> Although CI-1 and CI-3 have the ability to introduce an undercover agent into the HEO, I do not consider the use of an undercover officer a viable investigative technique. Given the illegal activities of the HEO and the manner in which it operates, it would be virtually impossible to ensure the safety of an undercover officer. When actively engaged with the HEO members during this investigation, CI-1 was essentially on-call and had to respond whenever asked to do so by ESCAMILLA. CI-1 had to frequently travel to meet with ESCAMILLA and other HEO members to perform 'favors' and 'jobs,' oftentimes without any prior knowledge of what those activities would be. It is simply unsafe for an undercover officer to assume such a role within the HEO. Moreover, if even suspected as an undercover officer, it is likely that ESCAMILLA would have the undercover officer killed. Indeed, ESCAMILLA has demonstrated his lack of regard for the authority of law enforcement personnel by trying to ram his vehicle into a CHP Officer and by offering to "block" SDPD units from pursuing BLASER and CI-1 following the murder of Sharky....

ECF No. 691-1 at 13. The FBI agent further explained that he considered using another

confidential informant to introduce an undercover officer to Cosme but concluded that, at best, an undercover agent would be able to buy or sell drugs to Cosme but would not be able to obtain information about the source of narcotics. The FBI agent examined the use of search warrants, grand jury subpoenas and pen register/telephone tolls and concluded that these investigative techniques would produce limited information, would not likely lead to identification of additional members of the organization operating in the United States, and would alert others to the existence of the investigation, allowing them to escape detection and prosecution.

The FBI agent set forth a full explanation of the investigative techniques which could be utilized and explained why those techniques would not be productive. The issuing judge reasonably concluded that the affiant made a showing that "ordinary investigative procedures, employed in good faith, would likely be ineffective in the particular case." *United States v. McGuire*, 307 F.3d 1192, 1196 (9th Cir. 2002). The affiant in this case did not rely upon conclusory statements and provides specific probative facts.[10] The affiant detailed various investigative methods utilized over a nine-month period and explained the necessity to intercept wire communications in order to identify the narcotic suppliers as well as the extent and scope of the violent crimes committed by the organization. There is no requirement that the investigative procedures have been completely unsuccessful prior to an application for a wiretap. *See United States v. Sandoval*, 550 F.3d 427 (9th Cir. 1976).

The Court of Appeals has recognized the dangers of attempting to gather evidence against drug trafficking organizations with the demonstrated ability and willingness to engage in violent crimes, such as armed robbery and murder. "Investigations of criminal conspiracies present unique law enforcement problems and pose a greater threat to society than individual action toward the same end." *United States v. Canales Gomez,* 358 F.3d 1221, 1226 (9th Cir. 2004) (quotation omitted). In *Canales Gomez*, the Court of Appeals stated:

> The Government need not show that informants would be useless in order to secure a court-authorized wiretap... The Government explained that investigators sought to identify the key personnel, suppliers, customers, and drug-locations of a large network, and confidential informants, monitored during individual drug

---

[10]There are no facts stated by the affiant which would require a *Franks* hearing.

transactions, could only have aided in the arrests of a limited number of those involved.

*Id.*; *see also*, *United States v. Decoud,* 456 F.3d 996, 1007 (9th Cir. 2006) ("The necessity for the wiretap is evaluated in light of the government's need not merely to collect some evidence, but to develop an effective case against those involved in the conspiracy.") (internal quotation marks and citation omitted); *United States v. Shryock*, 342 F.3d 948, 976 (9th Cir. 2003) (holding that necessity existed despite the existence of informants because infiltration by informants could not determine the scope of the conspiracy); *McGuire*, 307 F.3d at 1199 ("Not only common sense but also our precedent confirms that the existence of informants and undercover agents does not preclude a necessity finding."); *United States v. Brone*, 792 F.2d 1504, 1505 (9th Cir. 1986) (necessity finding despite an undercover agent "whose cover was apparently so believable that she was able to make several direct purchases of" drugs).

In this case, the affidavits of the FBI agent in support of the initial federal wiretap application and each of the subsequent federal wiretap applications provided the known information about the investigation into a wide ranging conspiracy involving a number of individuals in the United States and in Mexico. The FBI agent detailed specific acts of narcotics trafficking as well as specific, violent enforcement acts by members of the conspiracy. The FBI agent described reasonable goals of the investigation to identify the suppliers of the narcotics and to intervene to prevent the violent acts of the conspirators. Each of the affidavits set forth a full and complete explanation with respect to investigative techniques used as well as investigative techniques considered and not used. The FBI agent provided a full explanation of why the techniques not used were too dangerous or would not be productive. The information provided in the affidavits demonstrates a good faith investigation on the part of the Government and presented facts from which the issuing judge could independently determine that investigative techniques employing a normal amount of resources and protection for law enforcement had failed to make the case within a reasonable period of time. The Court concludes that the affidavits in support of each application provided "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous" in compliance

with 18 U.S.C. § 2518(1)(c).

**Minimization**

Defendants assert that the language in the applications regarding minimization is boilerplate. Defendants assert that there is no clear way to determine how the monitoring agents were instructed, and whether or not the agents abided by the instructions. The Government asserts that the Defendants have not made specific allegations regarding the Government's asserted failure to minimize. The Government contends that the record demonstrates the required prima facie case of compliance with the minimization requirements.

Section 2518(5) requires that the Government conduct wire intercepts so as to "minimize the interception of communications not otherwise subject to interception." 18 U.S.C. § 2518(5). The Government has the burden to show minimization. *Torres,* 908 F.2d at 1423. In *Torres,* the Court of Appeals explained:

> Minimization requires that the government adopt reasonable measures to reduce the interception of conversations unrelated to the criminal activity under investigation to a practical minimum while permitting the government to pursue legitimate investigation. The standard for minimization is reasonableness.

*Id.* (citations omitted). "The mere interception of calls unrelated to the drug conspiracy does not indicate a failure to meet the minimization requirement." *Id.*

In this case, the Government submits the affidavit of FBI Agent Melzer which states in relevant part:

> Pursuant to my duties as case agent, I was responsible for overseeing the conduct of all court-authorized wiretaps in this case, both the California state wiretaps and the federal wiretaps. As such, I am completely familiar with the procedures established to ensure that the wiretaps were conducted in conformance with the 'minimization' requirements of Title 18, United States Code, Section 2518(5) and California Penal Code § 629.80. Those procedures are summarized as follows:
>     a. All personnel who participated in conducting the court-authorized wiretaps in this case were given written and oral 'minimization' instructions by either a Deputy District Attorney or Assistant U.S. Attorney familiar with the investigation. Those instructions set forth, among other things: (1) the telephone facility/facilities subject to interception; (ii) the identifies (sic) of the Target Subjects; (iii) the criminal offenses for which intercept authority had been obtained; (iv) that all privileged communications should be minimized; and (v) that all conversations should be minimized in accordance with Title 18, United States Code, Section 2518(5). All personnel who participated in the wiretaps were required to review the written 'minimization' instructions and related court pleadings (i.e., wiretap application, affidavit and order).

- 29 -

b. All personnel who participated in conducting the court-authorized wiretaps were provided with contact numbers for the [FBI Cross Border Violence Task Force] case agents, as well as the attorneys overseeing the investigation. All monitoring personnel were informed that the case agents and supervising prosecutors were available for consultation on a twenty-four hour basis. The monitors and law enforcement personnel conducting the court-authorized wiretaps regularly consulted with the case agents and supervising prosecutors regarding minimization-related issues.

c. By utilizing the above-noted procedures, all of the wiretaps in this case were conducted in conformity with the respective court orders, which required the 'minimization' of non-pertinent conversations.

ECF No. 726-5 at 2-3. The Court finds that the statement of Agent Melzer meets the burden of the Government to demonstrate that the monitoring agents were instructed on the requirements for minimization and required to read the minimization guidelines, that supervising agents were present in the wire room during the interceptions, and that an Assistant United States Attorney was on call to answer questions relating to minimization. The record demonstrates that the minimization efforts were reasonable and in accordance with 18 U.S.C. § 2518(5).

The few specific examples of calls which Defendants assert should have been minimized do not show that Government failed to adopt reasonable measures to reduce the interception of conversations unrelated to the criminal activity to a practical minimum. *See, e.g.,* ECF No. 672 at 17-18. The interception of calls unrelated to the drug conspiracy does not, by itself, indicate a failure to meet the minimization requirement. *See Scott v. United States*, 436 U.S. 128, 140-41 (1978); s*ee also Bennett*, 219 F.3d at 1124. ("[I]f phone conversations include guarded or coded language..., a higher rate of non relevant intercepted calls should be expected because it takes longer to figure out the meaning of a particular call."). The Court concludes that the record establishes that the interception of nonrelevant phone conversations were properly minimized.

Defendants' motions to suppress electronic surveillance evidence from the wiretaps on the grounds of necessity and minimization (ECF No. 671, ECF No. 672, ECF No. 687, ECF No. 685, and ECF No. 688) are denied.

**Motion to Suppress Wiretap Evidence (ECF No. 669 )**

Defendant Jose Antonio Ortega-Nino moves to suppress the following three intercepted

10cr3044WQH

calls from target telephone 18: (1) number 589 (April 28, 2010); (2) number 3616 (May 18, 2010); and (3) number 3892,(June 2, 2010) on the grounds that the wiretap application and affidavit did not establish probable cause and necessity. Defendant states that he was arrested in April 2011 and counsel needs more time to develop his basis for the motion.

Defendant's motion to suppress wiretap evidence (ECF No. 669) is denied without prejudice.

**Motion to Suppress Wiretap Evidence (ECF No. 684 )**

Defendant Mikael Blaser moves to suppress State warrants issued on December 11, 2009 and January 14, 2010 and federal warrants issued on February 2, 2010, March 5, 2010, April 23, 2010, May 11, 2010, May 21, 2010 and May 27, 2010. Defendant does not state a separate ground for suppression and moves for joinder in the motion filed by Defendant Cosme (ECF No. 671).

The motion to suppress wiretap evidence (ECF No. 684) is granted as to joinder and denied as to suppression of evidence.

## CONCLUSION

IT IS HEREBY ORDERED that ECF Nos. 670, 677, 678, 682, 684, 686, 687, 696, 698, 713, 706, 705, 703, 702, 700, 719, 723, 721,727, 738, 740 and 741 are granted as to joinder only.

IT IS FURTHER ORDERED that:

1) the Motion to Suppress Evidence derived from state wiretaps due to a lack of authorization ECF No. 681 is denied;

2) the Motion to Suppress Electronic Surveillance Evidence ECF No. 676 and Motion to Suppress Wiretap Evidence ECF No. 687 are denied;

3) the Motion to Suppress Evidence derived from wiretaps as exceeding the jurisdiction of the authorizing court and Title III ECF No. 679 is denied;

4) the Motion to Suppress Wiretap authorized May 21, 2010 due to material misstatements and omissions ECF No. 683 is denied;

5) the Motions to Suppress Illegally obtained electronic surveillance evidence from the wiretaps on the grounds of Necessity and Minimization ECF No. 671, ECF No. 672, ECF No.

10cr3044WQH

1    687, ECF No. 685, and ECF No. 688 are denied;

2         6)  the Motion to Suppress Wiretap Evidence ECF No. 669 is denied; and

3         7)  the Motion to Suppress Wiretap Evidence ECF No. 684 is denied.

4    DATED:  August 24, 2011

5                                        *William Q. Hayes*
                                         **WILLIAM Q. HAYES**
6                                        United States District Judge